UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                                       Case No.: 17-cr-20639

vs.                                  Hon. TERRENCE R. BERG

D-1   MICHAEL DEANGELO GRIFFIN,
D-2   DENNIS CLIFTON EPPS,
D-3   MARIO LOZOYA GARCIA

       Defendants
_____/

**GOVERNMENT'S OMNIBUS RESPONSE TO DEFENDANTS' MOTIONS
TO DISMISS AND SUPPRESS [167, 168, 170, 172, 174, 176]**

# TABLE OF CONTENTS

Factual Background                                                                2

Griffin's Motion to Dismiss Counts 2-4, 6 & 851 enhancement        23
[167] and Epps' Motion to Dismiss Counts 2-4, 6 [180]

Griffin and Epps' Joint Motion to Suppress Louisiana Stop [168]      48

Griffin and Epps' Motions to Suppress Forensic Cell Phone             61
Examination [170 & 182]; & Griffin's Motion to Suppress CSLI [172]

Griffin and Epps' Motions to Suppress Information Obtained Pursuant   88
to 18 USC §2703(d) [174 & 181]

Garcia's Motion to Dismiss Counts Two, Four, & Six [176]              95

<u>**Factual Background**</u>

I.   **June 2016, Griffin, Eddins, Garcia and Harris began the drug conspiracy in Detroit, Michigan.**

In June 2016, Troy Harris (Harris), AKA "Red," conspired with Mariano Garcia (Garcia), Ruben Valdez III (Valdez) and a third Hispanic male from Texas, Emilio Garza, AKA "Shorty," to receive and distribute approximately 10 kilograms of cocaine. In the evening of June 13, 2016, Garcia flew into Detroit, Michigan from southern Texas. There he met Garza who had arrived in Detroit earlier and was staying at the MGM Grand. Valdez had driven to Detroit in his Ford F-150 with a hidden trap, and he activated a Cricket Wireless local (313) phone on the same day. A Texas-based associate rented a room for them at the Hawthorne Inn and Suites in Detroit, paying cash daily. FBI agents watched as Harris would repeatedly meet with Garcia, Garza and Valdez at the Hawthorne Inn and Suites. FBI also saw Garcia and Valdez meet Harris several times at a residence on West Chicago in Detroit, where they saw them load and unload Valdez's F-150.

Coincidentally, Michael Griffin (Griffin) and his best friend, Robert Eddins IV (Eddins) drove up from Alabama to visit Harris during this same time. Griffin had met Harris while both were serving time in prison at Elkton FCI in Ohio. On the night of June 15, 2016, Harris introduced Griffin to Mariano Garcia at the

Hawthorne Inn and Suites and later at the residence at West Chicago. Griffin left just before midnight and drove back to Alabama.

On June 16, 2016, FBI agents saw Garcia, Valdez and Harris meet twice at the Hawthorne Inn and Suites and once at West Chicago. Agents observed Garcia and Valdez buy duct tape at Home Depot. At West Chicago, approximately an hour and a half later, agents observed Garcia and Valdez loading something in the sealed compartment area inside the F-150. Garcia and Valdez returned to the hotel, smiling and high-fiving. Valdez then drove his F-150 south on I-75. FBI agents stopped Valdez as he drove southbound. Michigan State Police (MSP) troopers spoke to Valdez and obtained consent to search his vehicle. They found an aftermarket electronic trap in the rear of the vehicle, operated by the polarity on a drill. Inside, troopers and agents recovered seven packages wrapped and sealed in duct tape. Inside the packages was currency totaling $315,660. Valdez denied the money was his and claimed to not know to whom it belonged.

## II.   Ongoing Cocaine Trafficking through November 2016

### A. Troy Harris stopped with $90,000 cash on August 29, 2016.

FBI continued to surveil Harris in Detroit. Harris was on supervised release in the Eastern District of Michigan for Conspiracy to Distribute Controlled Substances. On August 29, 2016, agents followed Harris from his house in Southfield to the MGM Casino in Detroit. As Harris exited the passenger side of a

car carrying a backpack, agents approached Harris. They identified themselves, stated they were conducting an investigation and asked Harris for consent to search the backpack. Harris admitted knowing $90,000 cash was in the backpack and gave agents consent to search. After the agents recovered the cash, Harris offered to answer questions. Harris said the money was for some Mexicans, one of whom he had known from before, and that he believed it was payment for narcotics. Harris subsequently told agents that the $90,000 was for cocaine from the same Texas based source as the June 2016 seizure.

### B. Griffin, Eddins and Garcia trafficking cocaine from Texas to Alabama and Detroit.

After their initial introduction in Detroit on June 15, 2016, Garcia met with Griffin and Eddins multiple times in Texas and Birmingham to traffic cocaine. Garcia provided approximately three to six kilograms of cocaine to Griffin and Eddins approximately every two weeks. Even though different co-conspirators would change their cellphones at different times, call detail records for Garcia, Griffin and Eddins showed overlapping meetings in Dallas, metro-Houston and Birmingham. Garcia would provide the cocaine on consignment. Griffin and Eddins would pay $34,000 per kilogram. Griffin would sell his portion of the cocaine in Birmingham. Eddins, who was originally from Detroit, would sell cocaine both in Birmingham and Detroit. This arrangement worked well until November 2016.

In late October to early November 2016, Garcia, Griffin and Eddins met twice in the Houston suburb of Sugarland, Texas.  At some point during this time, Garcia fronted Griffin and Eddins the largest load of cocaine ever– at least ten kilograms. The three coordinated to meet in Houston between November 17 and 19 to settle-up.   Griffin took a portion of the cocaine to Birmingham; Eddins took some to Detroit.  Around the time of the scheduled meeting, as Eddins was headed to Texas, text exchanges between Eddins and Garcia, make it is clear that Eddins did not have the full amount that he owed Garcia.   To prove he had some cash, Eddins sent Garcia a picture of cash, but Eddins would not reveal how much. Griffin was already with Garcia in Texas during these text message exchanges between Eddins and Garcia.  Griffin was feeling the pressure caused by his friend. He texted Eddins on the night of November 18, "Cuzz this is bad and you no it now he putting all this on me. I am sitting here I can't talk." To which, Eddins responded, "Man fuck him I'll turn around." Eddins made it to Houston but then soon travelled to Birmingham in tandem with Griffin. Eddins stayed in Birmingham for several days and then left for Detroit before Thanksgiving on November 23.

Griffin's reaction to Eddins in a text on November 25 was clear, "Man Cuzz on some real man I can't believe you would mess up the only way I got to keep my family up man cuz I know I can't get no work done now Cuzz but want no body

6

else let u mess they line but me now I got to come up wit something." Garcia's

reaction in texts to Eddins was more direct, "Cocksucker stop being a coward and

man up and admit you are nothing but a dreamer. Get allmy $ together." Griffin,

now in debt to Garcia for his and Eddins' share decided to pay Garcia because he

did not "want to fucking my plug up." On November 25, Eddins turned off his

phone and got a new one. He never communicated with Griffin or Garcia on his

phone again.  Phone records show Griffin and Dennis Epps (Epps) drove to Texas

and met with Garcia at the end of November.

## III.    December 2016, the hunt for and murder of Robert Eddins IV and Ricardo McFarlin.

### A. December 1 to 18, looking for Eddins.

In December, Griffin's text messages show that Griffin is asking other

mutual friends if they have had contact with or heard from Eddins. At this time,

Griffin and Garcia texted hundreds of times, almost daily. By January 2017,

Griffin had tried to delete all of the text messages in December between him and

Garcia, which was largely successful. Content of the texts that were not partially or

fully deleted show that by December 15, Garcia's situation was becoming dire.

Without specifying who, he texted Griffin that "They are giving me till Sunday to

take care of that." Knowing that Griffin's family had a wedding that weekend

(December 15 to 18) in Detroit, Garcia discussed with Griffin going to Detroit with

his parents to look for Eddins. Griffin did not go to the wedding, but on Saturday,

December 17, Griffin reached out to Troy Harris for the first time in almost two months. That evening, they had a one minute and twenty-six second FaceTime conversation, the record of which Griffin tried to delete from his phone.

On December 18, Griffin and Epps left Birmingham, Alabama in the early morning and arrived in Detroit, Michigan after 1:00 p.m. A couple hours later, Griffin entered a note in his phone that listed eleven addresses in Detroit, all affiliated with Rob Eddins. An hour later, there is a partially deleted text explaining the purpose:

| SMS Messages | | | | 12/18/2016 4:07:19 PM(UTC-6) | theseare@all@theaddresswe@whavetowatch |
|---|---|---|---|---|---|

At the same time, Garcia continued to pressure Griffin saying he (Garcia) is being "cornered" and asking if Griffin has seen Eddins. Griffin and Epps stayed in local hotels and continued their search the next day.

### B. December 19 and 20, murder of Robert Eddins IV and Ricardo McFarlin.

That next day, a friend of Griffin's step-father wired $3,000 to Griffin via Western Union for "travel expenses" for a "bounty hunter." Griffin picked up the money at a check cashing location on Woodward Avenue at 4:52 pm. At 7:30 pm, Griffin spoke to Harris for under a minute. By 8:15, Griffin's cellphone hit off a cell tower four blocks North of Eddins' residence on Pierson Street, the fifth of eleven addresses in Griffin's Notes on his phone. Cell tower records show Griffin,

Eddins, Epps and a fourth person went in the same vehicle to a Walmart in Livonia, Michigan. Between 8:50 and 8:57 pm, Walmart videos capture all four enter the Walmart. Griffin and Eddins go to the customer service area



where Griffin picked up a $200 wire transfer from Christalyn Bibb (Eddins is in the gray puffy jacket, Griffin in the white jacket). All four return to Eddins' Pierson residence. Griffin's cell tower records showed he stayed at the same area from 9:36 pm on December 19 to 1:23 am on December 20. Epps's GPS records from one of his phones showed he was on the block of the homicide location from 9:37 pm to 1:01 am.

Text messages between Garcia and Griffin from 11:40 pm to 1:23 am describe some of the events (adding an hour to account for Detroit's time zone of UTC -5; outgoing is from Griffin, incoming from Garcia):

| Outgoing | | | 12/19/2016 10:41:54 PM(UTC-6) | | Yes |
|---|---|---|---|---|---|
| Incoming | | | 12/19/2016 10:42:32 PM(UTC-6) | | So hes laughing at us still |
| Outgoing | | | 12/19/2016 10:43:05 PM(UTC-6) | | Just chill dude I got him comfortable |

| Outgoing | | | 12/19/2016 10:48:15 PM(UTC-6) | | I will not let him out my sight |
|---|---|---|---|---|---|
| Incoming | | | 12/19/2016 10:48:46 PM(UTC-6) | | Ok u call me |

Texts messages from Garcia from 12:12 to 1:23 a.m. on December 17, were also supplemented with longer than usual calls between Garcia and Griffin at the same time (Tuss New was Garcia's then current phone):

| 12/19/2016 11:12:43 PM(UTC-6) | To: +17133852939 Tuss New | 00:05:26 |
|---|---|---|
| ███████████████████ | | |
| 12/19/2016 11:40:29 PM(UTC-6) | To: +17133852939 New | 00:06:56 |
| 12/19/2016 11:53:08 PM(UTC-6) | | Why dont you move him somewhere else . |
| 12/19/2016 11:57:31 PM(UTC-6) | | So they can start bringing all the money in |
| 12/19/2016 11:58:00 PM(UTC-6) | | We want the kid as warranty |
| 12/19/2016 11:58:31 PM(UTC-6) | To: +17133852939 New | 00:03:10 |
| ███████████████████ | | |
| ███████████████████ | | |
| 12/20/2016 12:07:33 AM(UTC-6) | | Keep in mind red he knows too much |
| ███████████████████ | | |
| 12/20/2016 12:23:50 AM(UTC-6) | From: +17133852939 Tuss New | 00:01:21 |

Epps and Griffin appeared to have left the house separately. Epps's phone records and a subsequent texts show that he went to a hotel in Madison Heights. Griffin stayed in the Detroit area and then went and picked up Epps at approximately 3:52 am. They drove directly back to Birmingham, Alabama, and reached there around 4:00 pm.

At 5:37 pm EST, Epps searched Detroit Free Press and News websites. He ultimately read an article about the homicide that evening. Approximately 30 minutes after Epps started searching news sites, Eddins's father, Robert Eddins III, went to the Pierson house, not having heard from his son all day. Inside, he found the house unlocked, no signs of forced entry, with music and TV blaring and the strong smell of gas from the oven in the kitchen. The three bedrooms on the main floor had been ransacked. He found his son and McFarlin in the basement with obvious multiple gunshots to the head and face. He called 911.

Eddins was wearing everything as depicted in the Walmart video, including the Timberland boots and sweatpants, except for the gray puffy coat that his father had got for him. DPD recovered eight 9mm shell casings. McFarlin had seven gunshot wounds including defensive wounds on his wrists consistent with McFarlin trying to hold up his hands prior to being shot. There were also contusions on his right hand and wrist consistent with being restrained. Eddins was fatally shot three times in the head. Ballistics determined seven rounds were fired from one gun and one round fired from a second gun. Homicide investigators also believe that pillows from upstairs were brought down to the basement and used to muffle the gun shots. McFarlin's vehicle was not found at the scene, but turned up the next day many blocks away from the scene. DPD could not find either of the victims' current cellphones.

IV.   **Trafficking in heroin and the Louisiana arrest.**

   A. **January 4, 2017 stop and arrest of Griffin, Epps and Christylen Bibb.**

On January 4, 2017, at approximately 12:43 AM, Louisiana State Police (LSP) Trooper Ryan Zimmerman (Tpr. Zimmerman) was on marked patrol on the right shoulder of eastbound I-12 near milepost 78. Tpr. Zimmerman saw a white Dodge Charger (Charger) in the right lane traveling at a speed abnormally slower than normal traffic. Using his radar, Tpr. Zimmerman determined the Charger was going 60 MPH in a 70 MPH zone. Tpr. Zimmerman pulled onto to I-12 to catch up with the Charger to check on the condition of the driver.

Tpr. Zimmerman drove on the left lane and caught up with the Charger. As they passed milepost 79, Tpr. Zimmerman saw the right side tires of the Charger cross the solid white line and enter two to three feet onto the right shoulder. The driver abruptly jerked the car back into the right lane of traffic. Tpr. Zimmerman activated his lights and conducted a traffic stop in violation of Louisiana Revised Statute 32:79 Improper Lane Usage. From this point, the traffic stop, subsequent arrest and search were captured on Tpr. Zimmerman's dashcam. R. 169: Exhibit C, LSP VIDEO.[1]

---

[1] Consistent with the Defendant's Motion (R.168), the time references are for the minutes and seconds noted on the video. The time stamp starts with the automatic activation of the video. The stop itself is at approximately 12:44 AM.

13

Tpr. Zimmerman approached the vehicle on the passenger side and observed three occupants, Dennis Epps-driver, Christylen Bibb-front seat passenger, and Michael Griffin-rear passenger. He asked Epps for his license and to step outside where Tpr. Zimmerman would inform Epps why he was stopped. *Id.*, 0:55. Tpr. Zimmerman noted that Bibb appeared nervous and fearful based on the fact that she was looking ahead, not making eye-contact; had a pulsating carotid artery; and, was not saying anything. R. 169: Exhibit A, Bates 06622. After he got out of the vehicle, Epps stated, "I think I know why you stopped me." R. 169: Exhibit C, 1:08. Upon inquiry, Epps suggested it was because of the way Griffin was sleeping and popped up. Tpr. Zimmerman said, "no … when you were in the right lane, you crossed the solid white line. I just want to make sure you have no alcohol to drink tonight. That's why I'm getting you out of the car." *Id.,* 1:17. To which, Epps responded, "no, sir." *Id.,* 1:21.

Tpr. Zimmerman and Epps continued to converse on the side of the road. Tpr. Zimmerman noticed Epps' hands shaking when Epps took his driver's license out of his wallet and gave it to Tpr. Zimmerman. R. 169: Exhibit A, Bates 06623. Epps stated he was coming from Houston, on a holiday. R. 169: Exhibit C, 1:25. Epps said he stayed there a week, "Six nights, seven days." *Id.,* 1:32. Epps explained he stayed at Sugarland, Texas in a hotel. *Id.,* 1:38. Epps specified Choice Hotel in Sugarland or Stafford. *Id.,* 1:46. While discussing the trip, Tpr.

14

Zimmerman noted that Epps also failed to make eye-contact and his carotid artery pulsated rapidly. R. 169: Exhibit A, Bates 06623. Tpr. Zimmerman then inquired who's car is the Charger. Epps said it is his friend's in the backseat. R. 169: Exhibit C, 1:52. Tpr. Zimmerman asked Epps if he had any weapons on him, which Epps denied. Tpr. Zimmerman did not pat Epps down and proceeded to the passenger side back seat of the Charger. *Id.,* 1:56. Epps stayed outside at the front of the police vehicle.

Tpr. Zimmerman asked Griffin if the Charger was his vehicle and if he had his identification. *Id.,* 2:10. Griffin indicated his license was in the front and asked Bibb to hand him his license. *Id.,* 2:12. Griffin said the car's paperwork was on the side of the door, so Tpr. Zimmerman asked Bibb to hand him the paperwork. *Id.,* 2:15. Tpr. Zimmerman then asked Griffin to step outside to speak with him. *Id.,* 2:24. Before stepping outside, Griffin directed Bibb to the paperwork and asked Bibb to give him (Griffin) the paperwork and his license. *Id.,* 2:39. As he exited, Griffin handed the car's paperwork and his license to Tpr. Zimmerman. *Id.,* 2:58. Tpr. Zimmerman saw Griffin's hands were visibly shaking when Griffin handed over his Alabama driver's license. R. 169: Exhibit A, Bates 06623. Tpr. Zimmerman told Epps to sit in the car, informing him that he wanted to speak with Griffin since it was his car. R. 169: Exhibit C, 3:03.

Tpr. Zimmerman reviewed the papers and saw that the vehicle was a rental. *Id.,* 3:10. Tpr. Zimmerman noted that Kim Griffin rented the Charger on December 21, 2016 to December 23, 2016 from Birmingham, Alabama and that Michael Griffin was an authorized driver. R. 169: Exhibit A, Bates 06623. Griffin confirmed the same. R. 169: Exhibit C, 3:16. Tpr. Zimmerman then asked, "where y'all coming from?" *Id.,* 3:22. Griffin responded, "we coming from Houston." *Id.,* 3:24. Tpr. Zimmerman followed up, "what y'all did out there?" *Id.,* 3:26. Griffin explained that his cousin played for the Houston Rockets just had a baby and they were out there for a baby shower. *Id.,* 3:27. Griffin said they were there for three days. *Id.,* 3:36. Tpr. Zimmerman then asked, "where'd y'all stay at, out there?" *Id.,* 3:46. Griffin said at his cousin's, the Rocket, house. *Id.,* 3:48. While discussing the itinerary, Griffin looked to the side and lost eye contact with Tpr. Zimmerman. Exhibit A, Bates 06623. After discussing Griffin's cousin, Tpr. Zimmerman went inside his patrol vehicle as Griffin stayed outside in front of the police car. R. 169: Exhibit C, 4:03.

In his vehicle, Tpr. Zimmerman, Unit 36, called into dispatch and requested a criminal history check for Epps and Griffin's driver's licenses. *Id.,* 4:30. Tpr. Zimmerman saw Griffin had been arrested for dangerous drugs in 2005, weapons in 2006, robbery in 2007 and vehicle theft in 2016, possession with intent to distribute cocaine base, sale of cocaine, and possession of a firearm in furtherance

of a drug trafficking crime, among other charges. *Id.,* Exhibit A, Bates 06623; Exhibit C, 6:00. Tpr. Zimmerman also noticed that Griffin was currently on federal probation or supervised release from January 15, 2015 to January 14, 2019. R. 169: Exhibit A, Bates 06623. Epps had been arrested for possession of marijuana in 2007 and 2008, burglary, and uttering forged instruments. R. 169: Exhibit A, Bates 06623; Exhibit C, 8:44. Soon after discussing Epps's criminal history with dispatch, Tpr. Shane Tilford (Tpr. Tilford) arrived on scene to assist. R. 169: Exhibit C, 9:46.

Based on Epps' driving, nervousness of all three occupants, conflicting statements from Griffin and Epps regarding how long and where they stayed in Houston, and Griffin's extensive criminal history with narcotics and Griffin currently being in the middle of a four year term of federal supervised release, in light of Tpr. Zimmerman's 13 years experience in law enforcement, Tpr. Zimmerman suspected criminal activity was afoot. R. 169: Exhibit A, Bates 06623-24. At same time as Tpr. Tilford arrived, Tpr. Zimmerman can be heard writing, as he prepared a consent to search form. R. 169: Exhibit A, Bates 06624; Exhibit C, 9:44. With consent form in hand, Tpr. Zimmerman exited his vehicle and returned to Griffin (still standing outside in front of the police vehicle) his license and rental paperwork. R. 169: Exhibit C, 11:55. He then approached the driver's side of the vehicle and spoke to Epps. *Id.,* 12:03. Tpr. Zimmerman advised

Epps to make sure he stays in his lane when he is driving because of the danger to troopers or broken down motorists on the side of the road. *Id.,* 12:05. Epps explained in response, "initially, I now know why, I tried to get over" because of Tpr. Zimmerman driving in the other lane. *Id.,* 12:12. Tpr. Zimmerman interrupted, informing Epps he was not ticketing him, just advising. *Id.,* 12:16.

Trp. Zimmerman then returned to Griffin initially to ask him why he was not driving since he was the only authorized driver on the rental agreement. *Id.,* 12:23. Griffin explained he was asleep after hanging out with his friends all day, even though Houston was not far away, *Id.,* 12:35. At this point, Tpr. Zimmerman asked Griffin if he had anything illegal in the vehicle, specifying drugs and money, which Griffin denied. *Id.,* 12:51. Tpr. Zimmerman then provided Griffin the LSP consent to search form. *Id.,* 13:10. Griffin reviewed the form and denied consent to search the Charger. *Id.,* 13:45. Tpr. Zimmerman then conducted a pat-down of Griffin. *Id.,* 13:47. He indicated to Tpr. Tilford that there are two others in the vehicle. Tpr. Tilford had Epps and then Bibb exit the Charger, and had them stand by Tpr. Zimmerman's vehicle. *Id.,* 13:51. Tpr. Zimmerman patted down Epps as he came to his vehicle, and then advised Griffin and Epps that they were going to have a narcotics K9 do an external walk around the car. *Id.,* 14:27. After Bibb walked to the side of Tpr. Zimmerman's car, Tpr. Tilford walked around the Charger. *Id.,* 15:25. Tpr. Zimmerman asked all three not to make any sudden movements and

18

they "should be all right." *Id.,* 15:54. Tpr. Tilford then deployed K9 Rex for an

external walk around the Charger, which took approximately 36 seconds. *Id.,*

16:07-43. Tpr. Tilford told Tpr. Zimmerman K9 Rex positively responded to a

trained odor. R. 169: Exhibit A, Bates 06625; Exhibit C, 16:50. Tpr. Zimmerman

immediately started searching the Charger. After approximately five minutes, Tpr.

Zimmerman pulled back the carpet from the left rear quarter panel and saw a clear

plastic Church's chicken bag that contained "a kilo sized compressed brick

wrapped in black electrical tape" that he suspected contained cocaine. At which

point, Tpr. Zimmerman turned around and placed Griffin, Epps and Bibb under

arrest. R. 169: Exhibit A, Bates 06625; Exhibit C, 21:54.



Tpr. Zimmmerman put on
gloves and retrieved the
suspected kilo package. R. 169:
Exhibit A, Bates 06625; Exhibit
C, 22:45.
He also recovered six

cellphones. Epps identified three phones as his, Griffin claimed one phone and

Bibb claimed another phone. One phone remained unclaimed. R. 169: Exhibit A,

Bates 06625. The kilo sized compressed brick and six cellphones were turned over

to narcotics officers Sgt. Mark Fontenot and Tpr. Brandon Beaudoin. (Tpr.

19

Beaudoin). *Id.* Tpr. Beaudoin cut a small whole in the middle of the compressed brick and observed a brown powdery substance. He tested it with a NIK Kit for Heroin and found it tested presumptively positive (LSP Crime Laboratory later determined it was papaverine and noscapine – non-opioid by-products of heroin processing). *Id.*

### B. Other evidence recovered from Griffin, Epps and the Charger.

After the arrest, on January 4, 2017, Tpr. Zimmerman impounded the Charger and secured certain personal items, including miscellaneous clothes, a suitcase and backpack. During booking at St. Tammany Parish Jail, deputies found one counterfeit $100 bill on Epps and one counterfeit $100 bill and five counterfeit $20 bills on Griffin. On January 5, 2017, United States Secret Service Special Agent (SA) Jessie Cordova interviewed Griffin Post-*Miranda*. Griffin stated the counterfeit twenty dollar notes came from a person he sold cocaine to and who "ripped him."

On January 11, 2017, Enterprise Leasing contacted LSP regarding additional evidence found in the Charger. Slidell Police Detective TJ McNulty recovered a black Taurus 9mm handgun, serial number TJR47413, under the driver's seat and subsequently gave it to Tpr. Zimmerman. After gaining further consent to search from Enterprise's manger, Tpr. Zimmerman recovered a large white leather jacket

that looked the same as the jacket Griffin wore in the Livonia Walmart on

December 19, 2016. Inside the pockets of the white jacket were the following:

- One receipt for Michael Griffin from a hotel located on Haggerty Road in Northville, Michigan dated December 18, 2016 at 9:25 PM showing he paid $98.46 cash.

- Two Michigan Daily 4 lottery tickets purchased on December 19, 2016 at 11:07 a.m.

- One Western Union Check Cashers from 3401 Woodward Avenue, Detroit, Michigan from December 19, 2016 at 4:48 PM for $3,000 to Michael Griffin.

- One Bucharest Grill, Piquette receipt from December 19, 2016 at 5:06 PM.

- One Walmart receipt for a $200 money transfer from December 19, 2016 at 8:54 PM from the Livonia Walmart on Seven Mile Road.

In March 2017, FBI Detroit requested to take custody of some of the

clothing items kept in property from the January 4 impound and found on January



11, in the Charger. LSP provided five items: black ski mask, black and white Detroit jacket, black Detroit baseball cap, the aforementioned white leather jacket, and a gray puffy 2XL jacket (pictured). The gray

jacket looked identical to the one Eddins wore in the Livonia Walmart video on

December 19, 2016 at 8:55 p.m. It was the only article of clothing seen in the video

that Eddins did not have on his body when discovered that next evening by his father. In fact, when Eddins father later saw the photograph, he immediately recognized it as the jacket he bought for his son. A jacket he has not seen since his son was murdered.

**Government's Response in opposition to Griffin's Motion to Dismiss Counts 2-4, 6 and 851 enhancement [167] and Epps' Motion to Dismiss Counts 2-4, 6 [180]**

## I. Interstate travel with the intent to kill is a crime of violence that properly predicates a charge under 18 U.S.C. 924(c).

Defendants Griffin and Epps are charged in count one with Interstate Travel with the Intent to Kill, Injure or Harass; Aiding and Abetting, in violation of 18 U.S.C. §§ 2261A(1), 2261(b)(1), and in count two with Use and Carry of a Firearm During and Relation to a Crime of Violence Causing Death, in violation of 18 U.S.C. §§ 924(c), 924(j)as well as other crimes. Griffin and Epps moved the Court to dismiss count two—the 924(c) count—because the interstate travel count is no longer a crime of violence. Their motions should be denied because interstate travel with the intent to kill is categorically a crime of violence.

### A. Applicable law

Title 18 United States Code, Section 924(c) makes it illegal to use a firearm during and in relation to a "crime of violence." The statute defines a "crime of violence" in two ways:

[A]n offense that is a felony and

(A)    has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or

(B)     that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

18 U.S.C. § 924(c)(3). Subsection (c)(3)(A), called the "elements clause," looks to the elements of the offense and whether the elements involve the use, attempted use, or threatened use of force capable of causing bodily harm. Subsection (c)(3)(B) is called the "residual clause" and looks to the risk of force posed by the offense. Previously, an offense need only satisfy the elements clause *or* the residual clause to qualify as a predicate "crime of violence".

However, the Supreme Court's decision in *United States v. Davis*, 139 S. Ct. 2319, 2323-24, 2336 (2019) invalidated the residual clause in § 924(c)(3)(B). 139 S. Ct. at 2323–24, 2336. But it left intact the elements clause in § 924(c)(3)(A). *Id.* at 2336. Consequently, *Davis* has no effect on § 924(c) offenses based on underlying crimes of violence that have as an element the use, attempted use, or threatened use of physical force against the person or property of another.

The level of force necessary to qualify as a crime of violence has been described as "nominal" force. *Johnson v. United States*, 559 U.S. 133 (2010). The Supreme Court later elaborated on *Johnson*: "*Johnson* thus does not require any particular degree of likelihood or probability that the force used will cause physical pain or injury, only potentiality?" *Stokeling v. United States*, 139 S.Ct. 544 (2019). It explained that the contact need only be "capable" of resulting in a violent response, thus being "capable of causing physical pain or injury." *Id*. at 553. The

*Stokeling* court quoted with approval from Justice Scalia's concurring opinion in

*United States v. Castleman*, 572 U.S. 1578 (2014) that "force as small as hitting

slapping, shoving, grabbing, pinching, biting, and hair pulling," was sufficient.

*Stokeling*, at 554.

And actual force is not necessary, rather, the threat of force is sufficient. For

example, "if you threatened to shoot someone, "you've clearly threatened the use

of physical force [a]nd the elements clause doesn't require that you have the ability

to carry on the threat." *Porter v. United States*, 959 F.3d 800, 803 (6th Cir. 2020)

(finding that Georgia strong armed robbery statute that requires "the use of actual

force or intimidation (constructive force) against another person satisfied § 924 (e),

(which is essentially identical to the elements clause in § 924(c)). Other circuits

have found that statutes that require the actual, threatened, or attempted use of

physical force are "categorically violent." (emphasis added). *See United States v.*

*Salmon*, 873 F.3d 446, 448 (4th Cir. 2017) (noting fourth circuit decisions finding

statutes that criminalize a taking by intimidation or the threat of criminal violence

are categorically violent.); *Jacobs* at *10, fn. 6 ("The majority of circuits agree that

crimes requiring bodily injury as an element necessarily require use or threatened

use of physical force.") (collecting cases).

Courts employ two different approaches to determine whether an offense is a

crime of violence for purposes of § 924(c): the traditional categorical approach and

the modified categorical approach.

### 1.  The Categorical Approach

The categorical approach is used when the statute defines only a single crime with a single set of elements. *United States v. Verwiebe*, 874 F.3d 258 (6th Cir. 2017); *United States v. Jacobs*, 2020 WL 3421765, *5 (E.D. Kentucky (June 22, 2020)(quoting *United States v. Harris*, 853 F.3d 318, 320, (6th Cir. 2017, "[w]hen a statute defines only a single crime with a single set elements, application of categorical approach is straightforward"). And when an offense sets out a single set of elements to define a crime, it is considered to be indivisible, thereby warranting the application of the categorical approach. The analysis under the categorical approach is limited to the statutory elements and the judicial interpretation of those elements, "rather than the manner in which an offender may have violated the statute in a particular circumstance." *Knight v. United States*, 936 F.3d 495, 498 (6th Cir. 2019). And under the categorical approach "the court should focus on the least culpable conduct criminalized by the statute but resist imagining unlikely crimes that theoretically could be covered by it." *Verwiebe* at 260-61.   It also "requires that the offense overall includes sufficient force." *United States v. Harris*, 853 F.3d 318, 321-22 (6th Cir. 2017) ("The categorical approach doesn't require each element of an offense involve use of force; it requires that the offense *overall* include the use of violent force.") (Emphasis in original).

### 2.  The Modified Categorical Approach

When an offense includes multiple versions of a crime with alternative elements, courts use the modified categorical approach. *Knight* at 498; *Jacobs* at *5. A statute that has multiple "alternative elements" that create different versions of the crime is a divisible statute. Statutory alternatives that carry different punishments are elements of the offense that must be charged and proven beyond a reasonable doubt. *Mathis v. United States*, 135 S.Ct. 2243, 2256 *citing Apprendi v. New Jersey*, 530 U.S. 466 (2000). Unlike under the traditional categorical approach, under the modified categorical approach, the court can look beyond the statutory definition to a "narrow category of documents to determine which portion the defendant violated." *Knight* at 498; *Jacobs* at *6. Those documents typically include the indictment and can also include the jury instructions. *United States v. Gooch*, 850 F.3d 285, 290-91(6th Cir. 2017) (considering indictment and jury instructions to determine statutory alternative that was defendant's conviction offense).

### B. Griffin's and Epp's Motion to Dismiss Counts, Two, Three Four and Six is Without Merit

#### 1. Count Two Properly Alleges a Predicate Crime of Violence under 18 U.S.C. § 924(c)(3)(A)

Griffin and Epps request this Court to dismiss Count Two because they argue that interstate travel with intent to kill, injure or harass, in violation of 18 U.S.C. § 2261A, is not a "crime of violence" under 18 U.S.C. § 924(c).

27

They claim that the charged offense fails to satisfy the definition of a crime of violence under the elements clause of § 924(c).  Since §2261A, as charged in Count One, has as an element the use, attempted use, or threatened use of physical force against the person, it is a crime of violence under § 924(c)(3)(A) and qualifies as a proper predicate offense  in support of the § 924(c) charges in Count Two.

As a threshold matter, 18 U.S.C. 2261A is a statute that defines one single crime with a single set of elements.

18 U. S. C. 2261A (1)(A) provides:

> Whoever travels in interstate commerce or foreign commerce
> or is present within the maritime and territorial jurisdiction of
> the United States, or enters or leaves Indian country, with the
> intent to kill, injure, harass, or intimidate another person, and
> in the course of, or as a result of, such travel or presence engages
> in conduct that–
>> (A) places that person in reasonable fear of the death of,
>> or serious bodily injury to– that person
> shall be punished by as provided in section 2261(b) of this title.

The main elements of § 2261A are: (1) that interstate travel occurred; (2) that defendant's intent was to kill, injure, harass or intimidate another person; and, (3) that the person the defendant intended to kill, injure, harass or intimidate was placed in reasonable fear of death or bodily injury to himself or a member of his family as a result of that travel. *See United States v. Al-Zubaidy*, 283

F.3d 804, 808 (6th Cir. 2002). And the form of interstate travel the defendants are charged with also requires death to have resulted from the travel. 18 U.S.C. § 2261(b)(1).

Although § 2261A includes several alternative means of committing the second element–the intent to kill, injure, harass or intimidate, respectively–it still defines one single crime.  Therefore, §2261A is an indivisible statute and should be analyzed under the traditional categorical approach to determine whether the statute is a crime of violence under § 924(c)'s elements clause.

Using the categorical approach, the Court should focus on the minimum conduct criminalized by the statute.  Defendants argue that the least serious conduct in the statute—harassment—does not require the use of force, so the statute does not qualify as a crime of violence. But this Court should not look at each element in isolation; rather, in determining whether an offense qualifies as a crime of violence, the categorical approach "requires that the offense *overall* includes sufficient force." *United States v. Harris*, 853 F.3d 318, 321-22 (6th Cir. 2017) ("The categorical approach doesn't require each element of an offense involve use of force; it requires that the offense *overall* include the use of violent force.") (Emphasis in original). And here, the overall offense requires more than just harassment; it requires force or the threat of force.

To satisfy the elements of §2261A, a defendant must travel with the requisite

intent *and* engage in conduct that places a victim or a member of a victim's family in reasonable fear of death or serious bodily injury and results in death. 18 U.S.C. § 2261A.Serious bodily injury means bodily injury which involves (A) a substantial risk of death; (B) extreme physical pain; (C) protracted and obvious disfigurement; or (D) protracted loss or impairment of the function of a bodily member, organ, or mental faculty. 18 U.S.C. § 1365;18 U.S.C. § 2266. So the least serious violation of the statute requires travel with an intent to harass a victim combined with conduct that causes the intended victim to fear death or dismemberment and results in death. This is all the force that 924(c) requires. *See United States v. Verwiebe*, 874 F.3d 258, 261 (2017)("crimes requiring proof of serious physical injury necessarily require proof of violent physical force.").

Indeed, the Sixth Circuit has made clear that crimes requiring proof of serious physical injury necessarily require proof of violent force. *United States v. Verwiebe*, 874 F.3d 258 (2017). And the defendants' analogy does not alter this holding. The defendants hypothesize that one may be convicted under the statute if the victim of harassment accidentally trips, falls, and dies. Thus, according to defendants, the crime does not require force. (R. 180: Epps Motion, 864). This is an incorrect analysis of both the travel statute and crime of violence precedents. Under the statute, the defendant is required to do more than verbally harass someone who falls down: the defendant must engage in conduct that reasonably places that person in fear of death or dismemberment. And it is that conduct that

30

necessarily involves either force or the threat of force.

The defendants' broader point, that indirect force (falling down after being harassed) does not constitute sufficient force to qualify as a crime of violence also misses the mark. "A defendant uses physical force whenever his volitional act sets into motion a series of events that results in the application of a 'force capable of causing physical pain or injury to another person.'" *Verwiebe*, 874 F.3d at 261. Here, a defendant's intentional travel with the intent to harass must be combined with conduct that both cause his victim to fear death or dismemberment and must result in the victim's death. This is sufficient.

Finally, there is no "realistic probability" that the statute would be enforced in the way the defendants imagine. *Gonzales v. Duenas-Alvarez*, 549 U.S. 183, 193 (2007). And courts repeatedly caution against using "legal imagination" to categorically disqualify an offense. *Moncrieffe v. Holder*, 569 U.S. 184, 191 (2013), *quoting Gonzales v. Duenas-Alvarez*, 549 U.S. 183, 193 (2007); *see, e.g.*, *United States v. Maxwell*, 823 F.3d 1057, 1062 (7th Cir. 2016) (defendant cannot "rely on fanciful hypotheticals not applicable in real world contexts" to show categorical overbreadth); *United States v. Hill*, 832 F.3d 135, 140 (2d Cir. 2016) (noting categorical approach must remain "grounded in reality, logic, and precedent, not flights of fancy").

Section 2261A requires conduct that causes a victim to fear death or dismemberment and results in death.   Considering the elements, § 2261A has an

element the use, attempted use, or threatened use of physical force against the person of another.  Consequently, it is a crime of violence and serves as a proper predicate crime for the § 924(c) charge alleged in Count Two.

### 2. Count Three Properly Alleges a Violation of 18 U.S.C. § 1952(a)(2) and a Crime of Violence

The defendants argue that the conduct alleged in Count Three fails to give defendants notice of an essential element of traveling in interstate commerce with an intent to commit any crime of violence to further an unlawful activity, in violation of 18 U.S.C. § 1952(a)(2).  Defendant's motion should be denied because Count Three is constitutionally sufficient and comports with the requirements of Rule 7(c) of the Federal Rules of Criminal Procedure. It tracks the statutory language of the offense; it is clear and unambiguous; provides defendant with notice of the elements the government must prove at trial; and gives defendants sufficient information to plead an acquittal or conviction in bar of future prosecutions for the same offense.  And even more importantly, Count Three alleges a crime of violence within the meaning of the elements clause of § 924(c).

### 3. Count Three adequately notifies the defense of the elements of the offense they are charged with committing and protects them against Double Jeopardy in the future.

Federal Rule of Criminal Procedure 7(c), which describes the "Nature and Contents" of Indictments and Informations, states:

The indictment or information must be a plain, concise, and

> definite written statement of the essentials facts constituting the offense charged and must be signed by an attorney for the government . . . . A count *may* allege that the means by which the defendant committed the offense are unknown or that the defendant committed it by one or more specified means. For each count, the indictment or information must give the official or customary citation of the statute, rule, regulation, or other provision of law that the defendant is alleged to have violated.

F.R.Cr.P. 7(c) (emphasis added). Moreover, in *Hamling v. United States,* 418 U.S. 87 (1974), the Supreme Court "identified two constitutional requirements for an indictment: first, [that it] contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, [that it] enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *United States v. Resendiz-Ponce,* 549 U.S. 102, 108 (*citing Hamling,* 418 U.S. at 117); *United States v. Mohney,* 949 F.2d 899, 903-04 (6th Cir. 1991) (same).

An indictment that tracks the statutory language of the offense charged "is generally sufficient . . . as long as those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished." *Hamling,* 418 U.S. at 117 (internal quotation marks omitted).

An indictment may be dismissed as insufficient if it fails to state an offense. *See United States v. Gatewood*, 173 F.3d 983, 986 (6th Cir. 1999)

(citing *United States v. Hart*, 640 F.2d 856, 857 (6th Cir. 1981)); Fed.R.Crim. P. 12(b)(3)(B).  If an indictment alleges conduct by a defendant that cannot within reason be construed to be a crime, a court may dismiss the indictment as insufficient.  *United States v. Tech*, 535 F.3d 511, 515 (6th Cir. 2008) ("Claims that a statute named in an indictment does not proscribe the alleged conduct are generally treated as claims that the indictment 'fails to state an offense'") (citing *United States v. Adesida*, 129 F.3d 846, 850 (6th Cir. 1997)).

"An indictment is usually sufficient if it states the offense using the words of the statute itself, as long as the statute fully and unambiguously states all the elements of the offense." *United States v. Landham,* 251 F.3d 1072, 1079 (6th Cir. 2001).

Count Three alleges, "On or about December 18, 2016, in the Eastern District of Michigan, and elsewhere, the defendants MICHAEL DEANGELO GRIFFIN, DENNIS CLIFTON EPPS and MARIA LOZOYA GARCIA, aiding and abetting each other, did knowingly travel in interstate commerce from the area of Birmingham, Alabama to Detroit, Michigan, with the intent to commit violence to further an unlawful activity, that is conspiracy to distribute and possess with intent to distribute a controlled substance in violation of Title 21, United States Code, Section 846, and thereafter committed or attempted to commit the crime of violence to further such activity and the crime of violence resulted in the deaths of Robert Eddins IV and Ricardo Denard McFarlin, all in

34

violation of Title 18, United States Code, Sections 1952 and 2." (Third Super.
Ind. at 4).

The defendants complain Count Three is invalid because it does not
specify the crime of violence the defendants are alleged to have committed.
Defendants cite no authority to support their claim.  The essential elements of
§ 1952(a)(2) are (1) that the defendant traveled in interstate commerce;(2) that
defendant did so with the intent to commit any crime of violence to further any
unlawful activity; and, (3) after such travel the defendant committed, or
attempted to commit, a crime of violence in furtherance of the activity.  *Modern
Federal Pattern Jury Instructions, 60-1.*  These elements are alleged in the
indictment and satisfy rule 7.

Count Three informs the defendants of the manner in which they are
alleged to have traveled in interstate commerce, "from the area of Birmingham,
Alabama to Detroit, Michigan." It also provides the unlawful activity on which
the government alleges was furthered, "conspiracy to distribute and possess
with intent to distribute a controlled substance, in violation of Title 21, United
States Code, Section 846.  In addition, Count Three also puts the defendants on
notice that death resulted from their conduct.   The detailed information
provided in Count Three sufficiently informs defendants of the nature of the
charges against  them.

The case which defendants cite, *United States v. Wahl*, 991 F.2d 797 (6th

35

Cir. 1993), supports this position.  There, the defendant was charged with "travel[ing] in interstate commerce from the State of Kansas to the State of Ohio, with intent to commit a crime of violence to further an unlawful activity, and therefore did attempt to perform a crime of violence in furtherance of an unlawful activity; [a]ll in violation of 18 U.S.C. § 1952(a)(2)." *Id.* Like here, the charge did not specify the crime of violence. And the *Wahl* court did not fault this charge language. Instead, it simply found the phrase "unlawful activity" required an explanation at the time of the plea in order for a defendant to have a full understanding of the nature of the charge against him. *Id* at \*4. *see also United States v Green*, 882 F.2d 999 (5th Cir. 1989)(finding defendant was adequately informed of the essential elements of the offense to which he pled guilty when the district court defined "interstate commerce" and "unlawful activity."). The court vacated the plea but did not alter the charge.

Similarly here, the charge sufficiently put defendants on notice of the crime they are alleged to have committed. And a jury instruction will ensure that the fact finder sufficiently understands the element of the offense. Finally, if the Court finds that the charge needs to be narrowed further, a bill of particulars can accomplish that.

Given the detail information provided in Count Three supplemented with the extensive discovery already provided to defendants, the defendants cannot reasonably claim they are unable to meet the allegations in Count Three. The

motion to dismiss Count Three should be denied.B.    Count  three  alleges  a

crime of violence that appropriately predicates the 18 U.S.C. § 924(c) charge

in count four.

Count Three, as alleged, is, in fact, a crime of violence.

18 U.S.C. § 1952 is an alternatively phrased statute; it has varying degrees of

punishment based on the severity of the resultant injury. 18 U.S.C. § 1952(a)

provides:

> Whoever travels in interstate commerce or uses the mail or
>    Any facility in interstate of foreign commerce, with intent–
>    (1) distribute the proceeds of an unlawful activity; or
>    (2) commit any crime of violence to further any unlawful
>    Activity; or
>    (3) otherwise, promote, manage, establish, carry on, or facilitate
>    the promotion, management, establishment, or carrying on, of any
>    unlawful activity,
> and thereafter performs or attempts to perform–
>    (A)  an act described in paragraph (1) or (2) shall be fined under
>    This title, imprisoned not more than 5 years, or both; or
>    (B) an act described in paragraph (2) shall be fined under this title
>    Imprisoned for not more than 20 years, or both, and if death
>    Results shall be imprisoned for any term of years or for life.

In other words, § 1952(a) is divisible statute because it describes different crimes

with different punishments. *Jacobs* at * 6.  Statutory alternatives that carry different

punishments are elements of the offense that must be charged and proven beyond a

reasonable doubt.  *Mathis v. United States*, 136 S.Ct. 2243, 2256, *citing Apprendi v.*

*New Jersey*, 530 U.S. 466 (2000).  18 U.S.C. § 1952(a), creates multiple different

offenses, for example:

a.   Traveling in interstate commerce in violation of subsections (1) and (3) – five year maximum

b.      Traveling in interstate commerce in violation of subsection (2) – twenty year maximum

c.      Travelling in interstate commerce in violation of subsection (2) – death resulting –  Up to life maximum

So, traveling in interstate commerce to distribute proceeds of an unlawful activity or to promote, manage, establish or carry on an unlawful activity is different from traveling in interstate commerce with the intent to commit a crime of violence to further an unlawful activity.  And even traveling in interstate commerce to commit a crime of violence to further an unlawful activity without injury is still different from doing so resulting in death.

The defendants are charged in Count Three with traveling in interstate commerce to commit a crime of violence to further the unlawful activity resulting in death.  It is this section of the statute that the Court must analyze to determine whether Count Three is a crime of violence. Since § 1952(a) is a divisible statute the Court should use the modified categorical approach which allows the Court to make reference to documents, such as the indictment and jury instructions, to determine whether the prosecution's chosen theory of prosecution involves the use of force. *Descamps v. United States,* 570 U.S. 254, 257 (2013) ("The modified approach merely helps implement the categorical approach when a defendant was convicted of violating a divisible statute. The modified approach thus acts not as an

38

exception, but instead as a tool.").

The elements of § 1952(a)(2) are (1) the defendant traveled in interstate or foreign commerce; (2) the defendant intended to commit any crime of violence to further any unlawful activity; (3), after such travel the defendant committed, or attempted to commit, a crime of violence to further the unlawful activity; and (4) the act of violence committed resulted in death of a person 18 U.S.C. § 1952(a)(2). And "the elements of the underlying 'crime of violence' supporting a § 1952(a)(2)(B) charge are incorporated as elements in the § 1952(a)(2)(B) charge itself. That means that a § 1952(a)(2)(B) offense is "divisible" and may qualify as a crime of violence for purposes of 🚩 § 924(c) if the underlying crime supporting the § 1952(a)(2) conviction would itself qualify as a crime of violence under 🚩 § 924(c). _Haynes v. United States_, 936 F.3d 683, 692 (7th Cir. 2019).

The death resulting enhancement makes even more clear that the charge here is a crime of violence. Importantly, death is an element of the offense that the government must prove beyond a reasonable doubt. _See Burrage v. United States_, 571 U.S. 204, 210 (2014)("Because the 'death results' [penalty] enhancement [in 21 U.S.C. § 841(b)] increased the minimum and maximum sentence to which Burrage was exposed, it is an element that must be submitted to the jury and found beyond a reasonable doubt."); _see also Mathis_, 136 S. Ct. at 2256; 18 U.S.C. § 1952(increasing statutory penalty "if death results.").

Since § 2261A is a divisible statute comprised of multiple versions of the crime with alternative elements, courts are instructed to use a modified categorical approach to determine whether an offense is a crime of violence under the elements clause of 924(c). *See Knight v. United States*, 936 F.3d 495, 498 (6th Cir. 2019); *United States v. Jacobs*, 2020 WL 3421765, *5 (E.D.KY. June 22, 2020)("If the statute is divisible–meaning it sets out one or more elements of he offense in the alternative, thereby defining multiple crimes–the "modified categorical approach" is used.). Under the modified categorical approach, the court should review a "narrow category of documents to determine which portion of the statute the defendant violated." Id. (quoting *United States v. Gooch* 850 F.3d, 290-91 (6th Cir. 2017). Typically, courts review the indictment and jury instructions. *See Knight* at 499; *Jacobs* at *6.

*Jacobs* is instructive. In *Jacobs* the court was charged with determining whether §§2261(a)(1) and (a)(2) qualify as crimes of violence in light of the Supreme Court's holding in *Davis*. Similarly, § 2261(a)(1) has the as an element the same alternative means to establish intent as the statute in this case– "intent to kill, injure, harass, or intimidate." The *Jacobs* court acknowledged that the Sixth Circuit had already firmly held that "coercion, and duress" as provided in §2261(a)(1), clearly meet the elements of § 924(c)(3)(A), the district court considered the possibility that fraud, harassment and intimidation could be

accomplished without force. *Jacobs* at \*11.  But, the *Jacobs* court ultimately found that § 2261(a)(1) and (a)(2) set forth a single crime with alternative means of committing a single element, and therefore, determined that the statute is indivisible, requiring analysis under the traditional categorical approach.  Yet, even after using the traditional categorical approach, the *Jacobs* court found that the statute qualified as a predicate crime of violence under § 924(c)(3)(A)'s elements clause. *Id. Jacobs* demonstrates that harassment used in connection with a crime of  violence or threat thereof can serve to qualify an offense as appropriate predicate crime under § 924(c)'s elements clause.

Further, under the modified categorical approach, as should be used in the instant case, reference should be made to the indictment and jury instructions to determine whether the statute is based on the elements of the use of force.  The indictment references "fear of death and serious bodily injury" in Count One. Counts Two, Four and Six include reference to "unlawful killing" and "murder" as having been committed by defendants. Clearly, an act involving the "unlawful killing of another human being requires the use of force capable of causing physical pain or injury to another person. *In re* Irby, 858 F.3d 231, 236 (4th Cir. 2017) (internal quotations omitted).   And murder is an unlawful killing. Alternatively stated, "one cannot unlawfully kill another human being without a use of physical force capable of causing injury to another. *Id.* at 238. Additionally, courts have found statutes that penalize threatened bodily injury connotes the use

of physical force. *Jacobs* at *10 (quoting *Verwiebe*, crimes requiring proof of serious physical injury necessarily require proof of violent physical force."). Moreover, "the indictment must be read as a whole, accepting all allegations as true and construing those allegations in a practical sense with all the implications." *United States v. McClellan*, 436 Fed.Appx 479, 487 (6th Cir. 2011) (quoting *United States v.* McAuliffe, 490 F.3d 526, 531 (6th Cir. 20070 and finding failure to specify the crime of violence in a § 924(c) count in an indictment with a reference to robbery in preceding count did not render the indictment invalid.).

Considering the indictment's allegations of murder and the jury instructions that will require the district court to define crime of violence, the elements of traveling in interstate commerce resulting in death has as an element the use, attempted use, or threatened use of physical force against a person. Consequently, it is a crime of violence as defined in 18 U.S.C. § 16 and in § 924(c)'s elements clause.

A contrary conclusion would require tremendously stretched reasoning. To find that § 1952(a)(2) resulting in death does not qualify as a crime of violence, the Court would necessarily have to conclude that a defendant who intends to commit a crime of violence, that resulted in death, does so in the absence of force capable of causing the death. This is nonsensical, and courts repeatedly caution against using "legal imagination" to categorically disqualify an offense. *Moncrieffe v. Holder*, 569 U.S. 184, 191 (2013), *quoting Gonzales v. Duenas-*

42

*Alvarez*, 549 U.S. 183, 193 (2007); *see, e.g.*, *United States v. Maxwell*, 823 F.3d 1057, 1062 (7th Cir. 2016) (defendant cannot "rely on fanciful hypotheticals not applicable in real world contexts" to show categorical overbreadth); *United States v. Hill*, 832 F.3d 135, 140 (2d Cir. 2016) (noting categorical approach must remain "grounded in reality, logic, and precedent, not flights of fancy").

### 4.   Count Four Properly Alleges a Crime of Violence

Defendants premise their entire argument in support of their motion to dismiss Count Four on the faulty argument they advance against Count Three, that is that the failure to specify the crime of violence in Count Three renders Count Four invalid.  As analyzed above, Count Three is, in fact a crime of violence as defined by the elements clause of § 924(c)(3)(A).  And as such Count Three is a qualifying predicate crime for the § 924(c) offense charged in Count Four.

## II.   Griffin's sentencing enhancements under 21 U.S.C. § 841 and 851, are properly pleaded in the Third Superseding Indictment.

The grand jury found Griffin, Garcia, Valdez, Jr., and Harris met the prior conviction sentencing enhancement under 21 U.S.C. §§ 841 and 851. DE 123: 474-75. Prior to December 2018, the facts that established such an enhancement were not included in an indictment because the facts consisted of predicate felony drug conviction(s) that, pursuant to 21 U.S.C. § 851, were to be found by the court. *Almendarez-Torres v. United States*, 523 U.S. 224, 226-27, 235 (1998). However, a fact, other than a prior conviction, that increases a defendant's statutory

43

mandatory minimum sentence is an element of the crime and "must be submitted to the jury." *Alleyne v. United States,* 570 U.S. 99, 103 (2013). Section 401 of the First Step Act of 2018 (FSA) amended the qualifying crimes under the 841 sentencing enhancement. Significantly, the new predicate serious drug felony conviction required not only a more serious type of drug conviction (minimum ten-year felony as described in 18 U.S.C. § 924(e)(2)), but also required three additional facts: (1) The defendant "served a term of imprisonment of more than 12 months" for the qualifying predicate; (2) service of that term of imprisonment ended on a particular date ("Date X"); and, (3) the instant offense commenced on or about a particular date ("Date Y") within fifteen years of Date X. 21 U.S.C. § 802(57). Facts (1) and (2), though related to the prior conviction, involve evidence such as prison records that can be more than a self-authenticating judgement of conviction. *F.R.Evid. 803(22) and 901(7).* Fact (3) is clearly an element not solely from a prior conviction and therefore must be submitted to the jury pursuant to *Alleyne.*

The sentence enhancement allegations are relevant to the jury's ultimate findings. They allege facts that are elements that must be found by the jury. Because they increase the mandatory minimum sentence the sentencing enhancement post-FSA are akin to drug quantities that must be pleaded in the

indictment under *Alleyne*. *United States v. Dado,* 759 F.3d 550, 570 (6th Cir. 2014). Thus, the Court should not strike the language as surplusage as irrelevant.

Further, mindful of Rule 7's requirement that the indictment "must be a plain, concise and definite written statement of the essential facts constituting the offense charged…," the indictment describes the predicate serious drug conviction in the least prejudicial way. *F.R.Cr.P. 7(c)(1)*. The third superseding indictment identifies the serious drug felony and plainly states that the defendant served more than 12 months and was released within 15 years of the instant offense. DE 123. It does not include all the details found in the amended 21 U.S.C. 851 notice (DE 124) such as the case number, jurisdiction or year of conviction. Additionally, other relevant but prejudicial facts such as the length of the sentence are also not included. The third superseding indictment does not include a "detailed description of the prior conviction" that would be "particularly prejudicial." *United States v. Kemper,* 503 F.2d 327, 328-29 (6th Cir. 1974). Therefore, the allegations are not the kind that should be struck as surplusage as prejudicial.

### III. The jury will be able to make findings ensuring 21 U.S.C. § 851 is constitutional under *Apprendi / Alleyne.*

Prior to the FSA courts have repeatedly found the judicial determination of the predicate prior conviction under 21 U.S.C. § 851 constitutional pursuant to *Almendarez-Torres, Apprendi and Alleyne. See United States v. Young,* 847 F.3d 328, 369 (6th Cir. 2017), *United States v. Nagy,* 760 F.3d 485, 488 (6th Cir. 2014),

*and United States v. Mack,* 729 F.3d 594, 607-09 (6th Cir. 2013). As described above, the FSA, in addition to the predicate prior conviction, added three facts necessary for enhanced sentencing under 21 U.S.C. § 841. As elements, pursuant to *Alleyne,* they all must be pleaded, proven beyond a reasonable doubt or admitted. *Alleyne* 570 U.S. at 103. The fact of the predicate prior conviction is an exception identified by caselaw that courts can determine, as it is not often in dispute and judges are used to seeing information regarding recidivism. Thus, the 21 U.S.C. § 851 requires notice and provides procedures to contest and determine the predicate prior convictions. The other three facts, however, must be constitutionally found by the jury.

Mandatory minimum drug quantities in 21 U.S.C. § 841 present a similar constitutional analysis. 21 U.S.C. § 851 does not mention drug quantities, but the courts constitutionally require, pursuant to *Alleyne,* a jury's finding of mandatory minimum drug quantities as a pre-requisite for increased penalties. *Dado,* 759 F.3d at 570-71; *see also Sixth Circuit Pattern Jury Instructions* 14.07A and 14.07B Unanimity Required: Determining Amount of Controlled Substance (§§ 841 and 846, respectively). In the same vein, properly worded factual findings in the jury's verdict form about the predicate serious drug felony, defendant having served at least 12 months incarceration for the predicate offense, and was he released within 15 years of the start of the instant offense would satisfy constitutional the

46

requirements under *Apprendi* and *Alleyne*. The jury would find all of the elements, beyond a reasonable doubt, to increase the mandatory minimum penalty, just as it would for drug type and quantity.

In presenting evidence of defendant's predicate felony conviction, length of incarceration and dates of release, the government is mindful of the holding in *Old Chief v. United States*, and is willing to stipulate to those facts. 519 U.S. 172 (1997). Then, the jury would be presented with stipulations concerning the predicate offense, dates of release and length of incarceration greater than 12 months, from which it could make its findings. Greater details than that would not be necessary unless the defendants choose to contest the facts. Ultimately, with the jury's findings of the additional FSA facts, beyond a reasonable doubt, the sentencing enhancement under §§ 841 and 851 is constitutional.

**Government's response in opposition to Griffin and Epps' Joint Motion to**

**Suppress Louisiana Stop [168]**

On January 4, 2017, at approximately 12:43 a.m., Tpr. Zimmerman saw the

Charger travel in the right lane on eastbound I-12 slower than normal traffic. Out

of concern for the condition of the driver, he decided to catch up to the Charger

driving in the left lane.  Tpr. Zimmerman saw the Charger cross the solid white

line to the right and enter the right shoulder and then abruptly jerk back. At this

point, Tpr. Zimmerman had probable cause to believe the driver of the Charger had

violated a Louisiana traffic infraction, Improper Lane Usage, and had reasonable

suspicion that the driver may be Operating a Vehicle while Intoxicated. Further,

Tpr. Zimmerman developed reasonable suspicion of criminal activity such that K9

Rex's external sniff approximately four minutes after the resolution of the traffic

infraction did not unreasonably extend the traffic stop.

## I.    Tpr. Zimmerman legally stopped the Charger based on probable cause and reasonable suspicion.

In the Sixth Circuit, "an officer must have probable cause to make a stop for

a civil infraction, and a reasonable suspicion of an ongoing crime to make a stop

for a criminal violation." *United States v. Collazo,* 818 F.3d 247, 253-54 (6th Cir.

2016) (internal quotations and citations omitted). "Probable cause is a reasonable

ground for belief supported by less than prima facie proof but more than mere

suspicion." *United States v. Blair,* 524 F.3d 740, 748 (6th Cir. 2008). Probable

cause "does not require an actual finding of a violation, rather, a probability or substantial chance of criminal activity is all that is required." *Collazo*, 818 F.3d at 254 (*quoting United States v. Huff,* 630 Fed.Appx. 471, 495 (6th Cir. 2015)). Further, "that fact-dependent determination is made based on the totality of the circumstances and includes a "realistic assessment of the situation from a law enforcement officer's perspective." *United States v. Warfield,* 727 Fed.Appx. 182, 186 (6th Cir. 2018) (quoting *United States v. Ferguson,* 8 F.3d 385, 391-92 (6th Cir. 1993)). And, the officer's subjective intent is irrelevant. *Whren v. United States,* 517 U.S. 806, 813 (1996); *see also United States v. Mesa,* 62 F.3d 159, 162 (6th Cir. 1995)("police officers [may] stop vehicles for any infraction, no matter how slight, even if the officer's real purpose was a hope that narcotics or other contraband would be found as a result of the stop").

Alternatively, a stop is proper if an officer has a "reasonable suspicion of an ongoing crime, such as drunk driving" where it is a criminal offense. *Warfield,* 727 Fed.Appx. at 186 (*citing United States v. Arvizu,* 534 U.S. 266, 273 (2002)). Reasonable suspicion requires more than a "mere hunch," but is met by "specific and articulable facts" showing criminal activity – a standard that is considerably less than probable cause. *United States v. Lyons,* 687 F.3d 754, 763 (6th Cir. 2012)(citations omitted). It is a "contextual inquiry that depends on the totality of

the circumstances or the whole picture." *Warfield,* 727 Fed.Appx. at 186 (internal

quotations and citations omitted).

### A. **Tpr. Zimmerman had probable cause that Epps violated LA Rev Stat § 32:79, Improper Lane Usage.**

When Epps drove the Charger over the solid white line into the shoulder and

then abruptly jerked back, Tpr. Zimmerman had probable cause to believe that he

violated Louisiana's Improper Lane Usage traffic regulation.[2] When determining

whether an officer can reasonably believe a driver's conduct has amounted to a

violation of a state's traffic infraction, courts often look at how that state's courts

review the traffic infraction. *See United States v. Gross,* 550 F.3d 578, 583-84 (6th

Cir. 2008)(collecting Tennessee appellate cases reviewing Tenn. Code Ann. § 55-

8-123); *Warfield,* 727 Fed.Appx. at 186 (collecting Ohio appellate cases reviewing

Ohio Rev. Code Ann. § 4511.33); and *Collazo,* 818 F.3d at 254-56 ("A canvass of

the caselaw interpreting Tenn.Code Ann. § 55-8-124(a) uncovers no opinion that

dictates the outcome of the present case." Ultimately, the court used the Tennessee

_____

[2] §79. Driving on roadway laned for traffic
Whenever any roadway has been divided into two or more clearly marked lanes for
traffic, the following rules, in addition to all others consistent herewith, shall apply.
(1) A vehicle shall be driven as nearly as practicable entirely within a single lane
and shall not be moved from such lane until the driver has first ascertained that
such movement can be made with safety.
(2) The department may erect signs directing slow moving traffic to use a
designated lane or designating those lanes to be used by traffic moving in a
particular direction, and drivers of vehicles shall obey the directions of such signs.
*LA Rev Stat § 32:79 (2018).*

Comprehensive Driver's License Manual as guidance to determine probable cause).

In Louisiana, this is well settled. The Louisiana Supreme Court held, "In Louisiana, as in other jurisdictions, a car which partially leaves its lane of travel and crosses the fog line either at the center of a divided highway or on the right hand shoulder of the road therefore provides the police with probable cause to believe that a traffic violation for improper lane use has occurred." *State v. Watters,* 780 So.2d 1053, 1056 (La. 2001) (*citing* Louisiana appellate, 5th Circuit and 7th Circuit cases). In *Watters*, the officer saw that Watters "touched the right-hand fog lane on the shoulder but did not cross it." *Id.* Even still, the Louisiana Supreme Court emphasized §32:79's provision that the vehicle "be driven as nearly as practicable *entirely* within a single lane…," and found probable cause for the minor violation of the infraction. *Id.* at 1056-57. (emphasis in the original); *See also United States v. Hernandez,* 744 Fed.Appx 873, 874 (5th Cir. 2018)("A vehicle touching a fog line, even momentarily, violates Louisiana Revised Statute 32:79, and officers are justified in initiating a traffic stop on that basis"). Epps exceeded this when he crossed over the solid white line and traveled into the right shoulder. Thus, pursuant to Louisiana law, Tpr. Zimmerman had clear probable cause that Epps violated § 32:79.

The defendant asks the court to reject Louisiana's analysis of its own statute and follow the holding in *Gross*. R. 168: Joint Motion to Suppress Louisiana Stop, 720. However, *Gross* is distinguishable on two grounds. First, in Gross, the driver straddled two driving lanes, appearing as if he was "slowly changing lanes" as he was rounding a curve.  *Gross,* 550 F.3d at 584. Here, Epps crossed the solid white lane into the shoulder and abruptly jerked back because it was not a proper lane of travel. And second, as mentioned above, the *Gross* court analyzed Tennessee's lane violation statute based on the findings of Tennessee appellate law. *Id.,* at 583-84. ("Particularly given the Tennessee courts' lenient interpretation of § 55–8–123 where a driver is not driving erratically, we simply cannot conclude that the slow lane change observed by Deputy Ritter amounted to a violation of the statute.) The law with regards to lane violations in Tennessee is not controlling.  Rather, here, Louisiana law determines whether Tpr. Zimmerman established probable cause that Epps violated Louisiana's lane usage infraction in Louisana. Especially considering the fact that "the question whether probable cause existed to believe that there was a violation of the statute is different from whether a violation in fact occurred." *Collazo,* 818 F.3d at 255.

Additionally, when Tpr. Zimmerman went to warn Epps to maintain in the same lane and not cross the solid white line for other motorist and state troopers safety, Epps did not deny doing so, but tried to explain why he did so. R. 169:

Exhibit C, 12:12. *See also United States v. Wilkerson,* 405 Fed.Appx. 893 (5th Cir. 2010) (Deputy saw defendant violate LA Rev. Stat § 32:79 by crossing over fog line to which the defendant explained he dropped his phone. The court found traffic stop objectively valid). But as Epps now contests this fact, the government shall present testimony at the motion hearing to establish probable cause for the infraction.

B. **Tpr. Zimmerman had reasonable suspicion that Epps was violating LA Rev Stat § 14:98, Operating a Vehicle while Impaired.**

When Tpr. Zimmerman saw the Charger traveling at an abnormally slow speed for I-12 in that area, at approximately 12:43 AM, he decided to follow the Charger to check on the condition of the driver. Once the Charger crossed the white solid line and jerked back, Tpr. Zimmerman had a reasonable, articulable suspicion that the driver of the charger may be impaired. In fact, when Tpr. Zimmerman first spoke to Epps, he told Epps "I just want to make sure you have no alcohol to drink tonight." R. 169: Exhibit C, 1:17.

Louisiana criminalizes Operating a Vehicle while Intoxicated in Louisiana Revised Statute § 14:98. Penalties range from a six month misdemeanor to a ten to thirty year felony for a fourth offense. *LA Rev Stat § 14:98.1-4.* Louisiana's Supreme Court analyzed this issue in *Waters.* The officer in *Waters* was positioned on shoulder of eastbound I-12 in the same parish as Tpr. Zimmerman, St. Tammany. At approximately 3:10 a.m., as he was about to pull out on I-12, the

officer saw Waters' vehicle drive by. *Waters,* 780 So.2d at 1054. The officer then saw Waters' car drift or veer to the right contacting the fog line. *Id.* The officer testified that in his 10 years experience at St. Tammany Parish Sheriff's Office, "he had often come into contact with fatigued drives, more so at that time of night," and that he was concerned that the driver was too fatigued or intoxicated to drive safely. *Id.,* at 1055. The court held, deferring to the officer's "experience in the field, the sudden and inexplicable veering of the Toyota to the fog line at that of the morning" provided the officer "the minimal level of objective justification required for an investigatory stop." *Id.,* 1057 (internal quotations eliminated).

The Sixth Circuit has also made fact intensive analyses in several cases with similar fact patterns regarding reasonable suspicion for driving under the influence. Reviewing chronologically, in *United States v. Roberts*, the court found reasonable suspicion when a Kentucky officer responded an hour later at 1:00 a.m. to a report of drunk and disorderly. The officer had answered similar complaints previously. He saw no cars in the driveway but found the defendant a quarter of a mile away driving in the middle of the road and swerving to the right. 986 F.2d 1026, 1029 (6th Cir. 1993). In *United States v. Freeman,* the Sixth Circuit found a Tennessee officer's observation of a Winnebago traveling at the speed limit on I-40, partially weaving into the emergency lane, on a windy day, rounding a curve did not establish reasonable suspicion that the driver was intoxicated. 209 F.3d, 464, 466-

468 (6th Cir. 2000). In *United States v. Guajardo*, the Sixth Circuit found that a Tennessee officer with more than ten years experience, had reasonable suspicion to stop a vehicle for impairment or falling asleep when he saw the car at 8:28 a.m. cross the fog line three times and travel at well-below the posted speed limit on I-75. 388 Fed.Appx. 483, 488-89 (6th Cir. 2010). And, in *Warfield*, the Sixth Circuit held that the Ohio officer lacked reasonable suspicion to stop the vehicle for intoxication where the driver touched the lane lines twice, drifting within the lane, and his slow speed was "easily attributable to driving through a construction zone … less than a mile before the car was stopped." 727 Fed.Appx. at 186-87.

In this fact intensive analysis, the Court will find, after considering testimony at the motion hearing, that Tpr. Zimmerman had reasonable suspicion to stop the Charger for impairment based on the Charger's speed, driving, conditions of the road, time of night and Tpr. Zimmerman's thirteen years experience. The facts will be more in line with the analysis in *Roberts* and *Guajardo,* than *Freeman* and *Warfield*.

## II.    Tpr. Zimmerman did not unconstitutionally prolong the traffic stop.

Based on the totality of circumstances, Tpr. Zimmerman had reasonable, articulable facts of criminal activity to extend the stop for approximately four minutes for an external K9 sniff. In order to prolong a stop beyond the completion of the traffic infraction investigation, an officer needs reasonable suspicion of

55

criminal activity. *Rodriguez v. United States,* 575 U.S. 348, 354-58 (2015). This is the same reasonable suspicion of criminal activity standard described above for an investigatory stop of a vehicle.

Tpr. Zimmerman's investigation of the traffic infraction was clearly appropriate under case law. He spoke to the driver, Epps, first, to investigate his concern about Epps's possible impairment and to get his license. He also asked about Epps travel itinerary and ownership of the vehicle. *See Lyons,* 687 F.3d at 770 ("Questions relating to travel plans, the driver's authority to operate the vehicle, or the safety of the officer are the sorts of classic context-framing questions directed at the driver's conduct at the time of the stop that rarely offend our Fourth Amendment jurisprudence." (brackets, citation and internal quotation marks omitted)). Once Epps informed him that it was Griffin's vehicle, it was also appropriate for Tpr. Zimmerman to ask similar questions to Griffin and get his license and rental paperwork. He completed this in less than four minutes. From his brief interviews, he observed all three individuals appeared nervous, either through their hands shaking, lack of eye contact or pulsating carotid artery. Epps and Griffin gave him factually different explanations as to how long they were in Houston, where they stayed and the purpose of the trip.

Contrary to the defendants argument, the bulk of Griffin's statements regarding his itinerary did not occur after the completion of the stop, but when Tpr.

Zimmerman first asked Griffin "where y'all coming from?" R. 168, 730-31; 169: Exhibit C, 3:10-4:03. Defendants also suggest that the statements about Houston by Epps and Griffin do not conflict. R. 168, 731. But they do, as it is clear from the video that Griffin responds in plural "we" that he meant they were in Houston for a baby shower for three days, directly in conflict with Epps' explanation.

Tpr. Zimmerman appropriately then went to his car to run driver's license checks, criminal histories and confirm the rental details. *Rodriguez,* 575 U.S. at 356. He discovered Griffin's extensive criminal history for narcotics and gun offenses and the fact that Griffin was currently on Federal probation or supervised release out of Alabama. He also confirmed that the Charger was rented to Kim Griffin from December 21 to December 23, 2016 with Griffin as the only other authorized driver. While Tpr. Zimmerman was getting Epps criminal history, Tpr. Tilford arrived to assist.

It is at this point that Tpr. Zimmerman had formed reasonable suspicion that Griffin and Epps were involved in illegal narcotic activity, based on: Epps' driving, contradictory statements as to itinerary, nervousness, rental information and Griffin's extensive and current criminal history. Especially instructive, is the Sixth Circuit's analysis and holding in a factually similar case, *United States v. Winters.* 782 F.3d 289 (6th Cir. 2015). In *Winters,* officers stopped a rental car for a traffic violation. *Id.,* at 296. The court evaluated various factors and concluded

57

that the officer "had reasonable suspicion to detain Winters for the dog sniff based on … nervousness, inconsistent and implausible travel plans, and an odd rental agreement, considered in the aggregate." *Id.,* at 302. Specifically, the court gave nervousness little weight on its own, but looked at it in conjunction with other factors. *Id.,* at 299. With regard to travel plans, the court discussed, even with "potentially innocent explanations" for the discrepancies, they have given conflicting explanations of travel plans some weight, and cited cases where they were "indicative of criminal activity." *Id.,* at 299-300 (internal quotations omitted). And, in discussing oddities of rental contract as a "legitimate consideration in the reasonable-suspicion analysis." *Id.,* at 300 (internal quotation omitted) (*citing United States v. Branch,* 537 F.3d 582, 588 (6th Cir. 2008), "a factor supporting reasonable suspicion that the defendants were driving a rental car that was several weeks overdue").

Here, all of those factors are present, nervousness, conflicting travel statements, Kim Griffin's rental dated December 21-23, in addition to the fact that Griffin has an extensive narcotics criminal history and was actively on Federal supervised release. *See Id.* at 301 (defendants prior history of crime could be stronger factor than those cited). The officer's thirteen years experience also supports reasonable suspicion. *Id.,* at 302.

58

Finally, the court emphasized that in "the proper totality-of-the-circumstances approach, we must determine whether the individual factors, *taken as a whole,* give rise to reasonable suspicion, *even if each individual factor is entirely consistent with innocent behavior when examined separately.*" *Id.* (emphasis in the original). As in *Winters,* here, K9's Rex's deployment, less than four minutes after the end of the traffic investigation "was a reasonable means of investigating the suspected illicit activity." *Id.,* at 303.

## III.   Reliability of K9 Rex and Tpr. Tilford and presumptive test by Tpr. Beaudoin.

The defendants contest the training and reliability K9 Rex and his handler Tpr. Tilford, as is their right. *Florida v. Harris,* 568 U.S. 237, 247 (2013). The government will present Tpr. Tilford at the motion hearing and will file with the Court, at least 30 days before the hearing, Tpr. Tilford and K9 Rex's training certifications and logs to establish Tpr. Tilford and K9 Rex's reliability to establish probable cause.

The defense also contests Tpr. Beaudoin's use of the NIK Kit for the presumptive test of the suspected kilogram brick seized on January 4, 2017. Field tests or presumptive tests have long been held sufficient to establish probable cause for arrest and search warrants. *United States v. Killebrew,* 594 F.2d 1103, 1105 (6th Cir. 1979). The government does not seek to use the presumptive test as evidence that the suspected kilogram brick was, in fact, heroin. But, the subsequent

laboratory testing by LSP finding that the kilogram brick consisted of by-products of heroin processing, papervine and noscapine, does not vitiate the validity of the presumptive test for probable cause. The Court should not find this as a reason to suppress evidence. If the defendants want to question Tpr. Beaudoin about the presumptive testing of the kilogram brick, the government will make him available at the motion hearing.

IV.   **Conclusion**

After the motion hearing, the Court should deny the motions to suppress for the reasons stated.

## Government's response in opposition to Griffin and Epps' Motions to Suppress Forensic Cell Phone Examination [170 & 182]; and Griffin's Motion to Suppress CSLI [172]

Griffin and Epps have filed motions to suppress information obtained from the court authorized search of phones seized during their arrest in Louisiana. (R. 170 and 182). And Griffin has filed a motion to suppress cell site location information that was obtained after a Wayne County judge authorized its seizure. (R. 172). These motions allege that the warrant affidavits did not establish probable cause to search and that the good faith exception does not apply. The motions should be denied because the judges that authorized the warrants did not arbitrarily decide that there was a fair probability evidence would be found in the locations to be searched.

## I. The Legal Standards

### A. Probable cause requires only a fair probability that evidence will be found in a given place.

The Fourth Amendment requires warrants to be premised upon probable cause.  U.S. Const. Amend. IV. Probable cause has been defined as "reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." *United States v. Harris*, 255 F.3d 288, 292 (6th Cir. 2001).  The United States Supreme Court has noted that probable cause is a "practical, nontechnical conception" based on "the factual and practical considerations of everyday life on

61

which reasonable and prudent men, not legal technicians, act." *Illinois v. Gates*, 462 U.S. at 231.  In reviewing search warrant applications, "[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* at 239 (*citing  Jones v. United States*, 362 U.S. 257, 271 (1960)). In other words, the magistrate judge must find an adequate "nexus between the place to be searched and the evidence sought." *United States v. Brown*, 828 F.3d 375, 382 (6th Cir. 2016).

Once a magistrate has determined the existence of probable cause, that decision should only be reversed if it was arbitrarily made.  *United States v. Coffee*, 434 F.3d 887, 892 (6th Cir. 2006).   "Reasonable minds frequently may differ on the question whether a particular affidavit establishes probable cause, and we have thus concluded that the preference for warrants is most appropriately effectuated by according 'great deference' to a magistrate's determination." *United States v. Leon*, 468 U.S. 897, 914 (1984)(citations omitted).  Thus, in the Sixth Circuit, it has long been "held that an issuing magistrate's discretion should only be reversed if it was arbitrarily exercised." *United States v. Allen*, 211 F.3d 970, 973 (6th Cir. 2000)(*en banc*).

This Court's deferential review of the sufficiency of probable cause is limited to the four corners of the affidavit. *United States v. Frazier*, 423 F.3d 526, 531 (6th Cir. 2005). Accordingly, an evidentiary hearing is unnecessary.

> ### B. Even in the absence of probable cause, the good faith exception applies where "some modicum of evidence, however slight," links the crime and the place to be searched.

Once a neutral magistrate or judge has issued a warrant, even if it is later found invalid due to insufficient probable cause, an officer executing the warrant is nonetheless entitled to rely on its validity and use the evidence obtained, except in a narrow range of circumstances. *See United States v. Leon*, 468 U.S. 897, 922–23 (1984). This is for good reason. The exclusionary rule, which bars the use of improperly obtained evidence at trial, is a "judicially created rule . . . designed to safeguard Fourth Amendment rights generally through its deterrent effect." *Herring v. United States*, 555 U.S. 135, 139–40 (2009) (citation and internal quotation marks omitted). But "the fact that a Fourth Amendment violation occurred . . . does not necessarily mean that the exclusionary rule applies," and "exclusion has always been our last resort, not our first impulse." *Id*., at 140 (internal citations and quotation marks omitted). That is because the exclusionary rule "is not a personal constitutional right," nor is it "calculated to redress the injury to the privacy of the victim of the search or seizure." *Stone v. Powell*, 428 U.S. 465, 486 (1976). Rather, the Supreme Court has made clear that the exclusionary rule's *sole* purpose is to deter future Fourth Amendment violations.

*Davis v. United States*, 564 U.S. 229, 236–37 (2011).  Accordingly, in deciding whether to apply the exclusionary rule, courts weigh the benefits of deterrence against the costs of excluding the evidence, *see Herring*, 555 U.S. at 141, and for exclusion to be appropriate, "the deterrence benefits of suppression must outweigh its heavy costs" on the judicial system and society of "requir[ing] courts to ignore reliable, trustworthy evidence," which often results in "suppress[ing] the truth and set[ting] the criminal loose in the community without punishment."  *Davis*, 564 U.S. at 237.

In light of these considerations, the Supreme Court has recognized a "good faith" exception to the exclusionary rule.  *See Leon*, 468 U.S. 897.  When law enforcement officers "act with an objectively 'reasonable good-faith belief' that their conduct is lawful, . . . or when their conduct involves only simple, 'isolated' negligence, . . . the 'deterrence rationale loses much of its force,'" and the exclusionary rule does not apply.  *Davis*, 564 U.S. at 238 (quoting *Leon*, 468 U.S. at 909, 919)).  In the context of a warrant, evidence from a subsequently invalidated search warrant will not be suppressed unless "a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization."  *Leon*, 468 U.S. at 922, n. 23.

In *Leon*, the Supreme Court identified four, narrow circumstances in which an officer's reliance on a search warrant would *not* be reasonable and therefore good faith exception would *not* apply to salvage the evidence.  *Leon*, 468 U.S. at

923.  Here, defendant Griffin argues the third circumstance applies: the "warrant

[is] based on an affidavit so lacking in indicia of probable cause as to render

official belief in its existence entirely unreasonable." *Leon*, 468 U.S. at 923

(internal quotation marks and citation omitted).  Such affidavits are known as "bare

bones" affidavits.  *United States v. White*, 874 F.3d 490, 496 (6th Cir. 2017);

*United States v. Laughton*, 409 F.3d 744, 748 (6th Cir. 2005).  In a recent opinion

extensively discussing the good faith standard, the Sixth Circuit defined a bare

bones affidavit as: (1) "one that states only suspicions, beliefs, or conclusions,

without providing some underlying factual circumstances regarding veracity,

reliability, and basis of knowledge"; (2) "a conclusory affidavit, one that asserts

only the affiant's belief that probable cause existed"; or (3) one that "provides

nothing more than a mere guess that contraband or evidence of a crime would be

found, . . . either completely devoid of facts to support the affiant's judgment that

probable cause exists, . . . or so vague as to be conclusory or meaningless." *White*,

874 F.3d at 496 (citations and internal quotation marks omitted).

By contrast, an affidavit is not bare bones—and the good faith exception

applies—"if, although falling short of the probable-cause standard, it contains 'a

minimally sufficient nexus between the illegal activity and the place to be

searched.'" *White*, 874 F.3d at 496–97 (quoting *United States v. Carpenter*, 360

F.3d 591, 596 (6th Cir. 2004) (en banc)).  Such a minimally sufficient nexus exists

where the reviewing court is able to identify in the affidavit "some connection,

regardless of how remote" between the criminal activity under investigation and the place or property to be searched.  *White*, 874 F.3d at 497; *see also Laughton*, 409 F.3d at 749 (observing that in prior cases where Sixth Circuit found no probable cause but that good faith exception should apply, there was "some modicum of evidence, however slight, to connect the criminal activity described in the affidavit to the place to be searched"); *United States v. Kinison*, 710 F.3d 678, 686 (6th Cir. 2013) (good faith exception can apply "so long as the affidavit was not 'completely devoid of any nexus' between the [place to be searched] and activity" (quoting *Carpenter*, 360 F.3d at 595–96)).

## II.    The evidence seized from Griffin's and Epps's phones should not be suppressed. (R. 170 and R. 182)

At 12:44 a.m. on January 4, 2017, police officers in Louisiana stopped a car being driven by Epps. The officers found a brick of a substance that field tested positive for heroin in the trunk of the vehicle and arrested Epps, Griffin, who was in the back seat, and a female passenger. The officer also seized five cellphones— three from Epps, one from Griffin, and one from the female passenger. A Louisiana judge authorized a search warrant for the phones.

### A. The affidavit established a fair probability that evidence would be located in Griffin and Epps's phones.

After Griffin and Epps were arrested and their phones seized, an officer submitted an affidavit and search warrant to a judge in Louisiana. The affidavit laid out the following facts:

- Epps, Griffin, and the female passenger were stopped in Louisiana in a vehicle with a Florida license tag at 12:44 am on January 4, 2017.

- A Louisiana State Police canine alerted to the presence of narcotics in the vehicle.

- The officers seized 1.28 kilograms of a powdery substance that field tested positive for heroin from the trunk of the vehicle.

- All three subjects denied knowing about the drugs.

- The three subjects agreed that they traveled from Birmingham, Alabama, to Houston, Texas, but gave differing answers about the length of the trip and the date of departure.

- The female passenger admitted that they had left Birmingham on January 3 at 2 am, traveled for 11 hours and arrived in Houston at about 1 pm; turned around and left Houston to return to Alabama as it was getting dark the same night. This was consistent with receipts found in the vehicle.

- Griffin acknowledged that he was on federal probation and told the officers they would understand why he would not cooperate when they found out who he was.

- The officers seized six cellphones—three claimed by Epps, one each by Griffin and the female, and one unclaimed.

- The officer believed that electronic evidence such as call logs, text messages, and voice mails would be on the phones.

The judge authorized a search of the phones.

Under any standard of review, but particularly giving "great deference" to the Louisiana judge as this Court must, this authorization was correct: based on the four corners of the affidavit, there is a fair probability that Griffin and Epps were involved in the distribution of more than a kilogram of heroin and that evidence of the drug trafficking would be found on their phones.

Griffin and Epps argue that the warrant lacked probable cause because it failed to provide a nexus—a "direct evidentiary link"—between the drug trafficking crime and the phones to be searched. (R. 170: Griffin's Motion to Suppress, 750). In drug trafficking cases, the nexus between the crime and electronic evidence is often supplied by an affiant's belief statement that drug traffickers use cell phones or other media to facilitate their drug trafficking. And the defense is correct that this type of belief statement is missing from this affidavit. But an explicit statement—a "direct evidentiary link"—is not what the Fourth Amendment requires. Instead, the Sixth Circuit has long held that a magistrate may infer a nexus "depending upon 'the type of crime being investigated, the nature of things to be seized, the extent of an opportunity to conceal the evidence elsewhere and the normal inferences that may be drawn as to likely hiding places.'" *United States v. Williams*, 544 F.3d 683, 687 (6th Cir.

68

2008); *quoting United States v. Savoca,* 761 F.2d 292, 298 (6th Cir.1985). For instance, a judge in this district recently upheld a search warrant authorizing the search of cell phones because "a magistrate judge might reasonably *infer* that a group committing a crime is likely to use cell phones to communicate." *United States v. Olaya*, No. 15-CR-20200, 2017 WL 1967500, at *6 (E.D. Mich. Apr. 19, 2017). And that is true even when the affidavit itself does not make this claim. *Id.*

Here, the warrant established probable cause to believe that Griffin and Epps were involved in drug trafficking, that they possessed the phones to be searched, and that the phones would likely contain contact lists, call logs, and text messages. The Louisiana judge correctly inferred the nexus between drug trafficking and cellphones, which are now well established as "tools of the drug trafficking trade." *United States v. Gilbert*, 952 F.3d 759, 761–62 (6th Cir. 2020); *see also, United States v. Hammett*, 555 F. App'x 108, 110 (2d Cir. 2014) (noting that defendant was also found with a digital scale and two cell phones, "which are tools that drug dealers often possess"); *United States v. Portalla*, 496 F.3d 23, 27 (1st Cir. 2007) (stating that cell phones were "essential tools" of defendants' drug trade); *United States v. Hernandez*, 17 F. App'x 464, 467 (7th Cir. 2001) (identifying pagers and cell phones as tools of the drug trade). Accordingly, the Louisiana judge's decision was not arbitrary and Griffin and Epps's motion should be denied.

**B. The officer's good faith reliance on the warrant was reasonable, so the evidence should not be suppressed even if probable cause was deficient.**

Even if the affidavit did not establish probable cause, the good-faith exception applies and the evidence from the phones should not be excluded. Contrary to the defendants' claim, the Louisiana affidavit was not "bare bones" and instead set forth a sufficient factual basis to satisfy the "minimally sufficient nexus" standard.

The Louisiana affidavit laid out that Griffin and Epps were arrested in a car with a kilogram of heroin; that they had taken a multi-state, 11-hour drive to Texas, where they stayed for a few hours before beginning their drive back to Alabama—a trip that is consistent with drug trafficking; that their stories about the trip didn't agree; that Griffin was on federal probation; and that once the officers learned who he was, they would understand why he could not cooperate. The affidavit also described the phones the officers seized from Griffin and Epps and the officer's belief that phones contain evidence such as text messages and call logs.

It was reasonable for the officer to have inferred that drug dealers involved in the transportation of large quantities of drugs would use their cellphones to communicate. *Olaya*, No. 15-CR-20200, 2017 WL 1967500, at *6 (E.D. Mich. Apr. 19, 2017). There is more than a slight modicum of evidence to connect the drug dealing and the phones. And that is all that is required. *Laughton*, 409 F.3d 744, 749 (6th Cir. 2005).

70

Griffin's and Epps's motion to suppress evidence obtained from their phones should be denied.

### III.   The cell site location information obtained from Griffin's cell phone should not be suppressed. (R. 172).

Just before Christmas 2016, Robert Eddins and Richardo McFarlin were murdered in a basement in Detroit. Within a few weeks, a source of information (SOI) identified the murderers and provided law enforcement with details about the crime. Although a warrant was not then necessary to obtain CSLI, a detective from the Michigan State Police submitted an application for a search warrant under 18 U.S.C. § 2703(c) and (d) for CSLI associated to phone number (205) 566-0729. As required under § 2703, the detective certified that the information he was seeking was relevant to a criminal investigation. The detective also identified the SOI in the application and described in detail the information the informant had provided. The application was approved by an assistant prosecutor and the warrant was authorized by a circuit court judge.

The application identified phone number (205) 566-0729 as the target number and provided a substantial basis for the circuit court judge to have concluded that evidence would be found in Griffin's phone records; however, the application never explicitly identified Griffin's phone number as the target number. The Court does not need to decide the more difficult question of whether the warrant is supported by probable cause despite this omission because the good

faith exception applies in any event. *See Leon*, 468 U.S. at 925 (court may proceed directly to issue of good faith where defendant challenges both the probable cause determination and the application of the good faith exception); *United States v. McCraven*, 401 F.3d 693, 698 (6th Cir. 2005) (concluding good faith exception applies and avoiding resolving "close question" of whether affidavit was sufficient).

The good faith exception applies where there is a "minimally sufficient nexus between the illegal activity and the place to be searched.'"  *White*, 874 F.3d at 496–97. That standard is satisfied here. According to the application, the SOI[3] informed the police that:

- Three individuals—Griffin, McAdory, Johnny McAdory, and Adrian Bonner, killed Eddins and McFarlin.

- SOI knew Eddins, Griffin, and Griffin's girlfriend.

- Griffin and Eddins were roommates in Alabama. McAdory and Bonner lived in Alabama too.

- Griffins and Eddins had a dispute about a drug deal.

- SOI spoke to Eddins the night he was killed. Eddins told SOI that Griffin showed up at his house while they were on the phone. Eddins also stated "if I don't come back to the phone, you know what's up."

---

[3] The SOI's name was included in the affidavit.

- Griffin's girlfriend told SOI that Griffin bragged to her about his involvement in the shooting.

- Griffin called SOI on "countless" occasions and demanded that SOI "stay silent" about the shooting.

- Griffin's father, Johnny McAdory, organized the trip to Detroit. McAdory is connected to an address on "Sheldon Street," where the killers met before the murder.

The application also included the detective's belief that Griffin's phone records would demonstrate a relationship between Griffin, Eddins, and SOI. And the detective's belief that Griffin's phone records would show that his phone was in the area of the area of the murder.

What the detective inadvertently left out of the application—that Griffin's number was the target number—the circuit court judge could certainly infer from the totality of the warrant. The Sixth Circuit's "good-faith jurisprudence allows a reasonable officer to indulge inferences that would otherwise be insufficient to establish probable cause, several of which may be drawn from [the] affidavit." *United States v. White*, 874 F.3d 490, 498 (6th Cir. 2017). In other words, to determine whether the good faith exception applies, "a reviewing court must read the affidavit reasonably," which "means a court must read it holistically, examining the totality of the circumstances and employing a healthy dose of common sense." *Id*., at 502. Moreover, "[i]f an inference is obvious from the

factual context, a reviewing court should indulge it." *Id.* (citing *United States v. Allen*, 211 F.3d 970, 975 (6th Cir. 2000) (en banc)). Here, the inference is obvious. The affidavit explained Griffin's involvement in the murder and also explained why Griffin's phone records will contain evidence of the murder. The only reasonable conclusion is that Griffin's number is the target number. And while admittedly the application could have been drafted to "connect the dots" more clearly, a holistic, common-sense reading of the application that permissibly draws obvious inferences reveals that it meets the "minimally sufficient nexus" standard.

Nor does Griffin's argument that the SOI's reliability and information were not corroborated alter this conclusion. In the Sixth Circuit, there is no strict formula for assessing the propriety of using information provided by an informant to find probable cause. *See United States v. Howard*, 632 F. App'x 795 (6th Cir. 2015). Instead, the affidavit is to be viewed in its totality to determine if the magistrate had a substantial basis for finding probable cause. *Id.* But an informant's reliability and the basis of the informant's knowledge are highly relevant" to that determination. *Id.* at 798. And here, for several reasons, the information in the application provided a substantial basis for the judge to have found probable cause to search Griffin's phone records.

*First*, the SOI was named in the application and "named informants, unlike confidential informants, require little corroboration." *United States v. Williams*, 544 F.3d 683, 690 (6th Cir. 2008); *see, e.g., United States v. Miller,* 314 F.3d 265,

270-71 (6th Cir.2002) (finding a first-time informant reliable because the affidavit named the informant, the informant provided detailed information, and the informant was subject to prosecution if his information was fabricated). This is because identified informants subject themselves to criminal liability for filing false police reports if they lie to the police, so their statements have added credibility and deserve more weight in the totality of the circumstances. *Howard*, 632 F. App'x at 801. Here, the SOI was not just known to the detective, he was named in the application to the judge. This alone "bolster[s] his veracity." *Id.*

Second, if the reliability of an informant is unknown, indeed, even if a court "entertain[s] some doubt as to an informant's motives, his explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed first-hand, entitles his tip to greater weight than might otherwise be the case." *Illinois v. Gates*, 462 U.S. 213, 234 (1983). The SOI was not in the room when Eddins was murdered but he was on the phone with him just before. Eddins told the SOI that Griffin had arrived and forecast his own death when he told Griffin "if I don't come back, you know what's up." And the SOI himself received numerous calls from Griffin in which Griffin instructed him to stay quiet about the killing. So while the SOI was not a first-hand observer of the murder, he had first-hand information about the place to be searched—the records of phone calls. And the SOI's information was paired with the detectives belief that the records would demonstrate the relationship between Griffin and the SOI and Griffin and Eddins.

The SOI also described the role of Griffin's father and his connection to 1138 Sheldon Street. The defense makes much of what they claim was the SOI's misidentification of 1138 Sheldon Street as a residence associated with McAdory. A simple google search, however, reveals that McAdory is associated with 1138 Selden Street, Detroit[4]. Although misspelled, this address was not misidentified. And this too, factors into the totality of the circumstances.

*Third,* applying the analytical framework used by the Sixth Circuit in *United States v. White*, the application here "looks nothing like the prototypical bare-bones affidavits first identified by the Supreme Court." 874 F.3d at 498.  In reviewing two "bare bones" Supreme Court cases, the *White* court observed the affidavits at issue were bare bones because they "presented a mere affirmation of suspicion and belief without any statement of adequate supporting facts" and thus "ask[ed] the magistrate to simply take [the affiant's] word for it."  *White*, 874 F.3d at 498. Here, by contrast, the application did *not* merely state that a murder occurred and assert, without *any* factual support, a belief that phone records would provide evidence of the murder.  Instead, the application tied the phone records to specific information in the affidavit: Griffin and Eddins knew each other—the phone records would show their preexisting relationship; Griffin spoke to the SOI about the murder—the phone records would show that connection; and Griffin was at the

---

[4] https://www.yellowbook.com/people/johnny-mcadory/.

scene of the murder—the phone records would prove it.  Even if those facts were

insufficient to "to give the magistrate a substantial basis to find probable cause,

[they] nonetheless supplied '*some* connection, regardless of how remote,'

between" the murder and the phone records.  *See White*, 874 F.3d at 499.

Fourth, as a general matter, "the threshold for establishing [the third *Leon*

circumstance]—is a high one, and it should be," because "'[i]n the ordinary case,

an officer cannot be expected to question the magistrate's probable-cause

determination' because '[i]t is the magistrate's responsibility to determine whether

the officer's allegations establish probable cause and, if so, to issue a warrant

comporting in form with the requirements of the Fourth Amendment.'"

*Messerschmidt v. Millender*, 565 U.S. 535, 547 (2012) (quoting *Leon*, 468 U.S. at

921).  And particularly where, as here, the detective "sought and obtained approval

of the warrant application from . . . a [prosecutor] before submitting it to the

magistrate provides further support for the conclusion that an officer could

reasonably have believed that the scope of the warrant was supported by probable

cause." *Messerschmidt*, 565 U.S. at 553.

Fifth, it merits mention that the "reasonable officer" standard is difficult to

apply in the instant case because the law was not clear at the time the detective

obtained the warrant that a search warrant was even required to obtain these CSLI

phone records.  In fact, by January 2017, six Circuit Courts of Appeals had found

that CSLI records could permissibly be obtained without a warrant.  *See United*

*States v. Elmore*, 917 F.3d 1068, 1078 (9th Cir. 2019) (explaining that before Carpenter, the "the prevailing belief" was "that CSLI data was not protected by the Fourth Amendment" as six circuits had so found).   Accordingly, not only was the law far from settled that a warrant was even required, but also there existed no settled body of law outlining what did and did not constitute probable cause for a warrant seeking historical CSLI.  Therefore, an officer executing a warrant for CSLI had considerably less guidance to go on when determining whether the affidavit was "bare bones" than, say, an officer executing a conventional search warrant for a house.  This factor should weigh in favor of applying the good faith exception here.

In sum, the application's factual basis, taken together with obvious inferences, establishes a "minimally sufficient nexus" between the Eddins murder and Griffin's CSLI phone records to trigger the good faith exception.

## IV.    The DPD Application and State Court Order Satisfy 18 U.S.C. § 2703(d), and the Good Faith Exception Applies

Even if the application was so lacking in indicia of probable cause that it fails to satisfy the good faith exception *for an invalid warrant*, Griffin's CSLI records should not be suppressed.  That is because the government obtained the records by valid legal process other than a warrant.  The application and the 3rd Circuit Court's order—whatever their labels—qualify as a legally sufficient application and order under § 2703(d).  Moreover, at the time the detective sought

78

and obtained those records in January 2017—more than a year before the Supreme

Court decided *Carpenter*—the government acted with an objectively reasonable

good faith belief that its actions conformed with the law as it then existed.

### A. The Application and State Court Order Satisfy § 2703(d)

Up until June 22, 2018, when the Supreme Court decided *Carpenter v.*

*United States*, 138 S. Ct. 2206 (2018), the Stored Communications Act (SCA)

provided the legal basis for the government to obtain CSLI.  Despite numerous

Fourth Amendment challenges, and before being reversed or abrogated by

*Carpenter*, the Sixth Circuit and other federal courts repeatedly held that court

orders pursuant to the SCA constituted a sufficient means by which to obtain CSLI

records.  *See, e.g.*, *United States v. Carpenter*, 819 F.3d 880 (6th Cir. 2016), *rev'd*

*and remanded*, 138 S. Ct. 2206 (2018); *see also United States v. Pembrook*, 876

F.3d 812, 819 (6th Cir. 2017) (affirming district court's denial of defendants'

pretrial motion to suppress CSLI), *cert. granted, judgment vacated sub nom.*

*Johnson v. United States*, 138 S. Ct. 2676 (2018).  Under that statutory authority:

> A governmental entity may require a provider of electronic
> communication service or remote computing service to disclose a
> record or other information pertaining to a subscriber to or customer
> of such service (not including the contents of communications) . . .
> when the governmental entity– (A) obtains a warrant issued using the
> procedures described in the Federal Rules of Criminal Procedure (or,
> in the case of a State court, issued using State warrant procedures) by
> a court of competent jurisdiction; [or] (B) obtains a court order for
> such disclosure under subsection (d) of this section[.]

18 U.S.C. §2703(c)(1).  Subsection (d), in turn, requires that the government meet a standard less than probable cause to obtain such a disclosure order: the court order "shall issue only if the governmental entity offers specific and articulable facts showing that there are reasonable grounds to believe that . . . the records or other information sought, are relevant and material to an ongoing criminal investigation."  18 U.S.C. § 2703(d).

Before the Supreme Court decided *Carpenter*, therefore, Section 2703(c) of the statute gave the government—both federal and state entities—the option of using either a search warrant or a court order under § 2703(d) to obtain non-content records from certain service providers, including cell service providers.  In addition, as the statute also made clear, the government was permitted to use either federal or state court legal process to obtain such records.

Here, Lutz's application is titled "Application for Search Warrant," and the document signed by the 3rd Circuit Court judge is titled "Search Warrant."  But both the application and the warrant are made under 18 U.S.C. § 2703(c) *and* (d).  So even assuming, that (1) the application fails to establish probable cause and the resulting warrant is invalid, and (2) the good faith exception does not save the warrant, there is no reason why Lutz's application cannot *also* be construed as an application for a court order under § 2703(d) and evaluated under that separate, statutory legal standard.

Indeed, that is exactly what the plain text of the documents says: the application and order are both replete with language tracking the § 2703(d) statute and its required legal standard.  The application is captioned "In the Matter of the Application to the 3rd Circuit Court . . . for an Order Requesting Telecommunications Records," and in the first paragraph states the applicant "hereby applies to the court [to] order, pursuant to Title 18, United States Code, Section 2703(c) and 2703(d)."  On the second page, the application again states the request is made pursuant to "Section 2703(d)," states that the applicant is "a governmental entity as identified in Title 18, USC, Sections [sic] 2703," and further "certifies that the information sought is relevant to an ongoing criminal investigation."  Simply put, the application's language tracks § 2703(d)'s text and expressly references the "relevant and material" legal standard set forth in § 2703(d).  To be sure, the application also notes a state court may issue a warrant (page 4) and asserts the affiant has "probable cause" (page 4), but it does not follow that the application cannot or does not also qualify as an application for a court order under § 2703(d).

Likewise, the court's order—whatever its formal title—clearly qualifies under the straightforward text of the SCA as "[a] court order for disclosure under [2703](b) or (c) . . . issued by [a] court that is a court of competent jurisdiction." 18 U.S.C. § 2703(d).  Like the application, the court order is captioned "In the Matter of the Application to the 3rd Circuit Court . . . for an Order . . ." The order

81

states the matter is "before the court pursuant to an application under Title 18,

USC, Section 2703(c) and 2703(d)" and expressly finds *both* "probable cause" *and*

"there are reasonable grounds to believe that the requested records are relevant and

material to an ongoing criminal investigation."  This latter phrase tracks, nearly

verbatim, the required legal standard set forth in § 2703(d), and therefore the court

made the requisite legal finding to issue such an order under § 2703(d)—regardless

of whether the document also survives as a valid warrant. Finally, the court ordered

the production of the records pursuant to "Title 18, United States Code, Section

2703(d)."

In sum, it is clear from the text of each that the application sought to satisfy,

and the court's order found, *both* the higher, probable cause standard for a warrant

to issue, *and* the lower, "relevant and material" standard for a § 2703(d) order to

issue.  Accordingly, if the search warrant is invalid, this Court can read Lutz's

application and 3rd Circuit Court order by striking out the phrases "search

warrant" and "probable cause" from those documents: what remains are a legally

sufficient, valid application and court order under § 2703(d).

Next, once so construed, the application contains a factual basis that is

legally sufficient to satisfy the low § 2703(d) standard of offering specific and

articulable facts showing that there were reasonable grounds to believe that the

CSLI records sought were relevant and material to an ongoing criminal

investigation.  *See Pembrook*, 876 F.3d at 823–24 (facts provided were sufficient

82

to meet § 2703(d) statutory standard where the application briefly informed the magistrate judge about two robberies in different locations and their similarities; explained that surveillance video from the two stores supported the suspicion that the same robbers committed both robberies; and concluded that cell tower information in the two locations may reveal a common cell phone number that was active at each location around the time of the crime, identification of which would aid in identifying potential suspects) (judgment vacated on other grounds).

## B. The Good Faith Exception Applies

Construed as an application and order pursuant to § 2703(d), a straightforward good faith analysis confirms the resulting CSLI evidence is admissible.

The Supreme Court's June 2018 decision in *Carpenter v. United States*, 138 S. Ct. 2206 (2018), created new law. Now, the government must obtain a warrant to acquire long-term CSLI records; obtaining a court order under the statutory authority of § 2703(d) is no longer sufficient. However, this new rule of law does not affect the admissibility of CSLI records that the government obtained before the Supreme Court's decision in *Carpenter*, because the government reasonably relied in good faith on, and complied with, a valid statute and appellate judicial precedent. *See Illinois v. Krull*, 480 U.S. 340, 349–50 (1987) (extending good faith exception to cover "searches conducted in reasonable reliance on subsequently invalidated statutes"); *Davis v. United States*, 564 U.S. 229, 249–50

(2011) (extending good faith exception to cover searches conducted in reasonable reliance on binding appellate precedent).

At the time Lutz sought the records, in January 2017, he relied in good faith on the SCA. And the Sixth Circuit has already addressed whether the good faith exception applies in similar circumstances and answered in the affirmative. *See United States v. Pembrook*, 876 F.3d 812, 823 (6th Cir. 2017), *cert. granted, judgment vacated sub nom. Johnson v. United States*, 138 S. Ct. 2676 (2018) (agreeing with the district court that "[a]lthough it may ultimately become settled [law] that long-term tracking via cell phones . . . requires a warrant supported by probable cause, that law was not established at the time [in 2014] the Government sought and obtained the cell-site data at issue in this case. Deterrence, therefore will not be forwarded by suppression.").

## V.   The Inevitable Discovery Doctrine Applies

Finally, even if the Court disagrees with the above analysis and finds the state application and resulting warrant/order to be *neither* a valid warrant *nor* a valid court order issued under § 2703(d), Griffin's CSLI records should not be suppressed because the inevitable discovery doctrine applies. In brief, if Lutz had not already sought and obtained the phone records via state legal process in January 2017 as part of the Eddins homicide investigation, the FBI inevitably would have obtained the records through a then-legally sufficient *federal* § 2703(d) Order as part of its independent investigation into the homicide and drug

conspiracy involving Eddins and Griffin.

The inevitable discovery doctrine is an exception to the exclusionary rule, which "allows for the admission of evidence that would have been discovered even without the unconstitutional source." *Utah v. Strieff*, 136 S. Ct. 2056, 2061 (2016) (citing *Nix v. Williams*, 467 U.S. 431, 443–444 (1984)). The doctrine thus avoids "put[ting] the police in a worse position than they would have been in absent any error or violation." *Nix*, 467 U.S. at 443. To avail itself of this path to admissibility for unlawfully obtained evidence, the government must "establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." *Nix*, 467 U.S. at 444. While applying the doctrine "necessarily requires some speculation about what would have happened if events had unfolded differently than they did," the court "must keep speculation at a minimum by focusing on 'demonstrated historical facts capable of ready verification or impeachment.'" *United States v. Ford*, 184 F.3d 566, 577 (6th Cir. 1999) (citations omitted).

The Sixth Circuit has held that the inevitable discovery doctrine "applies when the government can demonstrate *either* [1] the existence of an independent, untainted investigation that inevitably would have uncovered the same evidence *or* [2] other compelling facts establishing that the disputed evidence inevitably would have been discovered." *United States v. Kennedy*, 61 F.3d 494, 499 (6th Cir. 1995); *see also United States v. Lazar*, 604 F.3d 230, 240 (6th Cir. 2010).

85

Here, the FBI was, in fact, conducting an investigation starting in June 2016 and continuing through 2017 that was investigating a drug conspiracy that led to Eddin's homicide, and that investigation would have uncovered the same evidence—Griffin's CSLI records.  Conducting an inevitable discovery analysis "requires the district court to determine, viewing affairs as they existed at the instant before the unlawful search, what would have happened had the unlawful search never occurred."  *Kennedy*, 61 F.3d at 498.  And answering that question is easy here precisely because the FBI was conducting (1) an independent investigation into a drug conspiracy involving individuals from Michigan, Texas and Alabama, starting in June 2016; (2) took over the investigation of Eddins and McFarlin's murder once the affiliation with interstate drug trafficking was discovered; and (3) consistently sought and obtained CSLI records via federal § 2703(d) Orders for other drug conspiracy members' phones both before and after DPD gave the contested records to FBI.

Specifically, *prior* to receiving Griffin's CSLI records from DPD in 2017— and therefore also prior to any FBI analysis or review of those records—the FBI had already identified Griffin trafficking in drugs with Troy Harris starting June 2016. FBI subsequently took over the murder investigations with Griffin as a suspect. Next, by the time they received DPD records, the FBI had received a copy of Griffin's phone's forensic download. Finally, from 2016 to 2018, both before and after DPD gave the contested CSLI records to the FBI, the FBI agents

86

consistently and repeatedly sought and obtained CSLI records via federal §

2703(d) Orders for other phone numbers including the other two phone numbers

Griffin's used in 2016 during the drug conspiracy, and those of Eddins and

McFarlin.

Therefore, in light of all these facts, it is clear that had DPD not already

obtained the records, the FBI inevitably would have.  The FBI would have taken

the information about Griffin's narcotics trafficking and his phone number, and

then would have applied for and obtained a federal § 2703(d) order for CSLI for

Griffin's phone number in order to further investigate his potential involvement in

the murder of Eddins and McFarlin (through his phone's approximate location).  In

short, the factual record shows that the FBI's investigation, both the independent

narcotics investigation and the assumption of the homicide investigation, was "hot

on the trial of the disputed evidence," *Lazar*, 604 F.3d at 241, before DPD ever

gave the FBI a copy of Griffin's phone records.  Therefore, the inevitable

discovery doctrine applies.

Next, for the same reasons discussed above in Section IV.B, had the FBI

obtained these records through a federal § 2703(d) order, the good faith exception

would have applied and rendered such records admissible.

## Government's response in opposition to Griffin and Epps' Motions to Suppress Information Obtained Pursuant to 18 USC §2703(d) [174 & 181]

In August and December 2017, the government obtained cell site location information (CSLI) through the use of court orders authorized by Magistrate Judge Grand under the Stored Communications Act (SCA). 18 U.S.C. § 2703(d). Months after the execution of those orders, the Supreme Court ruled that the government generally needs a warrant supported by probable cause to obtain more than six days of CSLI. *Carpenter v. United States*, 138 S. Ct. 2206 (2018) (reversing the Sixth Circuit's decision that the information could be obtained with a 2703(d) order). Griffin and Epps argue that under *Carpenter*, those orders violated the Fourth Amendment and the information obtained from them should be suppressed. Griffin and Epps are right that the rule announced in *Carpenter* applies to this case, but wrong that the evidence should be suppressed. When the CSLI was obtained, *Carpenter* hadn't been decided, and the government had a good-faith belief its actions were lawful. That good faith was well founded—the SCA explicitly approved the acquisition of this information with 2703(d) orders like the ones used in this case, and Sixth Circuit precedent had upheld the constitutionality of that portion of the statute.

Because the government acted in good faith reliance on a then valid statute, there is no basis to suppress the CSLI.

I.   **Prior to *Carpenter*, Section 2703(d) Authorized the Government to Obtain CSLI Records from a Third Party, such as T-Mobile, with a Court Order**

Before the Supreme Court's *Carpenter* decision, the Stored Communications Act ("SCA") provided the legal basis for the government to obtain CSLI records:

> A governmental entity may require a provider of electronic communication service or remote computing service to disclose a record or other information pertaining to a subscriber to or customer of such service (not including the contents of communications) only when the governmental entity … (B) obtains a court order for such disclosure under subsection (d) of this section ….

18 U.S.C. § 2703(c)(1). Subsection (d), in turn, required that the government meet a standard less than probable cause to obtain a disclosure order: "A court order for disclosure … shall issue only if the governmental entity offers specific and articulable facts showing that there are reasonable grounds to believe that … the records or other information sought, are relevant and material to an ongoing criminal investigation." *Id.* at § 2703(d).

When the government sought the CSLI Records in this case, on August 8, 2017, and December 20, 2017, it was not required to obtain a warrant supported by probable cause to obtain such records from a third-party provider such as T-Mobile. Instead, § 2703(d) and at least six circuit courts authorized the disclosure of such records without a warrant. Notably, in April 2016, the Sixth Circuit decided *United States v. Carpenter*, 819 F.3d 880 (6th Cir. 2016), cert. granted, 137 S. Ct. 2211 (2017), and rev'd and remanded, 138 S. Ct. 2206 (2018). The court

held that "the government's collection of business records containing cell-site data was not a search under the Fourth Amendment." *Id.* at 890. And until the Supreme Court weighed in on this issue, no circuit court had found that the government's acquisition of CSLI under § 2703(d) was unconstitutional under the Fourth Amendment.

On June 22, 2018, the Supreme Court reversed the Sixth Circuit and held that, because "an individual maintains a legitimate expectation of privacy in the record of his physical movements as captured through CSLI, … the Government must generally obtain a warrant supported by probable cause before acquiring such records." *Carpenter*, 138 S. Ct. at 2217, 2221. Prior to this decision, and contrary to Griffin and Epps's argument, the government had no reason to doubt the constitutionality of § 2703(d). *See United States v. Korte*, 918 F.3d 750, 758 (9th Cir. 2019) (acknowledging that CSLI was a relatively novel form of evidence and the courts were authorizing its warrantless acquisition). Indeed, in *Carpenter* itself, when the Supreme Court held that cell-site data was "qualitatively different" from the "telephone numbers and bank records" to which the third-party doctrine applied, it acknowledged that such cell-site data "does not fit neatly under existing precedents." *Carpenter*, 138 S. Ct. at 2214–16.

Accordingly, it was objectively reasonable for the government to believe that if it complied with the SCA, no warrant was constitutionally required to obtain CSLI from a third party. *See, e.g., Carpenter*, 926 F.3d 313, 318 (6th Cir.), *on*

*reh'g,* 788 F. App'x 364 (6th Cir. 2019); *Korte*, 918 F.3d at 758–759 (holding that the Government's use of § 2703(d) to obtain CSLI records prior to *Carpenter* was objectively reasonable); *United States v. Ulbricht*, 858 F.3d 71, 97 (2nd Cir. 2017) (explaining that, "in light of [third-party doctrine,] no reasonable person could maintain a privacy interest in that sort of information").

## II.   The Good-Faith Exception to the Exclusionary Rule Precludes Suppression of the  CSLI Records

The government agrees that its acquisition of CSLI with a 2703(d) order was in violation of the Fourth Amendment because the rule in *Carpenter*, which had not been decided when the government obtained the records, applies retroactively. But a Fourth Amendment violation "does not necessarily mean that the exclusionary rule applies." *Herring v. United States*, 555 U.S. 135, 140 (2009). The exclusionary rule isn't a constitutional requirement, it's a judicially-created deterrence mechanism with high social costs. *See Hudson v. Michigan*, 547 U.S. 586, 591 (2006). Because it allows criminals to go free, suppression of evidence is supposed to be a "last resort," not a "first impulse." *Id.* Exclusion's "sole purpose … is to deter future Fourth Amendment violations," not to punish the government or make defendants whole. *See Davis v. United States*, 564 U.S. 229, 236-37 (2011); *Elkins v. United States*, 364 U.S. 206, 217 (1960).

Given its deterrence rationale, the exclusionary rule has no application when the government has acted with "reasonable good faith belief" that its conduct was

lawful. *United States v. Leon*, 468 U.S. 897, 909 (1984). *Leon* recognized what has

become well-known and widely established as the good-faith exception. Later

cases clarified that the exception covers "searches conducted in reasonable reliance

on subsequently invalidated statutes," *Illinois v. Krull*, 480 U.S. 340, 349-50

(1987), and "on binding judicial precedent." *Davis*, 564 U.S. at 239; *see also*

*United States v. Fisher*, 745 F.3d 200, 201 (6th Cir. 2014). For that reason, the

good faith exception should apply here, where the government relied on both a

valid statute and Sixth Circuit precedent. Courts, including the Sixth Circuit and in

this District, agree. *See United States v. Pembrook*, 876 F.3d 812, 823 (6th Cir.

2017), *vacated on other grounds by Johnson v. United States*, 138 S. Ct. 2676

(Mem.) (2018); *United States v. Williams*, 2018 WL 3659585 (E.D. Mich. 2018)

(Roberts, J.). And there is no reason for this Court to hold otherwise.

Griffin and Epps argue that the government—and presumably the magistrate

judge that authorized the 2703 orders—should have ignored years of circuit court

precedent and, instead, been put on notice to expect the Supreme Court's 2018

*Carpenter* decision by the 2008, Western District of Pennsylvania case, *In re U.S.*

*for an Order Directing a Provider of Elec. Commc'n Serv. to Disclose Records to*

*the Gov't*, 534 F. Supp. 2d 585, 586 (W.D. Pa. 2008), aff'd, No. 07-524M, 2008

WL 4191511 (W.D. Pa. Sept. 10, 2008). This argument does not hold up. Even if

the Pennsylvania district court case had not been vacated by the Third Circuit—it

had (*In re Application of U.S. for an Order Directing a Provider of Elec. Commc'n*

*Serv. to Disclose Records to Gov't*, 620 F.3d 304 (3d Cir. 2010))—it does not call into question the government's good faith reliance on 2703(d) and valid Sixth Circuit precedent. Indeed, after the remand in *Carpenter,* the Sixth Circuit applied the good faith exception to CSLI that was obtained in 2010—two years after the Pennsylvania case Griffin and Epps claim should prevent its application here. *United States v. Carpenter*, 926 F.3d 313, 318 (6th Cir.), *on reh'g,* 788 F. App'x 364 (6th Cir. 2019). The government reasonably relied on a then valid statute and precedent; the good faith exception should apply.

Nor does the unknowing inclusion of information that turned out to be incorrect affect this result. The government's 2703 application set out in substantial detail evidence it had obtained about Epps and Griffin's role in the murders of Eddins and McFarlin. Within the detailed factual recitation of the 2703 application, the government stated that "[o]n January 4, 2017, GRIFFIN was arrested by Louisiana State Police during a traffic stop where a kilogram of heroin was recovered from inside a rental vehicle in which he was riding as a passenger." At the time the applications were submitted, the federal government believed this to be correct. But on February 27, 2018, an assistant district attorney in Louisiana advised the federal government that the wrapped, brick shaped substance in the car with Griffin was not heroin. The ADA emailed a copy of the lab report the following day.

The government agrees that "the good-faith exception does not apply when 'the supporting affidavit contained knowing or reckless falsity' in violation of *Franks*." *United States v. Abernathy*, 843 F.3d 243, 257 (6th Cir. 2016). But innocent mistakes don't implicate *Franks*. *See Franks v. Delaware*, 438 U.S. 154, 171, 98 S. Ct. 2674, 2684, 57 L. Ed. 2d 667 (1978)("Allegations of negligence or innocent mistake are insufficient."); *United States v. Bateman*, 945 F.3d 997, 1008 (6th Cir. 2019). And here, false information was not knowingly or recklessly included in the affidavit. The government submitted its application with the information it understood to be true at the time. Nor did the government gain any advantage by including the information; the application more than met the "relevant and material" standard of 2703. Indeed, the application-even without the information about heroin—established probable cause for the order.

The 2703 order did not result from any government misconduct, so there is nothing to deter. Instead, the government obtained the order by relying on a valid statute and long precedent and by submitting a lengthy and detailed application. The good faith exception should apply.

## Government's response in opposition to Garcia's Motion to Dismiss Counts Two, Four, & Six [176]

Garcia moves to dismiss counts Two, Four and Six or in the alternative require that the government elect on which counts the government plans to proceed at trial. Defendant claims that counts two, four and six are multiplicitous because they all arose from the simultaneous use of one firearm.  Since Counts Two, Four and Six are predicated on separate distinct offenses that require proof of a fact which each of the other does not, there is no multiplicity and no double jeopardy violation.  And, therefore, the government may proceed on counts two, four and six as charged in the Third Superseding Indictment (R. 123).

### I.    Applicable Law

Multiplicity exists when a single offense is charged in more than one count of the indictment.  *United States v. Swafford*, 512 F.3d 833, 844 (6th Cir. 2008). But if each charged offense requires proof of a fact which the other does not, there is no multiplicity and no double jeopardy violation. *United States v. Nabors*, 901 F.3d 1351, 1358 (6th Cir. 1990). "Using the same evidence to prove violations of two statutes does not violate *Blockburger* [284 U.S. 299, 304 (1932)]." *Swafford* F.3d at 844.  Multiple crimes with one firearm that occur during the same criminal episode are lawful.  *United States v. Burnette*, 170 F.3d 567, 572 (6th Cir. 1999). And the law does not require that the predicate offenses occur at different times in

95

order to support multiple § 924(c) convictions.  *United States v. Angeles*, 484

Fed.App'x 27, 34 (6th Cir. 2012). "Whether a criminal episode contains more than

one unique independent use, carry, or possession depends at least in part on

whether the defendant made more than one choice to use, carry, or possess the

firearm." *United States v. Vichitvongsa*, 819 F.3d 260, 270 (6th Cir. 2016).

## II.    Counts Two, Four and Six are not multiplicitous because each count requires proof of a different crime.

Count Two and Four allege using and carrying a firearm during and in

relation to a crime of violence causing deaths of Robert Eddins IV and Ricardo

McFarlin, in violation of 18 U.S.C. § 924(c) and 924(j), and 2.  The underlying

crime of violence for Count Two is in traveling in interstate commerce, with the

intent to kill, injure, or harass, in violation of 18 U.S.C. § 2261A(1).  The

government is required to prove (1) that in interstate travel occurred; (2) that

defendant's intent was to kill, harass or intimidate another person; and, (3) that the

person intended to kill, injure, harass or intimidate was placed in reasonable fear of

death or bodily injury to himself or a member of his family as a result of that

travel.  *United States v. Al-Zubaidy*, 283 F.3d 804, 808 (6th Cir. 2002).

The underlying crime of violence for Count Four is traveling in interstate

commerce with the intent to commit a crime of violence to further the unlawful

activity of conspiracy to distribute and possess with intent to distribute a controlled

substance, resulting in death, in violation of 18 U.S.C. 1952(a).  This requires

proof that (1) the defendant traveled in interstate commerce; (2) that the

defendant's intent was to commit a crime of violence in furtherance of the of

conspiracy to distribute and possess with intent to distribute a controlled substance;

(3) after such travel the defendant committed, or attempted to commit, a crime

of violence in furtherance of the activity; and (4) that the victim of the violent

crime committed by defendant died as a result of that crime. *Modern Federal

Pattern Jury Instructions, 60-1.*

On the other hand, Count Six alleges using and carrying a firearm

during and in relation to a drug trafficking offense, conspiracy to possess and

possess with intent to distribute a controlled substance, in violation of 21

U.S.C. §§ 846 and 841 and causing the deaths of Robert Eddins IV and

Ricardo McFarlin. The government is required to prove that defendant agreed

with at least one other person to possess and to possess with intent to distribute

a controlled substance and that he knowingly and voluntarily joined the

conspiracy. *Sixth Circuit Pattern Jury Instructions, 14-05.*

Clearly, each of the underlying offenses in Counts Two, Four and Six require

proof of a fact that the others do not.  Therefore, they are not multiplicitous.

Defendant argues that Counts Two, Four and Six are multiplicitous because

they involve the use of one firearm during one criminal episode, the murders of

Eddins and McFarlin on December 20, 2016.  As an initial matter Counts Two and

Four are based on conduct that occurred on or about December 18, 2016, as alleged in Counts One and Three, respectively.  And Count Six is based on conduct that occurred on or about June of 2016 to the date of indictment, June 19, 2019. Thus, the offenses underlying the § 924(c) did not occur simultaneously.  Rather the criminal episode here had long begun before the murders in this case. And the defendants made more than one choice to use, carry or possess a firearm. Moreover, there are two victims in this case, one of whom, Ricardo McFarlin, had no connection to drug conspiracy that preceded, in part, the impetus for traveling over ten hours to kill, injure, or harass and/or commit a crime of violence to further the drug conspiracy with regards to Eddins. And the ballistic examination determined two firearms were used in the homicide. At some point, defendants made a choice to use weapons to kill McFarlin, who was not initially the subject of defendants' intentions, but later became one.

Defendant principally relies on *United States v. Vichitvongsa*, 819 F.3d 260 (6th Cir. 2016) in support of his position. But the defendants' reliance on *Vichitvongsa* is misplaced because the present case does not involve the commission of simultaneous predicate offenses. In an effort to shoehorn the facts of the present case to fit within the parameters of *Vichitvongsa*, the defendants improperly restrict the duration of the criminal episode to only the murder of Eddins and McFarlin on December 20, 2016, ignoring the multiple events leading up to the commission of the murder.

*Vichitvongsa* involved a defendant who, for each criminal episode, was convicted of two counts of § 924(c) based on two conspiracies that occurred simultaneously. On two different occasions, Vichitvongsa and his accomplices robbed drug dealers. For each event, Vichitvongsa was charged with conspiracy to commit Hobbs Act robbery, conspiracy to traffic drugs, and two counts of § 924(c). The § 924(c) offenses pertinent to each event were predicated on separate, yet simultaneously occurring, conspiracies (Hobbs Act robbery and drug trafficking). The Sixth Circuit concluded that "the *simultaneous* violation of two federal conspiracy statutes cannot support two § 924(c) charges on the sole basis of one firearm use." *Id.* at 264 (emphasis added).

As referenced, *Vichitvongsa* does not apply in this case because it is premised on a distinguishable fundamental fact: that the predicate conspiracies occurred simultaneously. *Id.* at 264 ("This consolidated appeal raises an important issue regarding the application of 18 U.S.C. 924(c)(1)'s criminalization of the use, carry, or possession of a firearm during the commission of *two simultaneous conspiracies*.") (emphasis added). Here, the government has not charged the defendants with predicate acts that occurred simultaneously. Rather, the three § 924(c) predicates—the substantive offense of travel in interstate travel with an intent to kill, harm or harass; travel in travel in interstate commerce with the intent to commit a crime of violence to further the drug conspiracy; and the conspiracy to possess with intent to distribute and to distribute a controlled substance—are distinct

offenses. Further, the Court in *Vichitvongsa* emphasized "the narrowness" of its decision. *Vichitvongsa* at 269. The Court highlighted that it did "not hold that multiple crimes with one firearm occurring during 'the same criminal episode' may support only one § 924(c) charge." *Id.* at 269. Because this case does not involve the simultaneous commission of predicate offenses, *Vichitvongsa* does not control.

Instead, the courts traditional focus on the nature of the predicate offenses determines the outcome. *United States v. Taylor,* 13 F.3d 986, 994 (6th Cir.1994); *see also United States v. Graham,* 275 F.3d 490, 519–20 (6th Cir.2001) ("We have upheld multiple convictions and sentences under 18 U.S.C. § 924(c)(1) so long as such convictions are based on separate predicate acts."); *United States v. Nabors,* 901 F.2d 1351, 1357–58 (6th Cir.1990) ("Nabors's two convictions under § 924(c)(1) do not each require the same proof of facts; the two predicate offenses are distinct and require proof of facts not required by the other predicate. Thus, no problem of multiplicity exists under *Blockburger v. United States,* [284 U.S. 299, 304]."). In other words, when not committed simultaneously, crimes separated by the measure of the double jeopardy clause can each support a § 924(c) conviction. *See United States v. Angeles*, 484 F. App'x 27, 34 (6th Cir. 2012) ("It is clear that when predicate offenses consist of non-identical conduct and are not committed simultaneously, these offenses are separate predicate acts that can support multiple convictions under 18 U.S.C. § 924(c).").

It is well-established that a conviction for the substantive offense does not bar a conviction for conspiracy to commit that offense because the latter requires proof of an agreement but the former does not. *Murr v. United States*, 200 F.3d 895, 902 (6th Cir.2000) ("A substantive crime and a conspiracy to commit that crime are not the 'same offense' for purposes of double jeopardy, even if based upon the same underlying indictments, 'because the essence of a conspiracy offense is in the agreement or confederation to commit a crime.'"). More specifically, the substantive interstate travel offenses in Counts Two and Four and the drug conspiracy in Count Six are distinct offenses for double jeopardy purposes. For example, in *United States v. Cole*, 526 F. App'x 638, 640 (6th Cir. 2013), the defendant contended that § 924(c) does not permit two separate convictions for "virtually the same conduct": conspiracy to distribute drugs and distribution of drugs. *Id.* at 640. Cole argued that the government cannot base a second § 924(c) conviction on conduct that temporally overlaps, and is intertwined with, conduct that supports the first § 924(c) conviction. *Id.* The Sixth Circuit disagreed, holding that convictions for conspiracy to distribute drugs and the distribution of drugs can support separate § 924(c) convictions. *Id.* at 642; *see also United States v. Martin*, 516 Fed.Appx. 433, 2013 WL 656258 (6th Cir. Feb. 25, 2013) (Martin ran a drug dealing enterprise in which he conspired to distribute drugs and distributed them. Martin was convicted on two counts of § 924(c): one based on conspiracy, the other based on distribution).

Here, the defendants' course of conduct is broader than the facts necessary to support the substantive travel offenses. A review of text messages reveal that that on December 18, 2016, Griffin and Epps left Birmingham, Alabama headed to Detroit in search of Eddins. On the way, they discovered several addresses associated with Eddins. They planned to look for him at those locations. Meanwhile, Garcia texted Griffin, inquiring whether they had found Eddins because he was being "cornered," presumably by others expecting payment for the drugs Eddins stole. The next day, December 19, 2016, they found Eddins. They don't kill him immediately. Rather Eddins went to the Walmart with Griffin, Epps and another individual while Griffin picked up money that had been wired to him through Western Union. They returned to Eddins house where phone records revealed that Griffin talked to Garcia for a longer than usual period of time. Griffin texted Garcia "just chill dude I got him comfortable. I will not let him out of my sight." Garcia, in turn, responded, "why don't you move him somewhere so they can start bringing all the money in" and "we want the kid as warranty." Obviously, the defendants were trying to collect the debt for the stolen drugs. Eventually, the defendants decided to kill Eddins. And they also killed McFarlin, who before that night, did not appear to have any involvement in the drug conspiracy. But before they did, they restrained him. In addition, they shot Eddins three times in the head. McFarlin had seven gunshot wounds including

defensive wounds on his wrists.  Ballistics revealed that one weapon fired seven rounds while another weapon fired one.[5]

Because the predicate offenses here did not occur simultaneously, and are distinct offenses for double jeopardy purposes, and they involve two separate victims, they can support three separate § 924(c) charges.

## III.     Election of counts is not required.

Alternatively, Garcia moves this Court to order the government to elect on which counts they intend to proceed at trial. Since as described above, Counts Two, Four and Six are not multiplicitous, no grounds exist to support defendant's position. Nor does defendant cite any authority to the contrary.  And even if the counts were multiplicitous, "rules about multiplicity are pleading rules, the violation of which is not fatal to the indictment." *United States v. Robinson*, 651 F,2d 1188, 1194 (6th Cir. 1981).  And although this Court has discretion in deciding whether to require the prosecution to elect between multiplicitous counts, as noted in *United States v. Throneburg*, 921 F.2d 654, 657 (6th Cir. 1990), the prosecution has "broad discretion in bringing cases."  Besides, the evidence in this case will be borne out at

---

[5] While the outlined evidence establishes that the predicate offenses did not occur simultaneously, and the Court should therefore deny defendants' motion on these basic facts, the government questions whether this type of challenge can be made at this stage of the proceedings since the unit of prosecution analysis is partly a factual determination. This is particularly true because government anticipates that additional facts will be developed at trial that further reveal the disparate nature of the charges.

trial.  If the indictment is, in fact, multiplicitous, a jury instruction particularizing the distinct offenses charged in each count will remedy any defect.

## IV.    Conclusion

For the reasons set forth above, Garcia's motion to dismiss counts two, four and six, or in the alternative to require the government to elect on which counts to proceed should be denied.

Respectfully submitted,


MATTHEW SCHNEIDER
United States Attorney


*/s/ Rajesh Prasad*
Rajesh Prasad
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI  48226
(313) 226-0821
Rajesh.prasad@usdoj.gov

*/s/ Dawn Ison*
Dawn Ison
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI  48226
(313) 226-9567
Dawn.Ison@usdoj.gov


*/s/ Craig Wininger*
Craig Wininger
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI  48226
(313) 226-9569
Craig.wininger@usdoj.gov


Dated: July 17, 2020

# <u>CERTIFICATE OF SERVICE</u>

I certify that on July 17, 2020, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF, for uploading and service by electronic notice to counsel and parties authorized to receive electronically Notices of Electronic Filing.

<u>/s/ Rajesh Prasad</u>
Rajesh Prasad
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI  48226
(313) 226-0821
Rajesh.prasad@usdoj.gov