UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **UNITED STATES**, <br><br> Plaintiff, <br><br> v. <br><br> **MICHAEL GRIFFIN, et al.**, <br><br> Defendants. | 2:17-CR-20639-TGB-MKM <br> HON. TERRENCE G. BERG <br><br><br> **ORDER DENYING DEFENDANTS' MOTION TO SUPPRESS LOUISIANA STOP (ECF NO. 168)** |

This criminal case involves charges of drug trafficking conspiracy, carrying firearms in furtherance of violent crimes and drug crimes, and murder.[1]

---

[1] The Third Superseding Indictment charges Defendants Michael Griffin, Dennis Epps, and Mariano Garcia, with: (1) Interstate Travel with the Intent to Kill, Injure or Harass in violation of 18 U.S.C. §§ 2261A(1) and 2261(b)(1) as well as aiding and abetting the same in violation of 18 U.S.C. § 2; (2) Use and Carry of a Firearm During and in Relation to, a Crime of Violence Causing Death, specifically the offense charged in Count One, in violation of 18 U.S.C. §§ 924(c) and 924(j) and aiding and abetting; (3) Interstate Travel in Aid of Unlawful Activity in violation of 18 U.S.C. § 1952 and aiding and abetting; (4) Use and Carry of a Firearm During and in Relation to, a Crime of Violence Causing Death, specifically the offense charged in Count Three, in violation of 18 U.S.C. §§ 924(c) and 924(j) and aiding and abetting; (5), along with two other Defendants, Conspiracy to Possess with Intent to Distribute and to Distribute Cocaine and Heroin in violation of 21 U.S.C. §§ 846, 841(A)(1), 841(b)(1)(A)(ii), and 841(b)(1)(C); (6) Using and Carrying a Firearm During and in Relation to a Drug Trafficking Crime, specifically the

Defendants Griffin and Epps move to suppress evidence seized during a traffic stop that took place in Louisiana conducted by the Louisiana State Police. Having reviewed the briefing of the parties, the relevant caselaw, and considered the sworn testimony of the witnesses and exhibits presented at an evidentiary hearing, as well as the oral arguments of counsel on the issues, the Motion to Suppress of Defendants Griffin and Epps (ECF No. 168) will be **DENIED**.

## I. BACKGROUND

In the early morning hours of January 4, 2017, then-Trooper[2] Ryan Zimmerman, a 17-year veteran of the Louisiana State Police ("LSP") and member of the LSP's "Criminal Patrol Unit," was parked on the shoulder of Interstate 12 in southeastern Louisiana. Transcript Vol. 1, ECF No. 223, PageID.1210-12, 1222. Trooper Zimmerman testified that he saw a white Dodge Charger approaching at sixty miles per hour, ten below the speed limit. *Id.* at PageID.1223-24. His suspicions aroused by the unusual speed, the late hour, and the fact that the vehicle may have slowed down significantly upon seeing his marked police vehicle,

---

offense charged in Count Five, and aiding and abetting; and (7) along with one other Defendant, Conspiracy to Launder Monetary Instruments in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i), (a)(1)(B)(i) and 1956(h).

[2] Ryan Zimmerman was promoted to the rank of Sergeant about a year after the events at issue here. ECF No. 223, PageID.1211. For consistency with contemporaneous reports and other documents, this Order will refer to Zimmerman and the other LSP officers as "Trooper" throughout, reflecting the ranks they held at the relevant time.

Zimmerman decided to follow the Charger. *Id.* at PageID.1224-26. Zimmerman testified that, after following the vehicle for between a half mile and a mile, he saw the Charger's right side tires "enter[] about two to three feet upon the right shoulder." *Id.* at PageID.1227. After the driver realized he had crossed the line, Zimmerman testified, the driver "made an abrupt jerk to the left and steered the vehicle back into the right lane." *Id.* After waiting until the vehicle reached a safe area, Trooper Zimmerman turned on his lights and pulled the vehicle over.

The ensuing stop was captured on video by the camera in Trooper Zimmerman's patrol car. *See* ECF No. 165, Def's. Ex. B, Zimmerman Dash Cam Video (filed in traditional manner). Trooper Zimmerman approached the vehicle and directed Defendant Dennis Epps, the driver, to exit the car. *Id.* at 0:56-1:10. Zimmerman told Epps that he stopped the vehicle because it had crossed the white lane line, and Zimmerman wanted to make sure Epps was not impaired. *Id.* at 1:15-1:20. Zimmerman appears to have asked where Epps was coming from, and Epps replied that he was coming from Houston, where he had spent six nights and seven days. *Id.* at 1:39. Epps indicated that he stayed in Sugar Land, Texas, at a hotel. *Id.* at 1:40-1:50. Epps also indicated that the car belonged to his friend—Defendant Michael Griffin—who was in the back seat. *Id.* at 1:50-1:55. The front passenger seat was occupied by Christylen Janae Bibb, a traveling companion of Griffin and Epps.

3

Zimmerman then approached the car and asked Griffin to produce his identification and paperwork for the car. *Id.* at 2:10-2:20. After he received the paperwork, Zimmerman directed Griffin to exit the vehicle as well. *Id.* at 2:25. Zimmerman then directed Epps to return to the car while he spoke to Griffin. *Id.* at 3:04. Griffin then explained to Zimmerman that the vehicle was a rental, that Griffin's mother rented the car, and that Griffin (though not Epps) was an authorized driver. *Id.* at 3:13-3:22. Zimmerman then asked: "where y'all coming from?" *Id.* at 3:26. Griffin replied, "coming from Houston," and Zimmerman asked, "what did y'all do out there?" Griffin explained that his cousin played basketball for the Houston Rockets, and had just had a baby, and that they had been in Houston for about three days for the baby shower. *Id.* at 3:29-3:50. Griffin explained that they had stayed at his cousin's house. *Id.* at 3:50-4:00. Griffin's explanation of the number of days spent in Houston (3) and the location where they stayed (his cousin's house) contradicted Epps' statement concerning the length of his stay (6 nights and 7 days) and where he had stayed (a hotel in Sugar Land, Texas). At that point, Zimmerman returned to his patrol vehicle and conducted a warrant and criminal history check on Griffin and Epps. *Id.* at 4:35-11:55. While Trooper Zimmerman continued his criminal history

check, Zimmerman's partner, then-Trooper[3] Shane Tilford arrived. *Id.* at 9:44. Trooper Tilford is a trained canine handler, and he was accompanied by "Rex," a trained drug-sniffing dog. Tr. Vol. 1, ECF No. 223, PageID.1266-67. During the course of the criminal history check, Zimmerman discovered that Griffin had been arrested for: possession with intent to distribute cocaine base, possession of cocaine and a firearm, possession of a firearm in furtherance of a drug trafficking crime, selling cocaine, carrying a concealed weapon, possession of marijuana, robbery, burglary, dangerous drug possession, an unspecified "weapons offense," fraud/impersonating a police officer, larceny, theft of services, vehicle theft, and buying or receiving stolen property. Tpr. Zimmerman Rep., ECF No. 169-1, PageID.739. The record check also revealed that Griffin in the second year of a four-year term of federal supervised release. *Id.* Finally, Zimmerman also discovered that Epps had been arrested for "burglary, uttering forced [sic] instruments, and possession of marijuana." *Id.*

Trooper Zimmerman returned Griffin's license and paperwork, and spoke briefly to Epps. Dashcam Video at 12:00-12:10. He cautioned Epps to stay in his lane while driving. When Epps began to explain why he crossed the lane line, Zimmerman indicated that he was not going to

---

[3] Like Zimmerman, Tilford was promoted to the rank of Sergeant some time after the events in question here took place. *See* ECF No. 224, PageID.1368.

issue a ticket "right this second." *Id.* at 12:15-12:20. Zimmerman then returned to Griffin and asked why Griffin, the only authorized driver listed on the rental contract, was not driving. *Id.* at 12:25-12:35. Griffin explained that he was tired. *Id.* Zimmerman then asked Griffin if there were any illegal narcotics or large amounts of cash in the car, which Griffin denied. Zimmerman requested Griffin's consent to search the car, but Griffin refused. *Id.* at 13:35-13:35. Zimmerman then patted Griffin down and told Trooper Tilford "there's two in there," referring to Epps and Bibb. Zimmerman then explained that Tilford was going to deploy Rex to conduct a sniff around the Charger. *Id.* at 14:45.

Tilford and Zimmerman removed Epps and Bibb from the Charger, and Trooper Tilford deployed Rex. Starting at the rear license plate, Tilford walked Rex around the car counterclockwise. *Id.* at 16:09. Near the right exhaust pipe, Rex appears to have become distracted, and briefly walked away from the vehicle. *Id.* at 16:11. Tilford redirected Rex's attention to the car, completed the first pass around the car, then began to walk Rex around the car a second time. *Id.* at 16:13-16:25. Near the right rear quarter panel, Rex sat. *Id.* at 16:31. Trooper Tilford completed his second pass, and indicated to Zimmerman that Rex had alerted to the odor of narcotics. *Id.* at 16:32-16:50. Zimmerman then began to search the Charger. *Id.* at 16:55.

After searching the Charger for several minutes and removing a number of items from the trunk, Zimmerman removed a section of carpet

6

from the trunk and, behind the carpet, discovered what appeared to be "a kilo sized brick" hidden in a "natural void" in the "left side quarter panel of the vehicle." ECF No. 223, PageID.1273; Dash Cam video at 21:53. At that point, Zimmerman and Tilford handcuffed Griffin, Epps, and Bibb. Upon further inspection, Zimmerman and Tilford recovered a "kilo sized brick," wrapped in black electrical tape and placed inside a plastic takeout bag from a fast food restaurant, from the area behind the carpeting in the vehicle's trunk. ECF No. 223, PageID.1273. After continuing to search the vehicle for other potential narcotics and finding none, Zimmerman interviewed Ms. Bibb. *Id.* at PageID.1281; Dash Cam Video at 43:55. Bibb told Zimmerman that all three had stayed for six nights, seven days in Houston, and had stayed with Griffin's cousin. ECF No. 223, PageID.1281-1282; Dash Cam Video at 43:56-44:50.

Zimmerman and Tilford then transported Griffin, Epps, and Bibb to the Louisiana State Police Troop L headquarters. Tr. Vol. 1, ECF No. 223, PageID.1283. The wrapped brick was turned over to then-Trooper[4] Brandon Beaudoin, that night's on-call LSP narcotics investigator for the area. *Id.*; Tr. Vol. 2, ECF No. 224, PageID.1482. Trooper Beaudoin cut open the package and discovered a "brown powdery substance," which he—based on his training and experience—preliminarily identified as likely to be heroin given its consistency and color. Tr. Vol. 2, ECF No.

_____

[4] Now "Master Trooper." Tr. Vol. 2, ECF No. 224, PageID.1479-80.

7

224, PageID.1489-90. Trooper Beaudoin then performed what he described as a field test for heroin using two different NIK-brand rapid test kits. Beaudoin concluded that one test was inconclusive, and the other indicated the presence of heroin. *Id.* at PageID.1496-98. Beaudoin then interviewed Bibb. *Id.* at PageID.1500.

During Beaudoin's interview, Bibb provided a different account of the group's travel than she had previously. She told Beaudoin that the group had departed Birmingham for Houston at about 2:00 a.m. on January 3rd, and arrived in Houston about twelve hours later, then Griffin and Epps separated from Bibb. *Id.* at PageID.1501-02. According to Bibb, all three reunited that same evening of January 3rd and left to return to Birmingham as it was getting dark. *Id.* As they were driving home, in the early hours of January 4th, they were pulled over by Trooper Zimmerman. Trooper Beaudoin then spoke with Griffin and Epps, who again provided divergent accounts of the group's travel, before returning custody of all three to Trooper Zimmerman. *Id.* at PageID.1504-6. The Louisiana State Police crime lab later determined that the powder in the package was not heroin, but was in fact a mixture of papaverine and noscapine—substances which, while also derived from opium, do not have narcotic effects and in and of themselves are not controlled

substances.[5] *See* Tr. Vol. 2, ECF No. 224, PageID.1507-08; LSP Lab Report, Def's. Ex. 30.

## II. ANALYSIS

"The Fourth Amendment applies to all seizures of the person, including seizures that involve only a brief detention short of traditional arrest." *United States v. Brignoni–Ponce*, 422 U.S. 873, 878 (1975) (citing *Davis v. Mississippi*, 394 U.S. 721, 727 (1969); *Terry v. Ohio*, 392 U.S. 1, 16-19 (1968)).

A police officer lawfully may stop a car when he or she has probable cause to believe that a civil traffic violation has occurred, or has reasonable suspicion of an ongoing crime. *See United States v. Street*, 614 F.3d 228, 232 (6th Cir. 2010) ("[T]here is nothing 'unreasonable' about stopping a vehicle whose driver has just committed a traffic violation.") (citing *Whren v. United States*, 517 U.S. 806, 810 (1996)). The fact that a

---

[5] Papaverine and noscapine are among a number of "alkaloids [that] can be extracted from opium." Opium derivatives, 1 Uelmen and Haddox, *Drug Abuse and the Law Sourcebook* § 3:4, available on Westlaw at DRUGAB § 3:4 (last updated Jan. 2022). While certain opium-derived alkaloids—such as morphine and codeine—are Schedule II narcotics, see 21 C.F.R. § 1308.12(i-ix) and are used in the production of heroin, other opium-derived alkaloids, including papaverine and noscapine, "have no significant influence on the central nervous system," are not scheduled or controlled substances. *Drug Abuse and the Law* § 3:4. Papaverine and noscapine are used, respectively, as a cough suppressant and intestinal relaxant. *Id.*; *see also* Papaverine, *Stedman's Medical Dictionary*, available on Westlaw at STEDMANS 647930 (last updated Nov. 2014); Noscapine, STEDMANS at 610710 (last updated Nov. 2014).

traffic violation is not an arrestable offense does not divest the police of authority to stop the vehicle. *Street*, 614 F.3d at 232 (upholding the legality of a traffic stop made for a seatbelt violation); *United States v. Anderson*, 458 Fed. Appx. 440, 442 (6th Cir. 2012) (holding that a license-plate violation provided probable cause to make a traffic stop). "[E]ven if [the] decision to stop [a vehicle] for a traffic violation was a pretext to fish for evidence of other crimes," this does not support the conclusion that the traffic stop was invalid at its outset. *United States v. Everett*, 601 F.3d 484, 488 (6th Cir. 2010). In other words, so long as there is an articulable legal basis for the stop, "the officers' actual subjective motivations in effectuating the stop are irrelevant to the validity of the stop." *United States v. Shank*, 543 F.3d 309, 313 (6th Cir. 2008); *see United States v. Garrido*, 467 F.3d 971, 978 (6th Cir. 2006) ("A police officer may effect a traffic stop of any motorist for any traffic infraction, even if the officer's true motive is to detect more extensive criminal conduct")(citation and internal marks omitted).

### a. Whether probable cause or reasonable suspicion existed to pull Defendants over

Defendants appear to argue that Zimmerman is not credible, and that his testimony that the Charger crossed the lane line and entered the shoulder of the freeway should not be credited. Defendants point to a number of alleged exaggerations in Zimmerman's testimony that, Defendants argue, are not supported by the video of the encounter. For

example, Defendants argue that Zimmerman claimed to be claimed to be "startled" when Griffin, who was sitting in the Charger's back seat "suddenly sat up" as Zimmerman approached the car or after Zimmerman requested Epps' license, when in fact the video shows Griffin sitting up well into the traffic stop. Def's. Supp. Br., ECF No. 233, PageID.1654-55. But that is not what Zimmerman testified. He testified that he was "startled" after he "pok[ed] [his] head . . . to the door to get down to the level" of the vehicle passengers and noticed a person sitting in the back seat. Tr. Vol. 1, ECF No. 223, PageID.1234-35. That statement is not contradicted by the video. As for the other alleged discrepancies, such as whether Bibb was looking forward without engaging Zimmerman, or whether Epps' hands were shaking when he handed Zimmerman his license, the video does not refute Zimmerman's testimony and, given the resolution of the video and the positions of Zimmerman, Bibb, and Epps, it would be impossible for the video to support or refute Zimmerman's testimony in any event. Therefore, having heard and reviewed the testimony of Trooper Zimmerman and carefully reviewed the video of the encounter, the Court finds Zimmerman's testimony credible that the Charger crossed the right lane line.

Defendants argue that even if Epps did cross the line, that was insufficient to justify a stop. Zimmerman pulled over the Charger for a suspected violation of Louisiana Rev. Stat. § 32:79, which prohibits

11

improper lane usage. Defendants direct the Court to a number of state and federal decisions interpreting a similarly-worded Tennessee traffic statute, pointing out that courts in those cases concluded that a single technical violation of Tennessee's improper lane usage statute—a driver briefly leaving their lane—was insufficient, without more, to justify a traffic stop. Mot. to Suppress, ECF No. 168, PageID.719-720 (citing cases). The government agrees that federal courts look to state law decisions interpreting traffic statutes in these situations, but argues that, under Louisiana law, it is well settled that a single violation of § 32:79 can justify a stop. Resp., ECF No. 189, PageID.961-62.

In similar cases, the Sixth Circuit has looked to state-court interpretations of the traffic law in question to determine whether the suspect's conduct amounted to a violation. *See United States v. Gross*, 550 F.3d 578, 583-84 (6th Cir. 2008)(considering Tennessee appellate cases to determine whether officer had probable cause to believe suspect had violated Tennessee traffic law); *United States v. Warfield*, 727 F. App'x 182, 186 (6th Cir. 2018)(collecting Ohio cases and concluding that a suspect vehicle touching lane lines did not violate Ohio traffic statute).

The Supreme Court of Louisiana and the Fifth Circuit have explained that, in Louisiana, "a car which partially leaves its lane of travel and crosses the fog line either at the center of a divided highway or on the right hand shoulder of the road . . . provides the police with probable cause to believe that a traffic violation for improper lane use has

12

occurred." *State v. Waters*, 2000-0356 (La. 3/12/01), 780 So. 2d 1053, 1056; *United States v. Hernandez*, 744 F. App'x 873, 874 (5th Cir. 2018)("A vehicle touching the fog line, even momentarily, violates Louisiana Revised Statute § 32:79, and officers are justified in initiating a traffic stop on that basis . . . Because Hernandez's vehicle briefly touched the fog line, the state trooper had probable cause to believe a traffic violation occurred, and this reasonable suspicion justified the traffic stop at its inception.").

Defendants acknowledge this Louisiana and Fifth Circuit precedent but, citing policy concerns, urge the court to follow *Gross* instead. But in *Gross*, a "particularly" important factor for the Sixth Circuit was "Tennessee courts' lenient interpretation of [the traffic statute in question]." 550 F.3d at 584. By contrast, Louisiana courts offer no such leniency; Louisiana law is clear that even momentary contact with a lane line violates state traffic law and justifies a traffic stop. Here, Trooper Zimmerman observed a traffic infraction when the Dodge Charger strayed over the right lane line. He therefore had probable cause to pull the Defendants over and make a stop.[6]

---

[6] The Government also argues that alternatively, Trooper Zimmerman had reasonable suspicion that Epps was violating Louisiana Rev. Stat. § 14:98, which prohibits driving while intoxicated. The Court need not reach that issue, because Trooper Zimmerman had probable cause to conduct the stop for improper lane usage.

### b. Whether reasonable suspicion existed to extend the stop for a dog sniff

"The tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop . . . and attend to related safety concerns." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015). Beyond determining whether to issue a traffic ticket, an officer's mission during a traffic stop includes "ordinary inquiries incident to [the] stop" such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* at 355. The Sixth Circuit has advised lower courts that they must "carefully scrutinize a police officer's conduct during the course of [a traffic stop] to insure that it is limited to effectuating the purpose of the stop," and must also "carefully scrutinize an officer's stated reasons for detaining the individual beyond the purpose of the stop to insure that the reasons rise to the level of reasonable suspicion[.]" *United States v. Hill*, 195 F.3d 258, 267 (6th Cir. 1999).

Deploying a trained drug-sniffing dog to investigate the possible presence of narcotics in a vehicle is not an ordinary inquiry incident to a traffic stop, and "is not fairly characterized as part of the officer's traffic mission." *Rodriguez*, 375 U.S. at 356. Therefore, the question is "whether conducting the sniff 'prolongs' [the stop]." *Id.* at 357. If it does, the dog

sniff is impermissible unless it is supported by "the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id.* at 355. Here, the parties do not dispute that the dog sniff prolonged the traffic stop, and occurred after Trooper Zimmerman had returned Defendants' licenses and rental documents. The critical question, then, is whether Trooper Zimmerman had reasonable suspicion to detain the Defendants for the period necessary to allow Rex to sniff their car.

Reasonable suspicion requires "more than a mere hunch, but is satisfied by a likelihood of criminal activity less than probable cause, and falls considerably short of satisfying a preponderance of the evidence standard." *United States v. Lyons*, 687 F.3d 754, 763 (6th Cir. 2012)(citation omitted). Reasonable suspicion is satisfied if an officer "possesses a particularized and objective basis for suspecting the particular person of criminal activity based on specific and articulable facts[.]" *Id.* Courts assess reasonable suspicion under the totality of the circumstances, considering "all of the information available to law enforcement officials at the time." *Id.*

The Sixth Circuit and Supreme Court have cautioned that courts should not engage in a "divide-and-conquer-analysis that examines the factors supporting reasonable suspicion in isolation from each other." *United States v. Winters*, 782 F.3d 289, 301 (6th Cir. 2015)(quoting *United States v. Arvizu*, 534 U.S. 266, 274 (2002))(internal quotation marks omitted). Instead, the Court must determine "whether the

15

individual factors, *taken as a whole*, give rise to reasonable suspicion, *even if each individual factor is entirely consistent with innocent behavior when examined separately*." *Winters*, 782 F.3d at 301 (internal marks and citation omitted, emphasis in original).

The government argues that Zimmerman developed reasonable suspicion after running a warrant and criminal history check for Griffin and Epps. ECF No. 189, PageID.968. This was based on five things: (1) Epps's driving over the fog line, (2) the level of nervousness displayed by all Defendants' throughout the encounter, (3) Griffin's extensive arrest history involving drug trafficking in cocaine, cocaine base, and illegal firearms possession, along with other offenses, and Epps' less extensive, but still existing, criminal history, (4) Griffin and Epps's inconsistent statements as to their itinerary in Houston, and (5) the rental document showing that the car was rented by Griffin's mother who was not present in the vehicle, was significantly overdue for return, and did not include Epps as an authorized driver. Defendants contend in response that these facts are not sufficient to give rise to reasonable suspicion. The Court will consider each of these purported grounds.

### 1. Observations of nervous behavior and Epps' driving conduct

Though Zimmerman testified that he was initially concerned that Epps may have been driving while impaired, and such suspicion goes to the issue of possible alcohol or drug use, Zimmerman appears to have

concluded fairly quickly that Epps was not drunk or otherwise impaired. Once Zimmerman satisfied himself that Epps did not appear to be under the influence, the driver's operation of the vehicle amounted only to a minor driving infraction. Such a traffic violation does not give rise to reasonable suspicion that contraband might be found in a vehicle. Therefore, Epps' observed violation of Louisiana's lane-line statute does not weigh in favor of a finding of reasonable suspicion of drug trafficking or possession of drugs.

Observations of nervous behavior by the driver and occupants of the vehicle are a different set of facts to be considered. Zimmerman testified during the hearing that Epps, Griffin, and Bibb exhibited signs of nervousness beyond the kind inherent in any traffic stop. Zimmerman identified the following as signs of "heightened nervousness." Epps was driving below the speed limit, allegedly an indicator of an attempt not to attract the attention of law enforcement, his hands were "visibl[y] shaking" when he produced his driver's license, and he broke eye contact when describing his itinerary. Tpr. Zimmerman Rep., ECF No. 169-1, PageID.739; Tr. Vol. 1, ECF No. 223, PageID.1239. Bibb did not look at Zimmerman as he approached the car, but was "staring straight ahead," ECF No. 169-1, PageID.738 and had a "deer-in-the-headlight look," ECF No. 223, PageID.1262. Griffin's hands "were shaking" as he handed over his driver's license and the rental agreement, *id*., and broke eye contact and "got very nervous" when asked to provide more detail about his travel

17

to Houston. *Id.* at PageID.1248. Zimmerman also testified that he observed the "carotid arteries" of Griffin, Epps, and Bibb "pulsating," indicating heightened nervousness. ECF No. 223, PageID.1239, 1261, 1323; ECF No. 169-1, PageID.740. Zimmerman explained that, in his experience as a police officer, a pulsating carotid artery indicates "a heightened form of nervousness." ECF No. 223, PageID.1239. As Zimmerman conceded, none of these observations are visible on the video, given its resolution and the time of night. ECF No. 223, PageID.1323. Similarly, Zimmerman's conversation with Epps about Epps' travel itinerary took place outside of the camera's field of view. The video does, however, confirm that Griffin looked away when asked for details about what position his cousin played for the Houston Rockets. Dash Cam video at 3:55-4:01.

Although these observations were clearly part of the overall calculus of Trooper Zimmerman's suspicion at the time, the Sixth Circuit has recognized that, given the fact that any driver may understandably become nervous during a traffic stop, such behavior by itself is "an unreliable indicator," that should be afforded "little weight, and even then only in conjunction with other factors," particularly in the traffic stop context. *Winters*, 782 F.3d at 299 (internal marks and citation omitted). Consequently, while Zimmerman's observations of nervousness may be considered—in conjunction with other facts—in the

18

determination of whether the officer had reasonable suspicion, they are entitled only to limited weight.

### 2. Inconsistent descriptions of itineraries

The Government argues that Griffin and Epps gave inconsistent accounts of the details of their trip to Houston, while Defendants contend that their accounts were, if not harmonious, at least reasonably reconcilable. Defendants further argue that Trooper Zimmerman's questions about Defendants' travel to Houston were ambiguous, and that Zimmerman made no effort to clarify them.

The Sixth Circuit has "repeatedly recognized that lying about travel plans can form the basis for reasonable suspicion." *United States v. Townsend*, 305 F.3d 537, 543 (6th Cir. 2002). Thus, "conflicting or implausible explanations" of travel plans can contribute to reasonable suspicion. *Winters*, 782 F.3d at 299. In evaluating how to assess such inconsistent stories, the Sixth Circuit has drawn a distinction between conflicting accounts of travel that are "mutually exclusive," and those that are "seemingly inconsistent but in fact reconcilable." *Id*. at 300; *compare United States v. Bonilla*, 357 F. App'x 693, 699 (6th Cir. 2009)(finding that defendants' explanations that they were travelling "for vacation" and "to visit friends" could plausibly be reconciled) *and United States v. Richardson*, 385 F.3d 625, 631 (6th Cir. 2004)(plausible that group had travelled both to see "a doctor," as one vehicle occupant said and "a lawyer" as another claimed) *with Winters*, 782 F.3d at 300

19

(vehicle driver and passenger's descriptions of future travel plans were not consistent, and were generally unusual and implausible) *and United States v. Hill*, 195 F.3d 258, 272 (6th Cir. 1999)*(*reasonable suspicion supported by U-Haul *driver's* statement that he and passenger planned to drop off possessions in California and leave immediately and *passenger's* conflicting statement that pair planned to stay in California for "three or four days," as well as conflicting statements about third party's contribution to loading U-Haul).

Here, the nature of the inconsistencies between the statements given by Griffin and Epps were entitled to some weight in evaluating the overall question of whether to extend the stop because of reasonable suspicion. During the stop, Zimmerman first asked Epps where he was coming from and going. Epps told Zimmerman that he was coming from Houston, where he had stayed at the Sugar Land Choice Suites hotel for six nights and seven days while visiting family. When speaking to Griffin, Zimmerman asked where the entire party was coming from, and where they were going. Specifically, Zimmerman asked, "where are y'all coming from," Griffin responded, "coming from Houston," and Zimmerman asked, "what y'all did out there?" Dash Cam Video at 3:23-3:28. Griffin responded that his cousin was a professional basketball player, and that they were attending a baby shower. When Zimmerman asked how long "y'all" had been there, Griffin responded "three days." *Id.* at 03:32-03:45.

20

Zimmerman then asked Griffin where "y'all" had stayed, and Griffin responded that they had stayed at his cousin's house. *Id.*

As to where they were coming from, both Griffin and Epps said they were coming from Houston. And Griffin's statement that the group had gone to Houston for the purpose of attending a cousin's baby shower is certainly reconcilable with Epps' statement that he had gone to Houston to "visit family." More problematic for Defendants are Griffin's statements about the duration of the trip and where the group had stayed. If Zimmerman had only been asking Griffin about where *he individually* had stayed and how long he had stayed there, the statements likely would have been reconcilable. But Zimmerman framed all of his questions to Griffin with the plural pronoun "y'all," which is "[u]sed in addressing two or more people or referring to two or more people, one of whom is addressed."[7]

As noted in his police report, Zimmerman believed Griffin to be answering on behalf of the group. Tpr. Zimmerman Rep., ECF No. 169-1,

---

[7] *you-all* or *y'all*, Am. Heritage Dictionary of the English Language, https://ahdictionary.com/word/search.html?id=Y5029700 [https://perma.cc/2HKP-UJJ7], (last visited May 26, 2022); *See also y'all*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/y%27all [https://perma.cc/K2BB-C7TL] (last visited May 27, 2022)(defining y'all as a pronoun "usually used in addressing two or more persons"); *y'all*, Dictionary.com, https://www.dictionary.com/browse/y-all, [https://perma.cc/HQ84-788G] (last visited May 27, 2022)("usually used in addressing two or more persons," or "one person who represents a family, organization, etc.").

PageID.739 ("[Griffin] informed me that *they* went to Houston . . . he informed me that *they* stayed out there three days[.]"). And given that Zimmerman had posed his questions using the pronoun "y'all," his belief that Griffin was answering that the whole group had stayed for three days was reasonable. What is more, Zimmerman explained that he intended the question to refer to all passengers in the vehicle. Transcript Vol. 1, ECF No. 223, PageID.1246. Zimmerman further testified that when he addresses a question to a person individually, he would ask "where are you going," but if he was asking questions about a group, as here, he would say "where y'all going." *Id*. Indeed, Zimmerman framed all of his questions to Epps individually with the word "*you*." There is no indication in Griffin's answers that he was speaking, or believed he was speaking, on his own behalf only. With that in mind, Epps' statement that *he* had stayed at the Sugar Land Choice Suites for six nights and seven days is not easily reconcilable with Griffin's statement that *the whole group* had stayed at Griffin's cousin's house for about three days, and the contradiction lends support to a finding of reasonable suspicion. But the strength of this support is limited to a degree because Epps' and Griffin's accounts, at least regarding their overall itinerary and the purpose of their trip, are not completely contradictory, and it was not irrefutably clear that Griffin was speaking on the group's behalf.

But there was more that contributed to Zimmerman's reason for suspicion: Epps' explanation of his travel sounded, in Zimmerman's

experience, "rehearsed" and not natural, ECF No. 223, PageID.1238-39. Zimmerman also testified that, when asked to provide more detail about his professional-basketball-playing cousin, Griffin appeared nervous, broke eye contact, and did not know what position his cousin played. *Id.* at PageID.1248. While there is nothing inherently unusual about an Alabama native not knowing the starting lineup of the Houston Rockets, it is reasonable that an officer would become suspicious when Griffin, asked for additional details about the purportedly close family member with whom he had just stayed for three days, became evasive and was seemingly unaware of a detail that one might expect a proud relative to know. Taking all these facts together, the conflicting explanations of travel details and other unusual responses given by the Defendants weigh in favor of creating a reasonable suspicion.

### 3. Irregular rental arrangement and overdue rental return

Of more importance is the concerning information that Tpr. Zimmerman encountered relating to the rental car. An "oddity in a rental-car contract" is a "legitimate consideratio[n]" in the reasonable suspicion analysis. *Winters*, 782 F.3d at 300 (citation omitted). That a rental car is overdue may also support reasonable suspicion. *United States v. Branch*, 537 F.3d 582, 588 (6th Cir. 2008). So too may the fact that a rental car has been rented by a third party who is not present. *Winters*, 782 F.3d at 300 (noting that "drug couriers may commonly drive

other people's rental cars" and finding that reasonable suspicion existed where car had been rented by driver's relative who was not present)(internal marks and citation omitted). All of these facts were present here.

The car had been rented by a third party (Griffin's mother) who was not present.[8] And although Michael Griffin was listed on the rental contract as an authorized driver, Epps, who was driving when Trooper Zimmerman pulled the car over, was not. Finally, and most importantly, according to the rental agreement, the car should have been returned two weeks earlier; it was significantly overdue. *See, e.g., Branch*, 537 F.3d at 588-589 (that defendants were driving a rental car "several weeks overdue" supported reasonable suspicion). These kinds of "oddities" regarding the rental car weigh in favor of reasonable suspicion.

### 4. The Defendants' criminal histories

After collecting Griffin and Epps' licenses and requesting a criminal history and warrant check, Trooper Zimmerman learned that Griffin had an extensive arrest history including a raft of drug offenses.[9] At the time

---

[8] Defendants argue that "there is nothing odd about driving a car that was rented by a relative," as was the case here. Def's. Supp. Br., ECF No. 233, PageID.1656. But the Sixth Circuit in *Winters* found that very fact— a third party renter's absence from the vehicle, even though the third party renter was the driver's cousin—to provide grounds for reasonable suspicion. *Winters*, 782 F.3d at 293, 300.

[9] Zimmerman testified that the criminal history report did not distinguish between arrests and convictions, though Griffin's status on

of the stop, Zimmerman knew that Griffin had been convicted of or arrested for: possession with intent to distribute cocaine base, possession of cocaine and a firearm, possession of a firearm in furtherance of a drug trafficking crime, selling cocaine, carrying a concealed weapon, possession of marijuana, robbery, burglary, dangerous drug possession, an unspecified "weapons offense," fraud/impersonating a police officer, larceny, theft of services, vehicle theft, and buying or receiving stolen property. Tpr. Zimmerman Report, ECF No. 169-1, PageID.739. In fact, at the time of the stop, Griffin was on supervised release imposed by a federal court sitting in Alabama, with an end date of January 14, 2019. *Id.*; This, Zimmerman testified, was particularly concerning to him because in his past interactions with those subject to supervised release imposed in out-of-state districts, the supervisee would invariably produce paperwork from their probation officer authorizing out of state travel, and Griffin had produced no such paperwork. ECF No. 223, PageID.1252-1255. While Zimmerman would have had no way of knowing for certain whether Griffin's conditions of release allowed him to travel interstate, in the absence of any showing of permission to travel, Zimmerman faced the possibility that Griffin's presence in Louisiana could constitute a violation of his supervised release conditions. And, in any event, his being on supervised release was a sure indicator that Griffin had recently

---

supervised release indicated to Zimmerman that Griffin had been convicted of at least one federal felony. ECF No. 223, PageID.1351.

served a sentence in federal prison. "Although a person with a criminal record could not be pulled over or detained based on the record itself, such a record is one factor that may justify further detention and that may cast a suspicious light on other seemingly innocent behavior." *United States v. Stepp*, 680 F.3d 651, 667 (6th Cir. 2012)(citation omitted). In addition to having these concerns about Griffin's prior criminal conduct, Zimmerman also discovered that Epps had been arrested for burglary, uttering forged instruments, and marijuana possession. Thus, two of the three adults in the vehicle had criminal records. Certainly, Griffin's extensive arrest record for drug-related offenses, and Epps' less significant criminal record, are factors that weigh in favor of reasonable suspicion.

### 5. These factors combined to support reasonable suspicion

In some respects this case is quite similar to *Winters*, which the Sixth Circuit acknowledged was a close case. 782 F.3d at 301. There, the Sixth Circuit concluded that an investigating officer developed reasonable suspicion based on a driver and passenger's nervousness, conflicting explanation of travel plans, the fact that the car was rented by a third party (the driver's cousin) who was not present, and the fact that neither the driver nor passenger was listed as an authorized driver of the vehicle. Although the contradictions in the travel itineraries in *Winters* were starker than those presented here, and Griffin (though not

the driver Epps) *was* authorized to drive the car, in this case we also have the facts that the rental car was two weeks overdue, and perhaps most significantly that Griffin had a substantial drug, firearms, and violent crime history, and Epps a less serious criminal history.

Taking the totality of these facts and circumstances into account, the Court concludes that Trooper Zimmerman had sufficient grounds to support a reasonable suspicion of illegal activity, so that a brief additional detention to conduct a canine sniff of the vehicle was justified. Considering the facts under the appropriate totality of the circumstances framework and not "in isolation from each other," as the Court must, the evidence supports Trooper Zimmerman's reasonable suspicion—particularly when examined in light of Trooper Zimmerman's decade and a half of law enforcement experience, several hundred hours of "specialized training . . . in criminal interdiction," ECF No. 223, PageID.1212-1214, and resulting ability "to make inferences from and deductions about the cumulative information available to [him] that might well elude an untrained person," *United States v. Shank*, 543 F.3d 309, 315 (6th Cir. 2008). As for Defendants' arguments that Zimmerman did not further investigate the rental information, nor ask follow-up questions regarding Griffin and Epps' statements about their travel plans, *see* ECF No. 233, PageID.1656-57, the Sixth Circuit rejected a similar argument in *Winters*, explaining that "it is not the role" of a court "to dictate the precise methods of investigation to be pursued by police

27

officers," *Winters*, 782 F.3d at 302. While some of the factors here might be subject to alternate, innocent explanations—for example, confusion by Griffin about whether Zimmerman was asking about his own personal itinerary, or that of the whole group—viewing the factors "as a whole," as the Court must, they clearly support reasonable suspicion.

### c. Whether the dog sniff was reliable and sufficient to establish probable cause to search the car

Defendants next challenge whether the dog sniff search provided sufficient probable cause to search the vehicle. "A positive indication by a properly-trained dog is sufficient to establish probable cause for the presence of a controlled substance." *United States v. Diaz*, 25 F.3d 392, 393-94 (6th Cir. 1994). But "[f]or a positive dog reaction to support a determination of probable cause, the training and reliability of the dog must be established." *Id*. at 394. "If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search. *Florida v. Harris*, 568 U.S. 237, 246-47 (2013). A dog may be presumed reliable even without such a certification "if the dog has recently and successfully completed a training program that evaluated his proficiency in locating drugs." *Id*. at 247.

"A defendant, however, must have an opportunity to challenge . . . evidence of a dog's reliability, whether by cross-examining the testifying officer or by introducing his own fact or expert witnesses." *Harris*, 568

28

U.S. at 247. Here, Defendants raise challenges to two aspects of the canine Rex's training and to the manner of his alerting to the drugs. On training, Defendants challenge first, his certification, issued by the National Police Canine Association ("NPCA") and; second, his additional training with the Louisiana State Police. Defendants also dispute whether canine Rex actually "alerted" to the presence of drugs in the vehicle. The Court will first address the issues of certification and training, before proceeding to the circumstances of the sniff itself.

### i. Rex's NPCA certification

When the Louisiana State Police acquires drug-sniffing dogs, it does not purchase "green" dogs, that is, animals with no prior drug detection training. Tr. Vol. 2, ECF No. 224, PageID.1372. Instead, the LSP buys "finished" dogs that have already been formally trained by professional trainers. *Id*. As part of the over-all training certification process, Trooper Tilford completed 80 hours of handler training with a different dog, and another 40 hours of training with Rex specifically. *Id*. at PageID.1371-74. Tilford and Rex also completed additional obedience and socialization training. *Id*.

After this training, the pair completed an NPCA certification exam in March, 2016, and Rex was certified. *Id*. at 1374-75. During the certification examination, a handler and dog are presented with different rooms and vehicles, and the dog conducts its search. *Id*. at PageID.1376-77. Under the NPCA rules, handlers are not told whether a particular

29

room or vehicle has an odor source. *Id.* at PageID.1376-77. Handlers are told, however, how many rooms and vehicles they will be asked to search, and how many total odor sources will be present—that is, Tilford knew that he and Rex would search three indoor rooms, two of which would have concealed odor sources, and four vehicles, two of which would have odor sources. *Id.* at PageID.1440-1443. Rex and Tilford were certified for a second time in September, 2016. *Id.* at PageID.1380-81. This second certification was supervised by Lieutenant Chad Guidry, LSP's canine coordinator and the officer in charge of LSP's K-9 program, and was conducted in accordance with NPCA guidelines. ECF No. 224, PageID.1619-20; Gov't. Ex. 5-2, PackTrack Training Records, pp. 12-14.

Defendants challenged Rex's training by presenting testimony from Daniel Bowman, a police canine trainer and expert witness, who cast doubt on the quality of NPCA's certification procedures, at least as they existed at the time when Rex was certified. The main issue was that the NPCA does not, or then did not, test dogs and their handlers in a "blind" manner during certification exams.[10] According to Bowman, the NPCA's

---

[10] "Blind" testing is testing in which the dog handler is not aware of how many finds are present, where they are placed, or whether they are placed at all. ECF No. 224, PageID.1578. Testing may be "single-blind," in which the handler does not know such information but the examiner does, *id.*, or it may be "double-blind," in which neither the handler nor the examiner supervising the exercise knows where or whether finds are placed in a particular target area. *Id.* at PageID.1579. Single-blind testing is intended to ensure the dog receives no cues from the handler,

non-blind testing arrangement is unacceptable because—with the knowledge of how many drug finds will be present in total and how many searches they must conduct—a handler may deduce which vehicles or rooms contain a drug find and, either intentionally or accidentally, "cue" their dog.[11] For example, if a handler's dog has only found one drug item, but the handler has been told that two are present, the handler might prompt his dog to continue searching until the second find is located.

While the government faults some of Mr. Bowman's other criticisms of the NPCA's certification procedures, the record is not in dispute that the guidelines then employed by NPCA did indeed inform handlers how many finds would be present during a certification examination. While the government cites cases in which courts have found other NPCA-certified dogs to be reliable, none of those cases address the NPCA's apparent practice of not requiring blind certification, or they involve dogs that *had been* certified by blind testing. *See, e.g.*, *United States v.*

---

while double-blind testing ensures that the dog receives clues neither from the handler nor the person supervising the testing activity. *Id.*

[11] "Cuing," as Mr. Bowman explained, is an "anticipatory action" that may arise when a dog learns to pick up on subtle, typically inadvertent and unintentional, signals from its handler that the handler knows drugs to be present in a training location and is expecting the dog to find them. ECF No. 224, PageID.1527. A dog that picks up on such cues may give its trained alert behavior, indicating the presence of drugs, even when it does not actually detect the odor of drugs, in order to satisfy the handler's perceived expectations. Mr. Bowman explained that canine trainers and handlers must be "very aware" of the possibility of cuing in order to avoid introducing biases and unreliability into a particular dog's searches. *Id.*

*Covington*, No. CR 19-636-6, 2021 WL 5769535, at *4 (E.D. Pa. Dec. 6, 2021)(discussing NPCA's failure to require double-blind, but not single-blind testing); *United States v. Shen*, 749 F. App'x 256, 261 (5th Cir. 2018)(no discussion of NPCA certification practices); *United States v. Smith*, 448 F. App'x 936, 939 (11th Cir. 2011)(same). And, more importantly, at least one other court considering a substantially similar certification program concluded that a certification procedure in which a handler was told how many finds would be present in the exam was insufficient to establish a dog's reliability. *See United States v. Jordan*, 455 F. Supp. 3d 1247, 1256 (D. Utah 2020)(finding canine certification insufficient to establish reliability where it was conducted without blind testing). Therefore, while Rex's successful certification does suggest an ability to detect drugs, due to the procedures used, the certification alone is insufficient to establish Rex's reliability.[12]

---

[12] While this challenge raises what appear to be deficiencies in a training program that does not use single or double-blind testing, the legal impact of such deficiencies on the reliability of the canine alert is less than clear. In *Florida v. Harris*, 568 U.S. 237 (2013), the Supreme Court did not explicitly impose a single or double-blind methodology for dog certifications. The Court required only that a "bona fide organization" "certify[y] a dog after testing his reliability in a controlled setting," subject to "any conflicting evidence offered." *Id.* at 246-47. While the Supreme Court's decision in *Harris* might not technically require a particular kind of testing and training, the absence of even single-blind testing in the certification of canine Rex raises sufficient questions about the validity of that certification such that the Court cannot presume Rex's reliability from it alone.

The reliability inquiry does not end there, however, because a dog can still be reliable even without any formal certification. *Florida. v. Harris*, 568 U.S. 237, 247 (2013). It stands to reason, then, that a dog with a deficient certification may still be reliable, so long as the dog has "recently and successfully completed a training program that evaluated his proficiency in locating his drugs." *Id.* Canine Rex has had such training. First, Rex was originally trained by US K9 Unlimited, a company that specializes in training law enforcement dogs. ECF No. 224, PageID.1372. Defendants do not challenge the training methods or practices employed by US K9 Unlimited. Rex and Trooper Tilford completed an additional 40 hours of training in March of 2016. *Id.* at 1374. After this initial period of training, Rex and Tilford participated in monthly trainings with the Louisiana State Police. Between March 2016 and January 2017, when the stop was made, Rex and Trooper Tilford participated in nine training sessions. Gov't. Ex. 5-2, PackTrack Training Records. Of the nine sessions reflected in canine Rex's "PackTrack" training record, five were "self-monitored"—in which Tilford would place the finds himself and assess Rex's ability to locate the find—three were trainings monitored by Lieutenant Chad Guidry—in which other LSP handlers and dogs also participated—and one was an NPCA recertification exam supervised by Guidry. *Id.*. In addition to these regular trainings, Tilford and Rex also participated in daily obedience training, care, and maintenance, which were not documented in the

PackTrack records.[13] ECF No. 224, PageID.1444. Between these various self-monitored trainings, group trainings, and daily obedience trainings, Tilford testified, he and Rex exceeded the NPCA-recommended 16 hours per month of training time.[14] ECF No. 224, PageID.1472-73.

Defendants contend that Rex was not subject to "blind" searches during his training—searches in which Tilford did not know where a find was placed, or whether one was present at all. Def's. Supp. Br., ECF No. 233, PageID.1665-66. Of course, the self-monitored trainings could not be blind. Because Trooper Tilford placed the drug finds himself, he knew where they were. However, in all of the training sessions supervised by Guidry (except for Rex and Tilford's September 2016 NPCA

---

[13] Defendants point out that this additional training is not documented in the PackTrack report. Because there are no indications that Tilford was untruthful in his testimony regarding this additional training, the Court credits Tilford's testimony that he did indeed perform the obedience training he says he did.

[14] The NPCA's guidelines "recommend[] a minimum of 16 hours per month dedicated to regular canine maintenance training to ensure a high level of performance for both the handler and canine." Def's. Ex. 19, NPCA Standards Manual, p. 1; Tr. Vol. 2, ECF No. 224, PageID.1444. It is not clear whether "regular canine maintenance training" refers to dedicated detection training only, or also includes the sort of obedience, care, grooming, and maintenance that Tilford and Rex performed on a daily basis. Mr. Bowman contended that the industry standard is a minimum of 16 hours of dedicated detection training per month. ECF No. 224, PageID.1528. Trooper Tilford explained that "Regular K-9 maintenance is care and cleaning . . . obedience, [and] socialization." *Id.* at 1445. In any event, Rex participated in monthly drug detection trainings, and demonstrated proficiency in detecting drugs.

34

recertification), handlers were given no information about the areas to be searched at all, including how many finds would be present in total, or whether a particular room or vehicle would contain a find, and thus these trainings were "blind."[15]

In addition to faulting a perceived lack of "blind" trainings, Defendants also argue that Rex was not subjected to training environments that included "blank" or "controlled negative" search areas, that is, areas with no drugs to find at all, which would have ensured Rex was not simply alerting every time he was asked to search a room or vehicle. However, as Trooper Tilford testified and as the PackTrack records reveal, four out of the nine training and/or recertification exercises included some vehicles or rooms with no finds. Tr. Vol. 2, ECF No, 224, PageID.1387; *see generally,* Gov't Ex. 5-2, PackTrack Records. Additionally, during the trainings conducted by Guidry, each of the vehicles would be kept distant from one another, and the vehicles and/or rooms were searched one by one, with a break between each search. ECF No. 244, PageID.1616-19. Lieutenant Guidry also employed "conflict

---

[15] The PackTrack software allows those inputting data to check a box indicating that a training exercise was "blind" or included "controlled negatives." By default, both indicators are turned off. ECF No. 224, PageID.1453-54. Given Tilford's responses to the Court's questions regarding the methodology employed in the trainings supervised by Sergeant Guidry, the Court is satisfied that, despite the failure to check the "blind" or "controlled negative" boxes in the PackTrack records, the trainings monitored by Guidry were conducted in a single-blind manner. *See* ECF No. 224, PageID.1617-1621.

odors" in some of the "blank" rooms or vehicles—those with no drug finds—placing items like "cellophane or duct tape" in the search area to ensure that Rex was only alerting to the presence of drugs, and not to packaging materials commonly found alongside drugs. *Id.* at PageID.1471-72. Trooper Tilford testified that, in his recollection, Rex never failed to alert when drugs were hidden in a search location. *Id.* at PageID.1476. Tilford also testified that false alerts by Rex when no drugs were present were "rare," and that "there was always [] an extenuating factor" that explained the false alert, such as wind that carried the scent of drugs from a vehicle with a find to a vehicle with no find. *Id.* at PageID.1397-98, 1476-77. Tilford only definitively recalled one instance in which Rex falsely alerted, *id.* at PageID.1477, and as Trooper Tilford described, that situation was unusual—a drug find had been placed in one vehicle but was later moved to a second, and Rex alerted on the lingering odor still present on the first vehicle. *Id.* at PageID.1398.

Given the extent of Rex's training, regular maintenance training in which Rex demonstrated reliability in detecting drugs and avoiding giving false alerts, the Court is satisfied that Rex's alert in this case was sufficiently reliable, even though the certification procedures to which he was subject may have been less than they should have been. *Cf., United States v. Guyton*, 2013 WL 2394895, at *7 (E.D. La. Apr. 16, 2013), aff'd sub nom. *United States v. Berry*, 664 F. App'x 413 (5th Cir. 2016), as revised (Dec. 14, 2016)(dog certified by NPCA and trained by LSP—by

the same Sgt. Chad Guidry—was reliable despite lack of NPCA's "true" single-blind certification in light of LSP's extensive use of blind testing during post-certification trainings).

Moreover, the additional concerns beyond deficient certification that troubled the district court in *Jordan*—upon which Defendants heavily rely—are absent here. First, there was evidence in *Jordan* that Tank, the dog found to be insufficiently reliable there, had been deficiently trained from the very beginning of his career as a drug detection dog, in addition to his problematic certification. *United States v. Jordan*, 455 F. Supp. 3d 1247, 1250-51 (D. Utah 2020). No such evidence exists here—no challenges have been levelled at Rex's pre-LSP training with US K-9 Unlimited. And unlike Tank, there are no indications that Rex suffered from any health problems that might have interfered with his ability to focus during investigations or otherwise perform his duties. *Id.* at 1250 ("Tank was diagnosed with . . . hip degenerative joint disease . . . it is important for the K9 to be in good health because pain or other conditions may impact the dog's ability to be successfully trained and perform.").

Finally, unlike the post-certification training Tank received, almost all of which "consisted of scenarios that made it impossible for Tank to make a false-identification of narcotics," *id.* at 1256, Rex underwent regular trainings that included searches of what Trooper Tilford described as "cold" vehicles or rooms and what Bowman referred to as

"blank" or "controlled negative" environments—that is, vehicles or rooms in which no drug finds were present, in order to ensure that Rex was not falsely identifying drugs when none were there. ECF No. 224, PageID.1387. Indeed, as Trooper Tilford testified, Rex did register false alerts on rare occasions, but never without the presence of some "extenuating factor." *Id.* at PageID.1398. In light of Rex's additional training in scenarios that evaluated his ability to avoid falsely alerting, training evaluations, and Trooper Tilford's testimony regarding Rex's performance in those scenarios, the Court is satisfied that, despite a potentially deficient certification, Rex was sufficiently reliable that his alert established probable cause to search the vehicle.

### d. Whether Rex alerted to the odor of narcotics

In addition to disputing whether Rex was sufficiently reliable such that his alert could support establish probable cause to search the vehicle, Defendants dispute whether Rex's conduct constituted an alert in the first place. As Trooper Tilford testified, Rex's final trained response is "sitting and staring intently" at the source of the odor of drugs. ECF No. 224, PageID.1449. Trooper Tilford also explained that, in the "initial" stages of an alert, Rex would "close his mouth and start breathing through his nose," his "body posture would change," he would "stiffen up a little bit, [and] maybe even square up to where he thought [the source of the odor] might be[.]" *Id.* at PageID.1377. The parties disagree as to whether, on the night question, Rex ever demonstrated this initial

38

alerting behavior, or his final trained response of sitting and staring intently at the source of the odor.

The deployment of Rex is captured on video. That video was presented at the hearing, interpreted by the witnesses during their testimony, and reviewed in camera by the Court. During the search, Tilford first directed Rex to the rear of the vehicle, around the license plate area. Tilford then led Rex around the vehicle counter-clockwise. Near the vehicle's right exhaust pipe, Rex appeared to become distracted, and began walking away from the vehicle towards the berm next to the highway. Trooper Tilford then tugged Rex's leash, redirecting his attention to the vehicle. Trooper Tilford testified that Rex was particularly sensitive to exhaust odors, and likely lurched away in an attempt to avoid the source of the smell. Mr. Bowman testified that, in his experience, such aversions are common, and that Rex did appear to be exhibiting signs of aversion to the exhaust. *Id.* at PageID.1564-65, 1569. After redirecting Rex and completing a pass around the vehicle, Tilford walked Rex around the vehicle again, to ensure that Rex sniffed the area he had missed before. This time, Rex sat near the right rear quarter panel. Bowman agreed that Rex had likely missed this spot during his first pass around the vehicle due to his aversion to the exhaust. *Id.* at PageID.1569.

Trooper Tilford testified that when approaching the rear passenger-side quarter panel of the vehicle on the second pass, Rex "clamped his

mouth, start[ed] breathing heavily . . . through his nose," and "tense[d] up a little bit[.] *Id.* at PageID.1428. According to Tilford, Rex also squared himself to the vehicle, stared, and sat. *Id.* The video shows Rex sitting near the rear passenger-side tire. Dash Cam video at 16:31. While Mr. Bowman testified that he could not see any alerting behavior prior to Rex sitting, ECF No. 224, PageID.1533, Mr. Bowman conceded that, given Rex's position with the car between Rex and the camera, the resolution of the video, and the lack of available light, it would be impossible to tell from the video whether or not Rex exhibited the subtle signs of alerting behavior that Tilford described. *Id.* at PageID.1571-73. The Court finds no reason not to credit the testimony of Tilford about his observations. In addition to being particularly expert in interpreting Rex's behavior given their experience together, Tilford was actually present and right next to Rex when he witnessed Rex's alerting behavior.

The parties also dispute whether Rex "stared intently" at what he had identified as the source of the odor. Again, the quality, position, and darkness of the video footage render it generally unhelpful. Mr. Bowman testified to his belief that Rex appears in the video to be looking at Tilford, not at the vehicle. *Id.* at PageID.1574. Tilford, on the other hand, testified that Rex was looking at the source of the odor—the car. *Id.* at PageID.1616-17. Again, given the position of Rex, the vehicle, and the camera, and the resolution of the video, it is not altogether clear in what direction Rex was looking. Trooper Tilford was present on the night in

40

question, had the closest vantage point to see what Rex was doing, and was specifically trying to observe Rex's behavior. The Court credits Tilford's testimony on this point. Moreover, in its own viewing of the video footage, the Court finds that it is more consistent with Rex looking at the car than with him looking at Tilford. Though, as discussed above, this is very difficult to discern and interpretation of the video on this point is ultimately a judgment call.

Defendants also argue that Tilford's behavior after Rex sat down was inconsistent with a belief on Tilford's part that Rex had alerted. Def's. Supp. Br., ECF No. 233, PageID.1661. Why, Defendants ask, did Tilford not "reward" or "praise" Rex for a successful find immediately upon exhibiting alerting behavior? However, Tilford provided two compelling explanations for why he did not immediately praise or reward Rex. First, that it would be dangerous to do so alongside a busy highway and in the immediate presence of unsecured suspects. ECF No. 224, PageID.1403. Second, and more importantly, it would be imprudent to immediately reward Rex for alerting because Tilford had no way of knowing whether or not drugs were actually present in the vehicle—that is, whether Rex had made a correct or a false alert. ECF No. 224, PageID.1429. Having carefully considered Defendants' arguments concerning whether Rex's behavior constituted an alert, the Court concludes that it did. Because Rex, a properly trained and reliable drug

41

detection dog, alerted to the odor of narcotics in the vehicle, Zimmerman and Tilford had probable cause to search the car.

### e. Whether probable cause supported Defendants' arrest

Defendants' final argument is that the LSP lacked probable cause to arrest after finding an electrical-tape-wrapped brick that appeared to be a kilo of some controlled substance in the trunk following Rex's alert. Defendants' principal argument is that the field drug identification test conducted by Trooper Beaudoin improperly identified the seized package as containing heroin, when in fact the substance was not illegal drugs. The government concedes that Trooper Beaudoin failed to follow the manufacturer's instructions on how the NIK test kit should be used, and that at least one of the two tests he conducted was inconclusive.[16] But regardless of whether Beaudoin improperly used the NIK test, or whether its results were incorrect, the facts before the officers presented sufficient probable cause to support an arrest. Indeed, even if the tests

---

[16] The NIK kit consisted of a series of individual test kits, each intended to test for a different substance and identified by letters of the alphabet. Users are instructed to start with test "A" and, depending on the results, move down a flowchart until the suspected drugs are identified. Def's Ex. 5, NIK Identidrug Chart. On the instructional chart is printed the following: "IMPORTANT: Follow the Polytesting flow chart. Do not jump from sequence to sequence[.]" *Id.* Rather than follow the chart, because he believed the substance was heroin, Trooper Beaudoin began with the test intended to identify heroin. Conducting the tests out of order does not compromise the validity of the chemical reactions contained in the preliminary test kits, *See* ECF No. 224, PageID.1609, but could lead to confusing results, as happened here.

Case 2:17-cr-20639-TGB-MKM    ECF No. 237, PageID.1748    Filed 06/08/22    Page 43 of 47


had been correctly administered and yielded inconclusive results, or had not been conducted at all, investigators still would have had probable cause to arrest Defendants for heroin possession. And, what is more, even if the tests had both been *negative*, the officers would have had probable cause to arrest Defendants under La. Rev. Stat. § 40:971.1, which criminalizes possession of a counterfeit or imitation controlled substance.

At the point the suspected drugs were tested, investigators were faced with a group driving a rental car nearly two weeks overdue for return, including a member, Griffin, with a significant and recent history of drug-related offenses. And moreover, a group that had provided sharply inconsistent accounts of their travel—by this point, Bibb had given a statement to police about the group's travel that directly contradicted the statements made by Griffin and Epps: Griffin told police that the group had stayed for about three days at his cousin's house, Epps told police that he had stayed for six nights and seven days in a hotel, and Bibb told Zimmerman that the entire group had stayed for six nights and seven days at Griffin's cousin's house, contradicting the stories of both Griffin and Epps.[17] Additionally, a drug-detecting dog had alerted to the presence of drugs in the vehicle, and investigators had located, in a hidden area of the vehicle, a substance that—based on investigators'

---

[17] Notably, after the drug test was completed, Bibb gave an entirely different account, explaining to Beaudoin that the group had been in Houston for less than a day. ECF No.224, PageID.1501-02.

training and experience—looked like illegal narcotics based on its size, weight, packaging and hidden placement. Even if the Troopers had not performed a field drug identification test, these facts were sufficient to support probable cause to arrest the group for drug trafficking.

What's more, Louisiana law provided the officers with another reason for concluding the group was committing a crime, so that even if the NIK test had conclusively determined the substance *not* to be heroin or any other illegal drug—which it did not do—investigators would have had probable cause to arrest the group. This is because La. Rev. Stat. § 40:971.1 criminalizes the transport or possession with intent to distribute of any "substance which is represented to be a controlled dangerous substance and which is an imitation controlled dangerous substance[.]" The statute is intended to prevent the sale of benign legal substances represented to be illegal drugs. *State v. Pierre*, 500 So. 2d 382, 383-84 (La. 1987). Under La. Rev. Stat. § 40:961, an "imitation controlled dangerous substance" is defined as "a noncontrolled substance which by appearance or operation, including color, shape, size, markings, or packaging, or by representations made . . . would lead a reasonable person to believe that the substance is a controlled dangerous substance." A "controlled dangerous substance" includes any substance "enumerated, or included in federal or state statute or regulations, 21 [C.F.R. §] 1308.11 through [§] 1308.15[.]" La. Rev. Stat. § 40:961. Heroin is one such substance. *See* 21 C.F.R. § 1308.11(c)(11).

44

Defendants contend that § 971.1 is inapplicable to their situation because as an element of conviction under that statute, a person must "represent" the substance in question to be a controlled substance, and no testimony indicates that any of the Defendants represented the discovered substance to be heroin. Def's. Supp. Br., ECF No. 233, PageID.1673. However, under Louisiana law, a representation for purposes of § 971.1 need not be verbal, and can be inferred from other conduct or facts, such as "the presentation of the substance and its packaging." *See State v. Gilmore*, 2010-0059 (La. App. 4 Cir. 2010), 50 So. 3d 208, 214, writ denied, 2010-2491 (La. 2011), 58 So. 3d 478 (that a defendant "exchange[d] a cocaine-appearing substance wrapped in packaging that mimicked the type of packaging used by drug dealers selling real cocaine for cash" was sufficient to support conviction under § 971.1 despite no verbal representation that the substance was cocaine). Here, Defendants were transporting a package containing a powdered substance consisting of opium alkaloids that was approximately a kilogram in weight, and that had been wrapped in electrical tape in a manner, in Trooper Beaudoin's experience as a specialized narcotics interdiction officer, "consistent with . . . packaged narcotics." ECF No. 224, PageID.1487-88. The package was also concealed in a hidden location in the Defendants' vehicle, which further suggests illicit drug trafficking. Even if perhaps not enough to guarantee a *conviction* under § 971.1, all of this, taken together is sufficient to

45

establish probable cause to believe that Defendants had violated that statute, authorizing their arrest.

## III.   CONCLUSION

In this case, Trooper Zimmerman had probable cause to pull the Defendants over for violating Louisiana's lane usage statute. In the course of that stop, Zimmerman developed reasonable suspicion that contraband might be found in the vehicle. An additional brief detention was therefore justified to permit Rex, a reliable drug detection dog, to inspect the vehicle for the odor of narcotics. Rex alerted to the presence of narcotics, and a package that looked like a kilo-sized brick of drugs was then discovered hidden in the trunk. Although an investigating officer did not correctly administer the field drug tests that preliminarily identified that substance as heroin, and the package was ultimately determined not to contain a controlled substance, based on all the circumstances the officers nevertheless had probable cause to arrest the Defendants for possession of what appeared to be controlled substances on the night of the stop, or in the alternative, for possession of an imitation controlled substance, in violation of Louisiana state law.

46

For the foregoing reasons, Defendants' Motion to Suppress (ECF No. 168) is **DENIED.**

**IT IS SO ORDERED.**

Dated: June 8, 2021    s/Terrence G. Berg
TERRENCE G. BERG
UNITED STATES DISTRICT JUDGE

47