UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **UNITED STATES**, <br><br> Plaintiff, <br><br> v. <br><br> **MICHAEL GRIFFIN et al.**, <br><br> Defendants. | 2:17-20639-TGB-MKM <br> HON. TERRENCE G. BERG <br><br><br> **ORDER ON JOINT MOTION FOR RECONSIDERATION (ECF NO. 241)** |

On June 8, 2022, the Court entered several orders resolving the numerous pending pretrial motions in this case. *See* ECF Nos. 237, 238, 239. Defendants have filed a motion seeking reconsideration of part of an order (ECF No. 237) denying their motion to suppress. Defendants contend that the Court made a mistake[1] in stating that the result of one of the drug tests performed by Louisiana State Trooper Beaudoin was "inconclusive," when Beaudoin actually testified that he regarded the result as negative. On this point, Defendants are correct: Trooper Beaudoin did testify that he regarded the first test as negative—though

---

[1] Defendants' motion uses the term "palpable error," which is no longer the correct standard for a motion for reconsideration under our Local Rules. *See* Eastern District of Michigan Local Rule 7.1(h)(2)(A). While the term palpable error does sound bad, and perhaps more in need of correction than a mere mistake, the current rule requires only a finding that that court made a mistake.

he also explained that he suspected that it could be a false negative. Thus, the Court did make a mistake in characterizing the result of the first test as inconclusive. Defendants argue that the Court failed to consider this exculpatory fact when it concluded that the investigating officers had probable cause to arrest the Defendants. They also argue that the Court misapplied a Louisiana statute that criminalizes the transport or possession with intent to distribute of imitation drugs. These two arguments, however, are without merit. For the reasons stated below, Defendants' joint motion for reconsideration will be denied.

## I. STANDARD OF REVIEW

Defendants move for reconsideration under Eastern District of Michigan Local Rule 7.1(h)(2)(A). To prevail on such a motion, Defendants must show that "the court made a mistake, correcting the mistake changes the outcome of the prior decision, and the mistake was based on the record and law before the court at the time of its prior decision." L.R. 7.1(h)(2)(A). "A motion for reconsideration which presents the same issues already ruled upon by the court, either expressly or by reasonable implication, will not be granted." *Ford Motor Co. v. Greatdomains.com, Inc.*, 177 F. Supp. 2d 628, 632 (E.D. Mich. 2001).

## II. DISCUSSION

Defendants' principal argument is that the Court's Order denying the motion to suppress mistakenly stated that the first drug test by Trooper Beaudoin produced an "inconclusive" result. This is correct: the

2

first test by Trooper Beaudoin showed results that Beaudoin considered "negative" for the presence of heroin. This error does not mean, however, that the officers lacked probable cause considering all the facts available to them. The Court will take this opportunity to clarify the record with respect to the two drug tests Trooper Beaudoin conducted.

### a. The Court mistakenly identified the result of the first test as inconclusive rather than negative.

In the Court's prior order, Defendants correctly point out that the Court referred to the first of two drug tests that Trooper Beaudoin conducted as "inconclusive." Prior Order, ECF No. 237, PageID.1713, 1747-48. Trooper Beaudoin used two different NIK-branded tests on the sample. The first was an "L" test which, in Beaudoin's view, was intended to detect the presence of heroin. Tr. Vol. II., ECF No. 224, PageID.1491-2. Beaudoin testified that he regarded the result of this test as negative for heroin, because he "didn't view the color that resulted from the reaction as one that would be consistent with a positive test for [the "L"] test kit." *Id.* at PageID.1494-95. But Beaudoin further explained that he was concerned the "L" test's result may have been a false negative—he therefore did not regard the negative result on the "L" test as a conclusive determination that the substance was *not* heroin. *Id.* at PageID.1496. This was because in Beaudoin's experience, large quantities of drugs are sometimes adulterated with "cutting agents." *Id.* Testing a small sample of a non-homogenously-blended substance might produce a false negative

3

result, because a sample that captured mostly or only the cutting agent would not test positive for drugs.[2] *Id.* Accordingly, Beaudoin tested the package again using a "K" test—another NIK-branded test that Beaudoin believed was intended to test for heroin. *Id.* Beaudoin viewed the result of the "K" test as positive for heroin. *Id.* at PageID.1497.

According to Beaudoin, the first—the "L" test—was negative, but he was not certain that it was correct. Therefore he conducted the second—the "K" test—and it was positive. But, as the expert testimony adduced during the hearing showed, there were problems with the ways Trooper Beaudoin conducted the tests. First, Trooper Beaudoin did not follow the NIK test manufacturer's direction that users follow the cascading flowchart. *Id.* at PageID.1511. Instead, he jumped directly to the tests for heroin. Second, while Trooper Beaudoin noted the final color of the "K" test, he did not note the color transition. *Id.* at PageID.1517 ("Q: . . .When you mixed the sample in the package that is labeled K, can you tell me what color it was before it turned that final color? A: No, I can't."). As Defendants' expert explained, the color transition is an

---

[2] Indeed, taking Beaudoin's testimony in its entirety, it would not be wholly inaccurate to state that Beaudoin considered the "L" test ultimately inconclusive. This is because although Beaudoin did say that the indicator for the "L" test was negative, he also said he doubted the validity of this result because of the possibility the sample had captured mostly a cutting agent. So his testimony as a whole suggested that he did not view the first test as conclusive. Nevertheless, it was a mistake not to clearly state that the "L" test result was negative.

important part of reading the "K" test's results. *Id.* at PageID.1593-4 ("[The "K" test] is one of those tests that has a – what we call a transition in color . . . then you have to be really observant in the color changes that are occurring during the chemical reaction. And in this case the Test K in the presence of heroin is supposed to change from a green to a purple[.]").

> **b. That the first test was negative and both were conducted improperly does not disturb the Court's probable cause finding.**

Despite these problems with the drug tests, Beaudoin and the other officers had ample probable cause to arrest the Defendants in light of all the information available to them. Probable cause exists when investigating officers have "reasonably trustworthy information . . . sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense." *Gardenhire v. Schubert*, 205 F.3d 303, 315 (6th Cir. 2000) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). The inquiry "depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest," and requires consideration of "both the inculpatory *and* exculpatory evidence" known to the officer. *Logsdon v. Hains*, 492 F.3d 334, 341 (6th Cir. 2007) (internal marks and citations omitted, emphasis in original). Throughout the inquiry, the "fluid concept" of probable cause "looks for a probability that the suspect violated a criminal statute . . . keeping in mind that probable cause does not establish a high bar."

5

*Barrera v. City of Mount Pleasant*, 12 F.4th 617, 620 (6th Cir. 2021) (internal marks and citations omitted).

Defendants argue that "circumstantial information known to the officers at the time of arrest, for example, Defendant Griffin's criminal history, was obviously not evidence the package in question contained a controlled substance." Def's. Mot., ECF No. 241, PageID.1821. While that much is true, the investigators had a number of other reasons besides Defendant Griffin's criminal history to suspect that the package they discovered was likely to contain illegal narcotics. As the Court previously explained, before they tested the suspected drugs the troopers were

> faced with a group driving a rental car nearly two weeks overdue for return, including a member, Griffin, with a significant and recent history of drug-related offenses. And moreover, a group that had provided sharply inconsistent accounts of their travel—by this point, Bibb had given a statement to police about the group's travel that directly contradicted the statements made by Griffin and Epps: Griffin told police that the group had stayed for about three days at his cousin's house, Epps told police that he had stayed for six nights and seven days in a hotel, and Bibb told Zimmerman that the entire group had stayed for six nights and seven days at Griffin's cousin's house, contradicting the stories of both Griffin and Epps.

ECF No. 237, PageID.1748. All of this evidence strongly suggested that the Defendants were engaged in criminal conduct of some kind. And,

6

more important, the officers knew specific facts about the package that supported probable cause to believe that it contained illegal drugs:

> Additionally, a drug-detecting dog had alerted to the presence of drugs in the vehicle, and investigators had located, in a hidden area of the vehicle, a substance that—based on investigators' training and experience—looked like illegal narcotics based on its size, weight, packaging and hidden placement.

*Id.* at PageID.1748-49.

Before the suspected drugs were tested, investigators had probable cause to arrest Defendants for drug possession. And after the tests, Bibb provided an entirely different story, further contradicting her past account and the accounts of Griffin and Epps by admitting that the group had been in Houston for less than a day. ECF No. 224, PageID.1501-1502. This supported probable cause because the group's one-day trip to Houston was consistent, in Trooper Beaudoin's experience, with a trip to a "source city" to purchase large quantities of drugs for later distribution. *Id.* at PageID.1501-1504.

Adding the results of the two NIK tests—including the negative "L" test and the problems presented by Beaudoin's improper methodology—to the above information does not change the probable cause calculus. While the negative result from the first test would weigh against a finding of probable cause, it is not enough to overcome all of the other evidence. *See e.g., Gover v. Muravchick*, No. 5:17-CV-272-REW, 2018 WL

7

4518580, at *10 (E.D. Ky. Sept. 20, 2018) (explaining, in the qualified immunity context, that vehicle search was supported by probable cause or at least reasonable belief that probable cause existed when police conducted two drug tests, one of which was negative and the other positive and explaining that "the co-existence of a negative field test [does not] meaningfully [call] into question the enduring probable cause . . . when one field test came back positive, a negative test would not have eliminated probable cause. An . . . officer is not required to resolve disputed factual issues in a probable cause milieu.") (collecting cases, internal marks omitted); *R.M.B. v. Bedford Cnty. (Virginia) Sch. Bd.*, 169 F. Supp. 3d 647, 654 (W.D. Va. 2016) (three negative drug tests on suspected marijuana did not undermine probable cause in light of "other factors" including the "size, shape, color, and smell" of the suspected marijuana and the fact that it was found alongside a lighter) (collecting cases). Ultimately, the two tests' results, including the negative result of the "L" test, do not vitiate probable cause in light of all the other facts available to the investigating officers. So the motion for reconsideration will be denied on this ground.

### c. The Court did not mistakenly apply the Louisiana statute that criminalizes transportation of imitation or counterfeit controlled substances.

Defendants' second argument is that the Court erroneously concluded that the arresting officers had probable cause to arrest Defendants based on La. Rev. Stat. § 40:971.1, which criminalizes the

8

production, manufacture, distribution, dispensation, transportation, delivery, or possession with intent to distribute or dispense, of "any substance which is represented to be a controlled substance" and which is an imitation controlled substance. First, Defendants argue that there is no evidence that the officers thought § 40:971.1 was potentially applicable at the time of arrest, which Defendants argue undermines a finding that the officers believed they had probable cause for an arrest.

In *State v. Guillory*, 21 So. 3d 945, 949 (La. 2009), the Supreme Court of Louisiana explained that § 40:971.1 may serve to establish probable cause in the alternative even when an officer did not specifically have the statute in mind at the time of the arrest. In that case, a police officer investigating a tip about drug activity saw the defendant stuff a plastic bag in his waistband. *Id.* at 947. The officer frisked the defendant and discovered a small plastic bag filled with what appeared to be crack cocaine. *Id.* After arresting the defendant, a search incident to the arrest revealed drugs in the suspect's vehicle. *Id.* But subsequent lab testing determined that while the suspected drugs in the vehicle were crack cocaine, the substance in the baggie was not. *Id.*

The Supreme Court of Louisiana explained that "[w]hile it seems quite reasonable for the officer to assume the substance he found [in the baggie in the defendant's waistband] was crack cocaine, the sale of a false controlled dangerous substance is also against the law—thus probable cause at this point is indisputable." *Id.* at 949 n.10. The *Guillory* court

9

did not consider whether or not the officer had actually had § 40:971.1 in mind when searching and arresting the Defendant. This analysis comports with the Sixth Circuit's instruction that "knowledge of the precise crime committed is not necessary to a finding of probable cause provided that probable cause exists showing that a crime was committed by the defendants." *United States v. Anderson*, 923 F.2d 450, 457 (6th Cir. 1991); *Halasah v. City of Kirtland, Ohio*, 574 F. App'x 624, 630 (6th Cir. 2014).

Defendants also reprise an argument presented earlier: that in order to violate § 40:971.1 a suspect must "represent" the substance to be a controlled substance. First, this argument was raised in the prior round of briefing and addressed in the Court's prior Order. *See* ECF No. 237, PageID.1749-51. That alone is a sufficient basis to deny reconsideration. *See Direct Constr. Servs., LLC v. City of Detro*it, No. 18-CV-12356, 2019 WL 2743533, at \*1 (E.D. Mich. July 1, 2019) (collecting cases, aff'd, 820 F. App'x 417 (6th Cir. 2020)). Moreover—as discussed in the Court's order— although the Louisiana Court of Appeal explained in *State v. Gilmore* that the defendant's "actions" (exchanging a small baggie for cash) supported a jury's finding that he "represented" the substance in question to be drugs, the court *also* relied on "the presentation of the substance and its packaging." 50 So. 3d 208, 214 (La. App. 4 Cir. 2010). So too here. The relevant inquiry is not whether investigators had sufficient information to prove beyond a reasonable doubt every element

10

required for conviction under § 40:971. Instead, the question is whether the facts available to the investigators at the time supported probable cause to believe that the Defendants had violated § 40:971. Here, the officers found a kilo-sized package wrapped in electrical tape—which looked like drugs—being transported from a drug-source city and hidden in the trunk. They had probable cause to believe the package was being represented to be illegal narcotics.

### III. CONCLUSION

Defendants correctly identified a mistake in the Court's prior order, and that order is now modified in one respect: Trooper Beaudoin conducted two NIK tests. He regarded the first as negative—though he gave reasons why he was concerned it could be a false negative—and he regarded the second test as positive. The portion of the Court's prior order describing the first test as "inconclusive" is hereby modified to be consistent with this Order.[3]. However, this modification does not disturb the Court's finding that officers had probable cause to arrest the Defendants for heroin possession or, in the alternative, possession of an imitation controlled substance represented to be a controlled substance

---

[3] It is worth noting that, although Court is modifying its previous order for clarity, the discussion of the drug test results in that order was not material to the Court's ruling. The order noted the problems with the way Trooper Beaudoin had conducted the tests, and concluded that those test results were ultimately immaterial, because there was sufficient probable cause to believe a crime had been or was being committed even if the results for both tests had clearly been negative.

11

based on the totality of the circumstances and all the facts available to the investigating officers. Accordingly, Defendants' motion is **DENIED**.

The Court will also exclude from the Speedy Trial computation, pursuant to 18 U.S.C. § 3161(h)(7)(A) and (7)(B)(ii), a period of fourteen days from today's date in order to allow counsel to consult with one another and the Court to set a firm and final trial date. The Court finds that, due to the complex nature of this case and logistical difficulties of scheduling a trial during the ongoing COVID-19 pandemic, the ends of justice served by such a delay outweigh the interest of the public and the Defendants in a speedy trial.

**IT IS SO ORDERED.**

Dated: Aug. 11, 2022

s/Terrence G. Berg
_____
TERRENCE G. BERG
UNITED STATES DISTRICT JUDGE